## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| THOMAS MCKENNA, Individually And On Behalf All Others Similarly Situated,<br><br>　　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>SMART TECHNOLOGIES, INC., DAVID A. MARTIN, NANCY L. KNOWLTON, G.A. FITCH, SALIM NATHOO, ARVIND SODHANI, MICHAEL J. MUELLER, ROBERT C. HAGERTY, MORGAN STANLEY & CO. INC., DEUTSCHE BANK SECURITIES, INC., and RBC DOMINION SECURITIES, INC.,<br><br>　　　　　　　　　Defendants. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, THOMAS MCKENNA, individually and on behalf of all others similarly situated, by his attorneys, alleges the following upon information and belief, except for those allegations as to himself, which are alleged upon personal knowledge. The allegations are based upon counsel's investigation, a review and analysis of documents filed with the United States Government and Securities and Exchange Commission (the "SEC"), press releases, marketing materials and other public statements made by the Defendants, reports and interviews published in the media and of public record, warnings issued by the SEC and other regulatory agencies and information obtained by Plaintiff.

### NATURE OF THE ACTION

1.　　This is a class action brought on behalf of the purchasers of SMART Technologies, Inc. ("SMART Technologies" or the "Company") common stock pursuant to its

32857

July 2010 Initial Public Offering ("IPO" or the "Offering") of 38.83 million shares of common stock, that closed on July 20, 2010.  In connection with this Offering - of which 8.8 million shares were sold by the Company and 30.03 million shares of which were sold by insiders - the total price to the public in connection with this offering was over $660.11 million, with total underwriters discounts and commissions totaling over $39.854 million, shares sold by the selling insiders totaling over $51 0.51 million and shares sold by the Company totaling $149.6 million.

2.    SMART Technologies, its entire Board of Directors , its Chief Financial Officer, and the Underwriters involved in the Offering (including, Morgan Stanley & Co. Inc. ("Morgan Stanley"), Deutsche Bank Securities Inc. ("Deutsche Bank"), and RBC Dominion Securities Inc. ("RBC")), are each charged with including or allowing the inclusion of materially false and misleading statements in the Registration Statement and Prospectus issued in connection with the IPO, in direct violation of the Securities Act of 1933. Specifically, defendants each failed to conduct an adequate due diligence investigation into the Company prior to the IPO, and they also each failed to reveal, at the time the IPO closed - which occurred almost one third of the way through the fiscal second quarter of 2011, the period ended September 30, 2010 - that the Company was not proceeding according to plan and that SMART Technologies' sales already had been adversely impacted by a slowdown during fiscal 2Q: 11 which would make it impossible for SMART Technologies to achieve its projected rates of growth, earnings, revenues, and profits.

3.    It was only on November 9, 2010, after the close of trading - and after Company insiders liquidated over $510.51 million of their privately held shares in or in connection with the IPO - that SMART Technologies revealed the truth about the Company, including that the problems which existed at the time of the IPO would result in extremely disappointing results for

the fiscal second quarter of 2011 - including a decline in quarterly profits of at least 22% - and that the outlook for the remainder of the year continued to be adversely impacted.

4.      The following trading day, on the publication of this news, SMART Technologies stock price declined precipitously.   As evidence of this, the following day, as shares of the Company resumed trading, shares of SMART Technologies fell over 30%, plummeting from $13 .07 per share on November 9, 2010, to close at $8.91 per share the following day. On November 10, 2010, SMART Technologies also experienced exceptionally heavy trading volume with over 17.84 million shares traded, more than ten times the Company's recent average daily trading volume.

5.      The chart below evidences the artificial inflation of SMART Technologies shares at the time of the July 20, 2010 IPO and the dramatic decline in the price of these shares on November 10, 2010, after defendants revealed the true financial condition of the Company.

**JURISDICTION AND VENUE**

6.      The claims asserted herein arise under §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act").  Jurisdiction is conferred by §22 of the Securities Act.

7.      Venue is proper pursuant to §22 of the Securities Act, as defendant SMART Technologies maintains an office at 20 South Clark Street, Suite 1950, Chicago, Illinois 60603 and/or the Individual Defendants and Underwriter Defendants -  Morgan Stanley, Deutsche Bank and RBC - conduct business in, and the wrongful conduct took place in, this District.

8.      In addition to the foregoing, venue is also proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(d).  Defendant SMART Technologies is a foreign or "alien" corporation that does significant business in this District, and may properly be sued in any District of the United States, including the Northern District of Illinois.

32857                                                3

## THE PARTIES

9.    Plaintiff THOMAS MCKENNA purchased shares of SMART Technologies common stock pursuant and/or traceable to the Company's materially false and misleading Registration Statement and Prospectus issued by defendants in connection with the July 2010 IPO, including those shares detailed in the attached Certification, incorporated herein by reference, and was damaged thereby.

10.    Defendant SMART TECHNOLOGIES INC. is a Canadian corporation incorporated under the Business Corporations Act (Alberta), or the ABCA, on June 11, 2007, with its chief executive offices located at 3636 Research Road NW, Calgary, Alberta, Canada. According to the Company's profile, SMART Technologies designs, develops, and sells interactive technology products and solutions worldwide, offering a range of interactive "whiteboards" and complementary products, as well as interactive touch-enabled display components. The Company also sells various additional interactive hardware products for the classroom and meeting room. The Company sells its interactive whiteboards through a reseller network to the education, business, and government markets.

11.    The individuals identified as defendants in subparagraphs (a) - (g) below, are refined to collectively herein as the "Individual Defendants."  The Individual Defendants are each liable for the false statements contained in the materially false and misleading Registration Statement and joint Prospectus, as alleged herein, as those statements were "group-published" information. The Individual Defendants include the following:

(a)    Defendant DAVID A. MARTIN ("Martin") is, and at the time of the July 2010 IPO was, Chairman of the Board of Directors and Co-Founder of SMART Technologies.  Defendant Martin signed the materially false and misleading Registration

Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the July 2010 IPO.

(b)      Defendant NANCY L. KNOWLTON ("Knowlton") is, and at the time of the July 2010 IPO was, President, Chief Executive Officer, Co-Founder and a member of the Board of Directors of the Company.  Defendant Knowlton signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the July 2010 IPO.

(c)      Defendant G.A. FITCH ("Fitch") is, and at the time of the July 2010 IPO was, Chief Financial Officer, Principal Accounting Officer and Vice President of Finance for the Company.  Defendant Fitch assisted in the preparation and filing of the materially false and misleading Registration Statement and Prospectus issued in connection with the July 2010 IPO.

(d)      Defendant SALIM NATHOO ("Nathoo") is, and at the time of the July 2010 IPO was, a Director and member of the Audit Committee of the Board of Directors of the Company.   Defendant Nathoo signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the July 2010 IPO.  Defendant Nathoo is also a partner and Global Co-Head of Apax Partners' Technology and Telecom team.   In connection with the July 2010 IPO, funds owned, advised, managed, and/or controlled by Apax Partners sold over 19.993 million shares of Company stock, valued at $339.881 over million.

(e)      Defendant ARVIND SODHANI ("Sodhani") is, and at the time of the July 2010 IPO was, a member of the Board of Directors of SMART Technologies.  Defendant

Sodhani signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the July 2010 IPO. Defendant Sodhani is also all Executive Vice President of Intel Corporation and President of Intel Capital. In connection with the July 2010 IPO, Jutel Corp. sold over 10.036 million shares of Company stock, valued at over $170.612 million.

(f)     Defendant MICHAEL J. MUELLER ("Mueller") joined the Board of Directors in connection with the July 2010 IPO. Defendant Mueller was, and is currently, a member of the Audit Committee and Compensation Committee of the Board of Directors of SMART Technologies. Accordingly, defendant Mueller was responsible for the preparation and filing of the materially false and misleading Registration Statement and Prospectus filed with the SEC and issued in connection with the July 2010 IPO.

(g)     Defendant ROBERT C. HAGERTY ("Hagerty") joined the Board of Directors in connection with the July 2010 IPO. Defendant Hagerty was, and is currently, a member of the Audit Committee and Compensation Committee of the Board of Directors of SMART Technologies. Accordingly, defendant Hagerty was responsible for the preparation and filing of the materially false and misleading Registration Statement and Prospectus filed with the SEC and issued in connection with the July 2010 IPO.

12.     In connection with the February 2007 Initial Public Offering, Morgan Stanley, Deutsche Bank, and RBC acted as Lead or Representative Underwriters of the Offering-facilitating the distribution of over 38.83 million shares of SMART Technologies stock to investors and initiating the first public market for SMART Technologies shares. Excluding the

over subscription allotment of an additional 5.824 million shares, the distribution of the SMART

Technologies shares awarded Underwriters in the IPO occurred, as follows:

| Name | Number of Shares |
|------|------------------|
| Morgan Stanley | 10,095,809 |
| Deutsche Bank | 9,319,200 |
| RBC Dominion | 9,319,200 |
| Merrill Lynch | 3,300,550 |
| Credit Suisse | 3,300,550 |
| CIBC World Markets | 873,675 |
| Cowen and Company | 873,675 |
| Piper Jaffray | 873,675 |
| Stifel Nicolaus | 873,675 |
| Total | 38,830,000 |

13.     In connection with the July 2010 IPO, the Underwriter Defendants were paid at

least $26,801,775 million -not including any additional fees paid in connection with the sale of

shares sold in connection with the Underwriters oversubscription agreement-paid indirectly by

purchasers of the Company's shares.  The Underwriter Defendants were paid at least $0.89 per

share in connection with July 2010 Offering[1], as follows:

| | Discounts and Commissions Payable by Us | | Discounts and Commissions Payable by the Selling Shareholders | |
|---|---|---|---|---|
| | No Exercise | Full Exercise | No Exercise | Full Exercise |
| Per Share | $        0.89 | $        0.89 | $        0.89 | $        0.89 |
| Total | $   7,854,000 | $   7,854,000 | $  26,801,775 | $  32,000,141 |

---

[1]  The following table shows the per share and total underwriting discounts and commissions that we and the selling shareholders are to pay the underwriters in connection with this offering.  These amounts are shown assuming both no exercise and full exercise of the underwriters' over-allotment option to purchase up to an additional 5,824,500 Class A Subordinate Voting Shares from the selling shareholders.

32857                                                    7

14.     Shareholders were willing to, and did, pay over $26.8 million in combined fees to compensate the Underwriter Defendants for conducting a purported significant "due diligence" investigation into SMART Technologies in connection with the IPO.   The Underwriter Defendants due diligence investigation was a critical component of the Initial Public Offering, and this was supposed to provide investors with important safeguards and protections.

15.     The due diligence investigation that was required by the Underwriter Defendants included a detailed investigation into SMART Technologies sales, accounting, controls, and procedures, and it also required defendants to test the assumptions and verify the projections adopted or ratified by defendants, to the extent a reasonable investor with access to such confidential corporate information would.   A reasonable due diligence investigation would have extended well beyond a mere casual view of SMART Technologies books and records, and its accounting, financial report, and operational and financial controls.   The failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

16.     In addition to the foregoing, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about SMART Technologies' business, operations, products, operational trends, financial statements, markets, and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith.

17.     In addition to the Underwriting Defendants, it is also appropriate to treat the individuals named as defendants herein as a group for pleading purposes (the "individual Defendants") and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

18.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ stock market exchange (the "NASDAQ"), and governed by the provisions of the federal securities laws, the individual Defendants each had a duty promptly to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.  The individual Defendants' misrepresentations and omissions made in connection

with the issuance of common stock in July 2010 violated these specific requirements and obligations.

19.     On July 20, 2010, SMART Technologies published a release announcing that the Company had closed its initial public offering of 38.83 million shares of Class A Subordinate Voting Shares at a price of $17.00 per share.  This release stated, in pmt, the following:

> SMART Technologies closes initial public offering
>
> CALGARY, ALBERTA - July 20, 2010 - SMART Technologies Inc. NASDAQ:SMT) (TSX:SMA), a global provider of interactive whiteboards, today announced that it had closed its previously announced initial public offering of 8,830,000 of its Class A Subordinate Voting Shares at a price to the public of US$ 17.00 per share. SMART Technologies sold 8,800,000 Class A Subordinate Voting Shares and selling shareholders sold 30,030,000 Class A Subordinate Voting Shares.
>
> Morgan Stanley, Deutsche Bank Securities, RBC Capital Markets, BofA Merrill Lynch and Credit Suisse acted as joint bookrunners for the offering, CIBC, Cowen and Company, Piper Jaffray and Stifel Nicolaus Weisel acted as co-managers.

20.     In connection with the Company's IPO, on or about July 14, 2010, a registration statement was declared effective by the Securities and Exchange Commission, and a final prospectus for the Offering has been filed with SEC pursuant to Fonn424(b)4. In the Overview section of the IPO Prospectus  defendants conditioned investors to believe that the Company was experiencing continued strong demand for its "whiteboard" products, and gave no indication that at that time SMART Technologies was already experiencing a significant sales decline that would foreseeably impact its results for the fisca12Q:201l.  Instead of disclosing the adverse conditions that defendants disregarded at that time, the IPO Prospectus stated, in part, the following:

> Since our introduction of the interactive whiteboard, interactive whiteboards and complementary solutions have been replacing and supplementing traditional learning and collaboration tools in classrooms and meeting rooms.  The

substantial majority of interactive whiteboard revenue historically has been within the education market.  Gartner, a technology market research firm, estimates that annual worldwide spending on hardware and software in the education information technology market will grow from $16.5 billion in 2009 to $18.6 billion in 2012.  Futuresource Consulting, a market research film, expects the worldwide market for interactive whiteboards to grow from $ 1.1 billion in 2009 to $ 1.8 billion in 2012, representing a 19.5% compound annual growth rate. In addition to the interactive whiteboard product category, we believe there are significant revenue opportunities in complementary interactive hardware and software products in the education market.  We further believe that additional attractive opportunities exist in the business and government markets for interactive whiteboards, as well as in the licensing of our touch-enabled technologies and sale of our touch-enabled solutions to other companies that seek to bring to market interactive touch products other than interactive whiteboards.

We have grown our revenue every year since fiscal 1992.  In our fiscal years ended March 31, 2008, 2009 and 2010, our revenue was $378.6 million, $468.2 million and $648.0 million, respectively, which corresponds to year-over-year growth rates of 24% in fiscal 2009 and 38% in fiscal 2010.

\*\*\*

We reported a net loss of$23.7 million in fiscal 2008, a net loss of$106.6 million in fiscal 2009 and net income of $142.0 million in fiscal 2010.  The significant factors driving our financial results have been the strong growth in sales of our products, the impact of the Corporate Reorganization that was undertaken in 2007 resulting in a significant increase in our debt levels with a corresponding increase in interest expense and the foreign exchange gains and losses on the U.S. dollar denominated debt that resulted from the Corporate Reorganization.

We use Adjusted EBITDA as a key measure to assess the core operating performance of the business removing the effects of our highly leveraged capital structure and the volatility associated with the foreign exchange on the U.S. dollar denominated debt, noted above.  Adjusted EBITDA was $58.7 million in fiscal 2008, $90.9 million in fiscal 2009 and $166.3 million in fiscal 2010.  Strong revenue growth resulted in a significant increase in this key measure from fiscal 2008 to fiscal 2009, and this trend has continued for fiscal 2010....

21.    Similarly, in describing the Company's purported "Growth Strategy" the IPO Prospectus again highlighted the Company's purported opportunities without disclosing the actual adverse market conditions which were then already negatively impacting the Company. In this regard, the IPO Prospectus stated, in part, the following:

**Our Growth Strategy**

*Our mission is to change the way the world works and learns.*  We plan to continue to grow our business based on our position as the global leader in the interactive whiteboard product category through the following key strategies:

*Acquire New Customers in the Education Market.*  According to Futuresource Consulting, as of December 31, 2009, only 7% of the estimated 41 million teaching spaces globally had an interactive whiteboard.  We believe that our current market leadership and strong portfolio of solutions position us to increase sales as more schools introduce interactive whiteboards.  We will continue to pursue and/or support schools and school districts that are investing in technology-enhanced teaching and learning products.  We believe that many of our existing and future solutions will continue to be well-suited to the education market and we intend to increase our sales efforts in this area.

*Further Penetrate the Education Market by Providing Additional Hardware, Software and Content Products.*  Our success has been driven by the adoption of our SMART Board interactive whiteboard.  We intend to turn our integrated education platform, consisting of a SMART Board interactive whiteboard with integrated projector options, our SMART Notebook software and SMART Exchange, our online content-sharing platform, into the hub of a growing collection of interactive technology products in the classroom.  We believe that our expanding portfolio of products, including hardware, software and content, complements our integrated education platform to provide a more compelling classroom experience.  We also intend to increase the depth and quality of the digital content offered by us for use on our interactive whiteboards through a mixture of both free and premium content.

*Accelerate Adoption in Business and Government Markets.*  We estimate that approximately 15% of our revenue in fiscal 2010 came from the business and government markets.  We intend to accelerate the adoption of our products in these markets and have recently implemented senior management changes to increase our focus in these areas.  Our growth strategy in these markets will focus on increasing the simplicity and ease of use of our products, while fully integrating them with critical business processes and products from other vendors of collaboration technologies.

*Maintain Technology Innovation Leadership.*  We believe that our focus on creating easy-to-use products and an excellent user experience is central to our continued leadership in the interactive whiteboard product category and an integral part of our culture.  We will seek to maintain our leadership position through continued investment in the development of new products and solutions.

*Expand Geographical Reach.* We are committed to expanding our geographical reach and increasing adoption of our products worldwide. We will seek to expand in continental Europe, Asia and in other countries, where we believe average penetration rates are currently lower than in the United Kingdom, the United States, Mexico and Canada. Our SMART Notebook software is already offered in 48 languages, our SMART Classroom Suite software is available in 22languages and we currently have offices in 11 countries. We intend to expand our geographical reach by opening offices in additional countries, by continuing to hire additional sales personnel globally and by increasing our global distribution network.

22.     Regarding the purported Recent Trends, which were reported to be aiding in the growth and stability of the Company at the time of the IPO, the Prospectus stated, in part, the following:

**Recent Trends**

We believe that interactive whiteboards are in the early stages of adoption and significant opportunities exist beyond the traditional education market. Solutions to meet the needs of business and consumer markets may provide additional sources of revenue for the industry, including the company. Growth will be dependent on a number of factors including competition, our ability to keep pace with rapidly changing technologies, our ability to retain and attract customers} our ability to establish new, and to build on our existing relationships with, our dealers and distributors and general economic conditions. Competition may also increase as additional companies enter the market and use their existing distribution channels and product development organizations to bring new products to market. Increased competition may require an acceleration of new product development and technologies and may result in margin reductions as we strive to maintain market share.

23.     While the first fiscal quarter 2011 had already ended on June 30, 2010, the IPO Prospectus presented only the results for the quarter and fiscal year ended March 31, 2010 (fiscal year 2010). Relying on fiscal 2010 results, defendants continued to lead investors to believe that the Company was continuing to increase revenues and gross margins according to plan. As further evidence of this, the IPO Prospectus stated, in part, the following:

**Gross Margin**

Gross margin for fiscal 2010 increased by $121.5 million, from $200.0 million, or 43% of revenue, in fiscal 2009, to $321.5 million, or 50% of revenue, in fiscal

2010.  The improvement in gross margin as a percentage of revenue reflects the redesign and lower manufacturing cost of certain key components in our product offering, including interactive whiteboards and integrated projectors, and a general focus on cost reduction in other areas, including logistics and transportation.  The increase in gross margin was partially offset by a negative foreign exchange impact of approximately $5.0 million as a result of the year-over-year weakening of the Euro and the British pound sterling relative to the U.S. dollar, which impacted our revenue, and the strengthening of the Canadian dollar relative to the U.S. dollar, which impacted our cost of sales.

In fiscal 2010, there was no significant seasonality in revenue between quarters, with each quarter's revenue falling within 24% to 28% of the full year's revenue with the latter percentage recorded for the second quarter.  In fiscal 2010, gross margins in each quarter as a percentage of revenue ranged from 47% to 51%, as compared with the full year fiscal 2010 gross margin of 50%.

24.    In addition to the foregoing, the IPO Prospectus also provided a list of Factors that purported to justify the increase in the value of its shares in the Offering.  Among other factors, the IPO Prospectus attributes the increase in the value of the Company's shares to "an improvement in the general economic outlook [and] progress in the implementation of [the] fiscal 2011 business plan."  As evidence of this, the IPO Prospectus stated, in part, the following:

Other factors contributing to the increase are:

- our acquisition of NextWindow on April 21, 2010, which resulted in a positive adjustment to our financial forecast and an increase in the enterprise value of the combined company;

- an improvement in the general economic outlook, progress in the implementation of our fiscal 2011 business plan and our expectation of continued growth in future years resulting from an acceleration of our strategic focus in business, government and international markets;

- our significant financial leverage (the value of our debt significantly exceeded the fair value of our equity in February 20 1 0) that caused the value of our common shares to increase disproportionately to our enterprise value; and

- the passage of time, which reduced the effect of discounting.

25.     In addition to reporting that the Company's NextWindow acquisition, on April 21, 2010, resulted in a positive adjustment to SMART Technologies' financial forecast and an increase in the enterprise value of the combined Company, regarding NextWindow, the IPO Prospectus also stated in part, the following:

> On April 21, 2010, we acquired all the share capital of Next Window, which designs and manufactures components for optical touch screens for integration into electronic displays, including PC displays.  For the fiscal years ended March 31, 2008 and 2009, NextWindow's revenue was $5.4 million and $31.8 million, respectively, as reported on NextWindow's audited financial statements, which were prepared using International Financial Reporting Standards, For the fiscal year ended March 31, 2010, NextWindow's unaudited revenue was approximately $46.4 million, NextWindow is headquartered in Auckland, New Zealand.  We expect to leverage NextWindow's technologies with ours to accelerate innovation in future generations of our interactive whiteboards.   We also expect that NextWindow's existing relationships with leading PC display manufacturers and other electronics equipment manufacturers will accelerate our ability to expand into the market for interactive touch products other than interactive whiteboards.  We believe that NextWindow's patent portfolio, which includes seven patents and approximately 82 patents pending for optical touch technologies, will complement and strengthen our existing patent portfolio and help us maintain our leadership in technology innovation in this area...

26.     In addition to the foregoing, the IPO Prospectus also reported that, previously, the Company had difficulties implementing its enterprise resource planning system.   The IPO Prospectus, however, described these weaknesses in a manner designed to lead investors to believe that the material weakness in the Company's controls had been substantially remediated. As evidence of this, the IPO Prospectus stated, in part, the following:

> On April 1, 2008, we commenced implementing a new enterprise resource planning, or ERP, system.   We experienced significant difficulties with this implementation which resulted in severe disruptions to our operations and- to our financial and accounting systems for a number of months.  For example, we were unable to issue invoices or ship any products for a significant period of time during the first quarter of fiscal 2009.  This resulted in our inability to complete reliable quarterly financial statements for fiscal 2009, In order to temporarily resolve the issues associated with the ERP system implementation, we adopted several manual processes and workarounds to perform functions that would typically be automated in a company of our size. By the end of the second quarter

of fiscal 2009, we had shipped all the products that we were unable to ship in the first quarter of fiscal 2009, and as of December 31, 2009, we had substantially resolved all material issues associated with the portions of the ERP system that we had implemented as of that date.

We have not yet completed the implementation of the new ERP system and many manual processes for functions that should be automated remain. The existence of such manual processes allows the possibility for human error that could potentially result in material mistakes in our operations as well as our financial reporting. Such mistakes, if made, could have a material adverse effect on our business. In addition, we currently do not have, and until we complete the implementation of our ERP system, we will not have, the necessary systems in place to provide us with certain data that would normally be automatically collected in an organization of our size. For example, until the first quarter of fiscal 2010, our systems were unable to generate operating expense reports for our various business cost centers. Furthermore, we have identified, and are in the process of correcting, additional weaknesses in the ERP system that could potentially have a material adverse effect on our business. Specifically, the configuration of our ERP system lacks sufficient authority controls and many users are able to make changes to the system that may affect all users. If a user makes unauthorized changes to the system, our business could be harmed. These issues did not prevent us from obtaining unqualified audit reports on our annual financial statements.

In the first quarter of fiscal 2010, we continued to experience problems of a less material nature in the implementation of the ERP system. For example, on one occasion, a particular module of the system was not properly tested, and after implementing the module, we discovered that the system prevented the shipment of certain products and the issuance of invoices for certain shipments. While in that particular instance we were able to remediate the problem in time to prevent any significant issues, we cannot assure you that similar problems will not recur or that we will be able to remediate these problems on a timely basis....

27.     Following the July 2010 IPO, on August 12, 2010, the Individual Defendants announced results for the fiscal first quarter of 2011, the period ended June 30, 2010 - almost one month prior to the closing of the Offering. In this release, defendants continued to report growth in revenues, earnings, and gross margins that were consistent with the numbers reported in the fiscal fourth quarter and year end fiscal 2010. This release stated, in part, the following:

SMART reports first quarter 2011 financial results

- Revenue of $219.2 million, up 38% year-over-year

- Record unit sales with 115;922 SMART Board interactive white boards sold

- Gross margin of 50.5%

- Adjusted EBITDA of $65.6 million

- Net Income: $5.0 million GAAP; $29.1 million non-GAAP

***

Total revenue for the first quarter of fiscal 2011 was $219.2 million, an increase of 38.3% compared to $158.5 million in the prior-year period.  In addition to record quarterly revenue, the first quarter was also a record for SMART from a unit sales perspective, with 115,922 SMART Board interactive whiteboards sold in the quarter, an increase of 26.0% from 91,996 units sold in the prior-year period.  Gross profit for the first quarter of fiscal 2011 was $110.7 million, an increase of 38.2% compared to $80.1 million in the prior-year period.  Gross margins for the first quarter were 50.5%, compared to 50.6% for the same period last year.

Adjusted EBITDA for the first quarter of fiscal 2011 was $65.6 million, representing an adjusted EBITDA margin of 29.2% and an increase of 29.7% compared to the prior-year .period.  Adjusted EBITDA margin is calculated by dividing Adjusted EBITDA by revenue after adding back the net impact of deferred revenue.

28.    On November 9, 2010, SMART Technologies shocked investors after the Company reported disappointing results for the fiscal second quarter ended September 30, 2010- the period during which the IPO was conducted.  At that time, SMART Technologies reported that its profit for the fiscal second quarter of 2011 had fallen by a remarkable 22% and that the Company believed that it would continue to be impacted by a slow down in the educational market for the remainder of the second half of fiscal 2011, the period ended March 31, 2011.

29.    The following day, as shares of the Company resumed trading, shares of SMART Technologies fell over 30% - plummeting from $13.07 per share on November 9, 2010, to close at $8.91 per share the following day.  On November 10, 2010, SMART Technologies also

experienced exceptionally heavy trading volume with over 17.84 million shares traded - more than ten times the 17 Company's recent average daily trading volume.

30.     That same day, November 10, 2010, Barron's published a report on the Company titled, *SMART Investors Feeling Stupid; Shares Slide After* Q2 *Report,* that stated, in part, the following:

> SMART Technologies (8MT), a maker of digital whiteboards that went public in July at $17 a share, is taking a huge hit today following the company's earnings report for its fiscal second quarter ended September 30.   For the quarter, the company posted revenue of $222.7 million and adjusted profits of 33 cents a share; the Street had been expecting $233.8 million and 24 cents.
>
> The real issue was a warning from the company that business seems to be slowing.   "While the company continues to execute at a high level," CEO Nancy Knowlton said in a statement, "we have seen slower than anticipated sales in our recently acquired NextWindow business" - the unit makes large-scale touch screens - "and are factoring in a more conservative growth assumption for the North American market in the second half of our fiscal year."
>
> The company reduced its revenue outlook for the March 2011 fiscal year; SMART now sees $770 million to $805 million, down from $850 million to $885 million.
>
> RBC Capital analyst Mike Abramsky responded to the news by cutting his rating on the stock to Sector Perform from Outperform, with a new price target of $12, down from $17.   "We now see higher investor risks and range-bound valuation, given lowered FY 2011 revenue outlook and under-performance at its Next Window acquisition," he writes.
>
> Likewise, Bank of America/Merrill Lynch analyst Tal Liani cut his rating on the stock to Neutral from Buy, while trimming his target to $13.50, from $16.50.   He notes that the company is suffering from weak education budgets, and adds that SMART "seems to have poor visibility" into customer spending patterns.   "Looking into 2011, concerns over education budgets exist, posting risks to our estimates, and likely causing an overhang for the stock."

31.     As investors realized after the publication of these shocking and belated adverse admissions, the true but undisclosed negative conditions that existed at the time of the July 2010

IPO, and that continued to adversely impact the Company after that time, include, in part, the following:

(a)     At the time of the IPO, the integration of the Company's then recently acquired (April 2010) NextWindow business was not proceeding according to plan and defendants were having difficulties integrating this acquisition, while at the same time demand for its legacy products and services was also slowing as a result of declining education and school budgets, such that; at the time of the July 2010 IPO, it was already foreseeable that SMART  technologies would not be able to achieve results for the fiscal second quarter of 2011 that were in line with either historical growth trends or defendants; guidance;

(b)     At the time of the IPO, difficulties integrating the Company's acquired NextWindow products as well as declining demand for the Company's legacy products were also eroding, and foreseeably would continue to erode, SMART Technologies' margins and profits, and these trends, which already existed during the fiscal second quarter and at the time of the July 20, 2010, IPO, would foreseeably continue to adversely impact the Company for the remainder of the fiscal year, continuing at least until the end of March 2011;

(c)     At the time of the IPO, the Company had *already* experienced disappointing results for the second fiscal quarter of 20 11, which had begun almost a full month before the July IPO closed, and which would  foreseeably continue to adversely impact the Company for the foreseeable near-term;

(d)     At the time of the IPO, SMART Technologies' control deficiencies were much more severe than revealed and the Company did not even maintain the most

minimum standards of good Corporate Governance or controls and procedures, as is required by the SEC and the Company's own internal guidelines and standards of business conduct; and

(e)    At the time of the July 2010 Offering, defendants had *not* conducted an adequate due diligence investigation into SMART Technologies, which would have revealed many of the issues, and which would most likely have prevented the sale of this Company to shareholders through the public equity markets at that time, or at the inflated price at which these shares were originally sold.

32.    SMART Technologies share price declined over 30% on November 10, 2010, as an immediate reaction to the publication of these belated disclosures.  As over 17 million shares traded that day, SMART Technologies stock collapsed in one day - plummeting from $13.07 per share on November 9, 2010, to close at $8.91 per share the following day.

33.    In connection with the July 2010 SMART Technologies IPO, defendants signed a materially false and misleading Registration Statement, and filed with the SEC-and made available to shareholders - a materially false and misleading Prospectus.  These filings were essential in allowing defendants to complete the Initial Public Offering of at least 38.83 million SMART Technologies shares, to raise over $660 million, and to create a public market for trading in Company stock, immediately thereafter.

34.    On November 9, 2010, after defendants' prior misrepresentations and illegal and improper conduct came to be revealed and was apparent to investors, shares of SMART Technologies declined precipitously - evidence that the prior artificial inflation in the price of Company shares was eradicated.  As a result of their purchases of SMART Technologies stock in connection with the IPO, including those who purchased shares traceable to the Offering in the

public markets immediately thereafter, Plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

35.     By improperly characterizing the Company's financial prospects, defendants presented a misleading image of SMART Technologies' business and future growth prospects. Within the IPO Prospectus and Registration Statement, defendants repeatedly emphasized the ability of the Company to integrate its acquired assets and consistently reported expenses and gross profit margins within expectations sponsored and/or endorsed by defendants.  These claims caused and maintained the artificial inflation in SMART Technologies' stock at the time of the July 2010 IPO and thereafter until the truth about the Company was ultimately revealed to investors.

36.     Defendants' false and materially misleading statements caused SMART Technologies shares to trade at artificially inflated levels from the time of the IPO, when they were offered at $17.00 per share.

37.     On November 10, 2010, however, after investors learned the truth about the Company, and learned that defendants could not operate the Company according to plan, and could not integrate its NextWindow acquisition efficiently or operate the Company in a manner consistent with its prior results or with the expectations sponsored and/or endorsed by the Individual Defendants, such that the fiscal second quarter 2011 results were *already* adversely impacted *prior* to the Offering, shares of the Company collapsed, Defendants' belated disclosures had an immediate, adverse impact on the price of SMART Technologies shares.

38.     These belated revelations also evidenced defendants' prior misrepresentation of SMART Technologies' business prospects due to defendants' false statements.  As investors and the market ultimately learned, the Company's prior business prospects had been overstated.  As

this adverse information became known to investors, the prior artificial inflation was immediately eliminated from SMART Technologies' share price, and shareholders were damaged as a result of this related share price decline.

39.     As a direct result of investors learning the truth about the Company, on November 10, 2010, SMART Technologies; stock price collapsed over 30%, from $13.07 per share on November 9,2010, to close at $8.91 per share the following day-and dec1inedalmost 50% from the July IPO.  That day, over 17 million shares traded - over ten times the average daily trading volume for SMART Technologies shares.  This dramatic share price decline eradicated much of the artificial inflation from SMART Technologies' share price, causing real economic loss to investors who purchased this stock in, or in connection with, the SMART Technologies IPO.

40.     The economic loss, *i.e.* damages suffered by Plaintiff and other members of the Class, was a direct result of defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of defendants' prior misstatements and omissions being revealed.

## CLASS ACTION ALLEGATIONS

41.     This is a class action on behalf of all persons who purchased SMART Technologies shares, or traceable stock, pursuant to the July 2010 Registration Statement and Prospectus and/or from July 15, 2010 through November 9, 2010 (the "Class Period"), excluding defendants.  Class members are so numerous that joinder of them all is impracticable.

42.     Common questions of law and fact predominate and include: (i) whether defendants: violated the Securities Act; (ii) whether the SMART Technologies IPO Registration Statement and Prospectus misrepresented material facts; and (iii) the extent of and appropriate measure of damages.

43.     Plaintiff's claims are typical of those of the Class.   Prosecution of individual actions would create a risk of inconsistent adjudications.   Plaintiff will adequately protect the interests of the Class.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIM FOR RELIEF
### For Violations of §11 of the Securities Act Against
### All Defendants and §15 of the Securities Act
### <u>Against Defendants Martin, Knowlton, Nathoo and Sodhani</u>

44.     Plaintiff incorporates each and every allegation above as if stated herein.

45.     The Individual Defendants each signed SMART Technologies' IPO Registration Statement and/or filed that Prospectus with the SEC and distributed it to investors.   The Underwriter Defendants each permitted their names to be included on the cover of the Prospectus as the Underwriters.

46.     On or about July 20, 2010, the defendants named in this Claim for Relief completed an IPO of 38.83 million shares of SMART Technologies stock at $17.00 per share, for total proceeds of at least $660 million.

47.     Each of the statements alleged herein relating to SMART Technologies' prospects and financial results made in the July 2010 Prospectus and Registration Statement were false or misleading when issued.   The true but concealed facts were that SMART Technologies was not able to integrate its NextWindow acquisition according to plan, and it was not witnessing demand consistent with its historical results or with the guidance sponsored and/or endorsed by the Individual Defendants, which had already severely and adversely affected results of the Company prior to the Offering and which, foreseeably, would continue to hinder the Company in the near-term.   These omissions were a violation of SEC Regulation S-K, Item 303(a), which requires that trends which will have a material effect on a registrant's results be disclosed.

32857                                         23

48.     With the exception of SMART Technologies (the issuer, whose liability for the misstatements is absolute), all defendants named in this Claim for Relief owed to the purchasers of the stock, including Plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time it became effective to assure that those statements were hue and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

49.     The officers and directors of SMART Technologies who were signatories to the Registration Statement and the Underwriter Defendants were responsible for the preparation of the Prospectus and the Registration Statement.   By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, Plaintiff and the Class have been damaged.

50.     By reason of the conduct herein alleged, each defendant named in this Claim for Relief violated §11 of the Securities Act.   Defendants Martin, Knowlton, Nathoo and Sodhani, by reason of their stock ownership and positions with SMART Technologies, were controlling persons of SMART Technologies and are liable under §15 of the Securities Act.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  January 26, 2011

**THOMAS MCKENNA**

By:＿＿＿＿/s/ *Kenneth G. Gilman*＿＿＿＿＿＿＿＿＿
Kenneth G. Gilman
GILMAN AND PASTOR, LLP
16 Fourteenth Avenue
Wareham, MA 02571
T: (508) 291-8400
F: (508) 291-3258
kgilman@gilmanpastor.com


Michael Weininger (*Local Counsel*)
LUPEL WEININGER, LLP
30 N. LaSalle St.
Suite 3520
Chicago, IL  60602
T: (312) 260-7700
F: (312) 260-7701
mweininger@lw-llp.com