## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS MCKENNA, individually and on behalf of itself and all others similarly situated, ) | |
| ) | |
| Plaintiff, ) | Civ. A. No.:11-cv-7673 (KBF) |
| ) | |
| v. ) | **AMENDED CLASS ACTION COMPLAINT** |
| ) | |
| SMART TECHNOLOGIES, INC., NANCY L. ) | **JURY TRIAL DEMANDED** |
| KNOWLTON, G.A. (DREW) FITCH, DAVID ) | |
| A. MARTIN, SALIM NATHOO, ARVIND ) | **ECF CASE** |
| SODHANI, MICHAEL J. MUELLER, ) | |
| ROBERT C. HAGERTY, APAX PARTNERS ) | |
| L.P., APAX PARTNERS EUROPE ) | |
| MANAGERS LTD., INTEL CORPORATION, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |

# TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ................................................................. 2

II.     JURISDICTION AND VENUE ................................................................ 6

III.    THE PARTIES ....................................................................................... 7

   A.    Plaintiff ............................................................................................ 7

   B.    Defendants ........................................................................................ 7

IV.     BACKGROUND FACTS AND NATURE OF THE MISREPRESENTATIONS ........... 10

   A.    The IPO and the Inaccurate and Misleading Offering Materials .................... 11

   B.    The Serious But Undisclosed Problems Affecting SMART as of the Time of the IPO 14

      1.    The Declining Demand and Downward Trend for SMART Products ...................... 14

      2.    SMART's Inability to Sell Its Products to Corporate Clients and Overseas without Significant Additional Investments ............................................................. 16

      3.    The Stagnant Lack of Demand for NextWindow Products ......................... 19

      4.    SMART's Defective Internal Controls .................................................... 20

V.      MATERIAL MISSTATEMENTS AND OMISSIONS .................................... 22

   A.    Misrepresentations about the Demand for SMART Whiteboards ................. 22

   B.    Misrepresentations about the Demand for NextWindow Products ................ 28

   C.    Misrepresentations about SMART's Internal Reporting System ................... 32

VI.     THE TRUTH EMERGES ....................................................................... 34

VII.    CLASS ACTION ALLEGATIONS ........................................................... 39

i

VIII.   CAUSES OF ACTION ................................................................................ 41

IX.     PRAYER FOR RELIEF .............................................................................. 49

X.      JURY DEMAND ......................................................................................... 49

1.      Lead Plaintiff the City of Miami General Employees' and Sanitation Employees' Retirement Trust (the "City of Miami" or "Lead Plaintiff") brings this action individually and on behalf of all persons and entities, except Defendants (listed at ¶¶18-28 below) and their affiliates, who purchased or otherwise acquired shares of common stock pursuant and/or traceable to the publicly registered initial public offering of the SMART Technologies, Inc. ("SMART" or the "Company"), further described herein at ¶¶32-38 (the "IPO"), and who were damaged by the circumstances described herein.  The IPO was conducted pursuant to a Registration Statement and an incorporated Prospectus (defined below at ¶33, and referred to collectively as the "Offering Materials").  The Offering Materials contained untrue statements of material fact or omitted to state material facts that were required to be stated therein or were necessary to make the statements therein not misleading.

2.      The allegations in this Amended Class Action Complaint ("Complaint") are made upon Lead Plaintiff's personal knowledge with respect to itself and its own acts, and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based upon, *inter alia*, the ongoing investigation of Court-appointed Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP.  This investigation has included interviews and consultations with numerous former employees of SMART, as well as a review of: (1) public filings with the Securities and Exchange Commission ("SEC"), including the Offering Materials issued in connection with the IPO; (2) research reports by securities and financial analysts; (3) transcripts of SMART investor conference calls; (4) press releases and media reports concerning SMART and/or the industry in which it operates; and (5) economic analyses of securities movement and pricing data.  Many of the facts related to Lead Plaintiff's allegations are known only by the Defendants named herein, or are exclusively within their custody or control.  Lead Plaintiff

1

believes that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

3.      Based on the material misstatements and omissions alleged herein, Lead Plaintiff, on behalf of itself and all others who purchased SMART common stock in or traceable to the IPO, allege only strict liability and negligence claims against SMART and certain of its directors, officers and affiliates pursuant to Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k(a), 77l(a) and 77o.   Plaintiffs do not accuse any of the Defendants of making misstatements or omissions with fraudulent intent.

## I.    SUMMARY OF THE ACTION

4.      This action arises from the July 20, 2010 IPO of the common stock of SMART. SMART, SMART insiders and the underwriters of the IPO sold almost 39 million shares of SMART common stock at $17.00 per share in the IPO, reaping over $660 million in proceeds. Significantly, Defendants Apax Partners and Intel – who were SMART insiders by virtue, *inter alia*, of their controlling interests in SMART and representation on SMART's board of directors – liquidated over $500 million of their privately held shares through the IPO.

5.      Defendants conducted the IPO pursuant to the Offering Materials, which described for investors SMART's business, operations and financial results.    SMART manufactures and sells interactive whiteboards to primary and secondary schools, colleges, government agencies, and corporations.[1]  At the time of the IPO, sales of interactive whiteboards and related software products to education providers represented 85% of SMART's revenues, and more than 70% of SMART's sales were in North America.

---

[1]  As described in more detail in ¶¶29-31 below, interactive whiteboards function as modern replacements for the traditional chalk-board.  They permit a user to control computer applications, write in digital ink, access the internet, and save and share work over a computer network.

2

6.     In the period leading up to the IPO, tax revenues of local, state and federal governments were declining because of the economic crisis, posing an immediate threat to the demand for SMART's products.  As of the time of the IPO, it was therefore acutely important to investors to know the trends in the demand for SMART products, as well as SMART's ability to diversify its revenue base away from education into the corporate sector, and away from the U.S. to emerging markets.

7.     The Offering Materials trumpeted strong, increasing demand for SMART's interactive whiteboards and related software as of the time of the IPO.  According to the Offering Documents, the increase in demand for SMART's interactive whiteboards resulted from a rapidly growing market for whiteboards and related software.  In addition, the Offering Materials touted SMART's ability as of the time of the IPO to expand beyond its education market into the corporate market, and to use its well-established global distribution network to expand sales in emerging markets without making significant investments.  Similarly, the Offering Materials touted SMART's recently completed April 2010 acquisition of NextWindow – a manufacturer of interactive touch components that were sold to manufacturers of interactive displays and PCs (such as Dell and Hewlett Packard) with purportedly growing revenues – as yet another way for SMART to diversify its revenue base away from education by accelerating the Company's expansion into the consumer markets.  For the reasons summarized below, these representations were materially false, and give rise to the claims asserted herein for violations of the Securities Act.

8.     First, as multiple confidential witnesses formerly affiliated with SMART during the relevant time period have advised Lead Counsel, by at least March 2010 the Company was experiencing a precipitous *decline* in the demand for its interactive whiteboards, as the

3

Company's sales pipeline essentially began to dry up.  Moreover, contrary to the representations in the Offering Materials, multiple witnesses stated that the sales that were reported in the March 31, 2010 financial statements (which were incorporated into the Offering Materials) were the result of federal stimulus spending to reduce the effects of the economic crisis — and was not the result of expanding markets or demand for SMART whiteboards and related software, but rather reflected the winding down of stimulus – supported spending that was already winding down many months before the later July 2010 Offering.

9.      Second, multiple witnesses affiliated with SMART during the relevant time period have also advised that, as of the time of the IPO, SMART had not made the basic investments necessary to develop products for the corporate market, lacked the ability to foster and support corporate sales, had failed to develop any traction in the potential corporate market for SMART's products, and had failed to support and develop a corporate sales practice.  Indeed, in the period leading up to the IPO, but unbeknownst to investors, multiple large potential corporate sales deals with Disney, Cisco, British Telecom, Google and HP fell through. Moreover, contrary to Defendants' representations in the Offering Materials, SMART also did not have a well-established global distribution network as of the time of the IPO that would allow it to expand sales in emerging markets without making substantial additional investments.

10.     Third, the April 2010 acquisition of NextWindow was not made to accelerate the Company's expansion into the consumer markets.  Instead, as at least one well-placed former SMART employee confirmed, SMART's desire to resolve patent litigation between SMART and NextWindow – rather than the potential impact of NextWindow's products or technology – was the real driver of the acquisition.  In fact, as of the time of the IPO in July 2010, demand for NextWindow's products was very weak because almost no touch applications had been

4

developed for Windows 7. Indeed, Defendants themselves admitted soon after the IPO, demand for NextWindow's touch-enabled products would remain weak at least until the next generation of Microsoft's operating system (Windows 8) was released. As of the date of this Complaint, there is still no release date for Windows 8, which is not expected to be on the market until at least fall 2012—more than two years after the IPO.

11.     The foregoing problems were exacerbated by significant failures of and weaknesses in SMART's internal controls. SMART's Enterprise Resource Planning system — the integrated computer system used to track the company's finances and accounting, and to manage its supply chain, manufacturing, and customer relationship functions – was defective, and prevented the Company from accurately keeping track of certain basic matters such as which customers had paid it for its products. As numerous former SMART employees have advised, at the time of the IPO SMART'S controls were also so weak that it maintained multiple sets of books with wildly divergent figures – and that the Company's forecasts were "speculative at the best of times." Indeed, immediately after the IPO, the Company failed an internal audit of its financial controls performed by its auditor, KPMG.

12.     The truth concerning the declining of demand for SMART's interactive whiteboards and NextWindow's interactive touch technologies began to emerge less than four months after the IPO. On November 9, 2010, after the close of trading, SMART announced that the Company was slashing its fiscal 2011 revenue outlook due to "slower than anticipated sales in our recently acquired NextWindow business" and "a more conservative growth assumption for the North American market in the second half of our fiscal year." In an earnings conference call that day, Defendant Knowlton attributed NextWindow's poor performance to "the limited number of touch applications developed for the Windows 7 operating system," and

acknowledged that NextWindow's growth would remain stagnant until the Windows 8 operating system was released.  In the same call, Knowlton discussed the deteriorating demand for SMART's whiteboards, which she belatedly admitted was due to "increased caution around spending against budgets."

13.     The disclosures of November 9, 2010, stunned analysts and investors.  Shares of SMART common stock plummeted over 30% on heavy trading the following trading day, falling from $13.07 per share on November 9 to close at $8.91 per share on November 10, as analysts downgraded the stock.  As the *Financial Post* reported, investors "fled" the Company after it released "worse-than-expected earnings and cut its revenue outlook … on a big miss from one of its key acquisitions."

14.     The full impact of the Company's declining whiteboard sales and limited application of NextWindow technology was not disclosed until May 18, 2011, when the Company reported increased operating costs and decreased profitability, due primarily to necessary investments to sell SMART's products to the corporate market and overseas.  In response to this news, SMART shares dropped more than 23% on heavy trading to close at $7.01.

## II.     JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.  The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate wire, and telephone communications.

16.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. §§ 1391(b), (c) and (d).  Defendant SMART is a foreign or "alien" corporation that does significant business in this District, and may properly be sued in any District of the United States.  The Company and Defendant Apax Partners also maintain offices and conduct business in this District.

## III.     THE PARTIES

### A.     Plaintiff

17.     Lead Plaintiff City of Miami is a public pension plan that operates for the benefit of general and sanitation employees of the City of Miami, Florida.  As set forth on its certification attached hereto as Exhibit A, City of Miami purchased SMART common stock in the IPO and in the aftermarket pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact, and suffered damages as a result of the circumstances described herein.

### B.     Defendants

18.     Defendant SMART is, and was at all relevant times hereto, a Canadian corporation that designs, develops, and sells interactive technology products.  The Company's core product is its SMART Board interactive whiteboard, which allows a user to control computer applications, write in digital ink, access the internet, and save and share work over a network.  Its principal executive offices are located in Calgary, Canada.  SMART maintains a sales office in this District located at 200 Lexington Avenue, Suite 1115, New York, NY 10016.  SMART was the statutory issuer of the common stock offered in the IPO.  The Company's securities trade on the NASDAQ under the symbol "SMT" and on the Toronto Stock Exchange under the symbol "SMA."

19.    Defendant Nancy L. Knowlton ("Knowlton") was, at all relevant times herein, SMART's Chief Executive Officer. Knowlton was a co-founder of the Company and has been a director of the Company or its predecessors since 1987. Knowlton is liable under the Securities Act for the false and misleading statements in the Offering Materials for the IPO that occurred pursuant to the Registration Statement dated June 24, 2010 filed with the SEC on Form F-1 (as amended), which she signed.

20.    Defendant G.A. (Drew) Fitch ("Fitch") was, at all relevant times herein, SMART's Chief Financial Officer, principal financial and accounting officer, and Vice President. Fitch is liable under the Securities Act for the false and misleading statements in the Offering Materials for the IPO that occurred pursuant to the Registration Statement dated June 24, 2010 filed with the SEC on Form F-1 (as amended), which he signed.

21.    Defendant David A. Martin ("Martin") was, at all relevant times herein, the Chairman of SMART's Board of Directors, and its Executive Chairman. Martin is a co-founder of the Company and has been a director of the Company or its predecessors since 1987. Martin is liable under the Securities Act for the false and misleading statements in the Offering Materials for the IPO that occurred pursuant to the Registration Statement dated June 24, 2010 filed with the SEC on Form F-1 (as amended), which he signed.

22.    Defendant Salim Nathoo ("Nathoo") was, at all relevant times herein, a Director of SMART. Nathoo is also a Partner and global co-head of the technology and telecom team of Defendant Apax Partners, a private equity firm that sold almost 20 million SMART shares through the IPO. Pursuant to a security holders agreement between Apax Partners, Intel and IFF Holdings Inc. (a company wholly owned by Defendants Martin and Knowlton), Apax Partners is entitled to nominate one director to SMART's Board of Directors. Nathoo serves as Apax

Partners' designee and representative on the SMART Board.  Nathoo is liable under the Securities Act for the false and misleading statements in the Offering Materials for the IPO that occurred pursuant to the Registration Statement dated June 24, 2010 filed with the SEC on Form F-1 (as amended), which he signed.

23.    Defendant Arvind Sodhani ("Sodhani") was, at all relevant times herein, a Director of SMART.  Sodhani is an Executive Vice President of Defendant Intel Corporation and President of Intel Capital, the strategic investment arm of Intel Corporation, which sold more than 10 million SMART shares through the IPO.  Pursuant to a security holders agreement between Apax Partners, Intel and IFF Holdings Inc., Intel is entitled to nominate one director to SMART's Board of Directors.  Sodhani serves as Intel's designee and representative on the SMART Board.  Sodhani is liable under the Securities Act for the false and misleading statements in the Offering Materials for the IPO that occurred pursuant to the Registration Statement dated June 24, 2010 filed with the SEC on Form F-1 (as amended), which he signed.

24.    Defendant Michael J. Mueller ("Mueller") was, at all relevant times hereto, a Director of SMART.  Mueller was named in the Registration Statement with his consent as about to become a director of the Company.  Mueller resides in Ontario, Canada.

25.    Defendant Robert C. Hagerty ("Hagerty") was, at all relevant times hereto, a Director of SMART.  Hagerty was named in the Registration Statement with his consent as about to become a director of the Company.  Defendant Hagerty resides in Diablo, California.

26.    The Defendants listed in ¶¶19-25 are collectively referred to herein as the "Individual Defendants."

27.    Defendants Apax Partners L.P. and Apax Partners Europe Managers Ltd. (collectively "Apax Partners") advised or managed funds, including but not limited to Apax US

VII, L.P., and APAX Europe V, respectively, that held more than 56 million shares of SMART stock prior to the IPO, held almost 47% of SMART's total voting power at the time of the IPO, and had a partner at Apax Partners (Defendant Nathoo) serve as a member of the SMART Board of Directors.  Apax Partners sold almost 20 million shares of SMART stock in the IPO.

28.     Defendant Intel Corporation ("Intel") was an owner of more than 27 million shares of SMART stock prior to the IPO, held 23.5% of SMART's total voting power at the time of the IPO, and had one of its senior officers (Defendant Sodhani) serve as a member of the SMART Board of Directors.  Intel sold more than 10 million shares of SMART stock in the IPO.

## IV.   BACKGROUND FACTS AND NATURE OF THE MISREPRESENTATIONS

29.     At all relevant times, SMART was the global market share leader of interactive whiteboards to classrooms.  Interactive whiteboards function as modern replacements for a traditional chalk-board and permit a user to control computer applications, write in digital ink, access the internet, and save and share work over a network.  As the Company stated in the Offering Materials:

> SMART Technologies designs, develops and sells interactive technology products and solutions that enhance learning and enable people to collaborate in innovative and effective ways.  We are the global leader in the interactive whiteboard product category, which is the core of our interactive technology solutions.  We introduced the world's first interactive whiteboard in 1991 and since then have shipped over 1.6 million of our SMART Board interactive whiteboards worldwide.

> SMART Board interactive whiteboards combine the simplicity of a whiteboard and the power of a computer.  [...]  We have sold our products and solutions in over 100 countries and believe that our well-established distribution network gives us a broad global presence and access to a large addressable market.  In our fiscal year ended March 31, 2010, 71% of our revenue was generated in the United States and Canada, 23% in Europe, the Middle East and Africa, and 6% in the rest of the world. ***We have grown our revenue every year since fiscal 1992.***[2]

---

[2] Throughout this Complaint, emphasis is added unless otherwise indicated.

30.     SMART sells its whiteboards in every U.S. state.  For the year ended March 31, 2010, approximately 85% of SMART's revenue came from the education market, with the remainder derived from the government and business markets.  SMART's customers include primary and secondary schools, colleges, universities, other education providers, and government agencies, which all depend heavily on government funding.  At any given time, SMART has a pipeline of potential and confirmed orders.

31.     In the period leading up to the IPO in July 2010, the recession had resulted in declines in the tax revenues of federal, state and local governments.  It was therefore particularly material to investors that SMART's Offering Materials fully and adequately disclosed accurate information concerning the demand for its products, and trends in the demand based on its order pipeline.  As set forth below, the Offering Materials failed to do so.

## A.     The IPO and the Inaccurate and Misleading Offering Materials

32.     On July 14, 2010, SMART issued a press release announcing that 38.83 million shares of Class A Subordinate Voting Shares would be offered to the public at $17.00 per share in the IPO, and that trading of the shares would begin the following day on the NASDAQ Global Select Market under the ticker symbol "SMT" and on the Toronto Stock Exchange under the ticker symbol "SMA."

33.     SMART conducted the IPO pursuant to: (i) a registration statement that was filed with the SEC on June 24, 2010, first amended on June 28, 2010, second amended on July 12, 2010, and made effective as of July 14, 2010 (the "Registration Statement"); and (ii) a prospectus dated July 14, 2010 which was incorporated into the Registration Statement, and filed with the SEC pursuant to Rule 424(b)(4) on July 15, 2010.  The Registration Statement and Prospectus are referred to herein as the "Offering Materials."

11

34.     Pursuant to the Offering Materials, 38.83 million shares of SMART Class A Subordinate Voting Shares were sold in the IPO at a price of $17.00 per share.  Of the 38.83 million shares sold, 8.8 million shares were sold by the Company; the remaining 30.03 million shares were sold by Company insiders Apax Partners and Intel Corporation.  Specifically, Apax Partners sold over 19 million shares, and Intel sold over 10 million shares.  After underwriting commissions, SMART realized more than $141 million and Apax and Intel realized more than $483 million as a result of the IPO.

35.     The Offering Materials for the IPO contained material misstatements of fact and/or omitted to disclose material facts, as detailed below, concerning: (i) the demand and the trend in the demand for SMART's core whiteboard products; (ii) the demand and the trend in the demand for SMART's NextWindow products; (iii) SMART's ability to sell its whiteboard products to corporate clients and clients overseas; and (iv) SMART's materially inadequate internal enterprise reporting system.  Each of these material misstatements or omissions misled investors as to the demand for SMART's products and SMART's actual ability to execute its business plans.

36.     As further detailed below at ¶¶63-72, the Offering Materials represented that there was strong, growing demand for the interactive whiteboards and related products that form SMART's core business.  The Offering Documents emphasized that SMART's revenue had "grown every year," including year-to-year growth rates of 24% in fiscal 2009 and 38% in fiscal 2010, and that "interactive whiteboards represented a large and growing market."  According to the Offering Materials, the 24% increase in revenue for fiscal year 2009 was "due primarily to higher product sales volumes in North America driven by the continued adoption of interactive whiteboard technology and related products in the U.S. education market."  Moreover, the

Offering Documents assured investors that "[d]emand for our core products has been *increasing* as a result of a general expansion of the market for interactive whiteboards and other complementary products."

37.     The Offering Materials also touted that SMART was expanding its whiteboard sales beyond its traditional focus in the education market to corporate clients, and beyond North America to markets overseas, stating for example that SMART had "spent almost 20 years building our global network of dealers and distributors," and that "many of our resellers already sell to business and government accounts."  Further, the Offering Materials cited research estimates that the worldwide market for interactive whiteboards would grow from $1.1 billion in 2009 to $1.8 billion in 2012, a nearly 20% compound annual growth rate, and represented that, as of the time of the IPO, SMART was in a position to share in that growth through its "well-established" global distribution network.  The Offering Materials further listed Cisco Systems, Ernst & Young, General Electric, Microsoft and Texas Instruments as "[e]xamples of our customers in the business sector," and described a British Telecom case study that purportedly resulted in the sale of 100 SMART boards for use by 3,000 developers, product managers and offshore subcontractors.

38.     Each of these statements was material to investors.  For example, the analyst report initiating Deutsche Bank's coverage of SMART stock in August 2010 noted the "significant opportunity for [interactive whiteboard] adoption in the Enterprise over time," and that, over time, "the Enterprise collaboration opportunity could be larger than Education."  In its August 2010 coverage initiation report, RBC Capital Markets agreed, noting that SMART offered "a large nascent global education and corporate opportunity."  Similarly, Deutsche Bank and RBC Capital Markets each advised their clients that SMART presented a good investment

opportunity, and gave SMART common stock "buy" and "outperform" recommendations, respectively.

**B.   The Serious But Undisclosed Problems Affecting SMART as of the Time of the IPO**

39.     Unbeknownst to investors, however, the statements in the Offering Materials concerning SMART's whiteboard business, as set further detailed below, were materially false and misleading because they failed to disclose the true state of demand for SMART products and SMART's actual ability to execute its diversification plans without significant additional investment.

**1.   The Declining Demand and Downward Trend for SMART Products**

40.     As multiple witnesses affiliated with SMART during the relevant period independently confirmed, SMART experienced a material *decline* in the demand for its interactive whiteboards by at least March 2010.  For example, confidential witness ("CW") 1 worked at the Company's headquarters in the Services Division of SMART from 2006 through 2011, including as a Team Leader in Technical Training from 2008 through 2011.  As CW 1 stated, there was "*definitely a decline*" in demand for SMART's interactive whiteboards prior to the IPO.  Through discussions with project managers and product managers, CW 1 became aware of a "*big slowdown*" in sales in March 2010.  CW 1 further noted that the decline in sales resulted in significantly increased pressure on SMART's training group, which traveled extensively, to cut costs and increase revenues.  "We were pressured to come up with creative ways of generating revenue."  CW 1 stated that the big slowdown in sales was confirmed by a decrease in forecasted revenues from SMART's training group in July 2010.  CW 1 explained that, because the budget for training lags sales by several months, the decline in the July 2010 training budget meant that sales team "must have known" about the decline in sales several

14

months earlier. "Training revenues mirrored sales revenues. If sales go up, training revenues go up; if sales go down, training revenues go down."

41.    CW 2, a Corporate Trainer for SMART from 2008 through October 2010, similarly confirmed a decline in demand for training prior to the IPO. As CW 2 stated, the decline in demand SMART's training services reflected a decline in SMART sales, and thus confirmed that sales had declined several months prior to the IPO.

42.    CW 3, a Senior Manager in Global Information Systems Service Operations who worked at SMART from 2007 through January 2010, also stated that a slowdown in sales "was apparent" by the time he left the Company, months before the IPO.

43.    CW 4, an Education Account Representative for SMART from 2009 through April 2010, also confirmed the decline in sales prior to the IPO. As CW 4 stated, while SMART benefitted from the government stimulus in 2009, SMART's whiteboards were a one-time purchase and sales had decreased before the IPO.

44.    Multiple witnesses affiliated with SMART during the relevant period have also confirmed that the year-to-year revenue growth rates of 24% in fiscal year 2009 and 38% in fiscal year 2010 that were included in the Offering Materials were *not* the result of a general expansion of the market for interactive whiteboards and related products as represented in the Offering Materials, and *not* reflective of an upward trend. Rather than reflecting a platform for sustainable demand in the future, in fact SMART had experienced growth primarily because of federal stimulus spending aimed at reducing the effects of the economic crisis.

45.    On February 17, 2009, Congress passed the American Recovery and Reinvestment Act of 2009 ("ARRA") in response to the financial crisis, and President Obama signed ARRA into law four days later. ARRA included significant financial aid for local school

districts, including $650 million for an Enhanced Education Through Technology ("EETT") program. SMART immediately sought to capitalize on this opportunity. For example, according to CW 5, who worked at a Manager of Enterprise Operations within the IT department from 2009 until shortly before the IPO, SMART pre-built massive quantities of interactive whiteboards in anticipation of a significant increase in orders driven by government stimulus spending prior to the IPO. Similarly, CW 1, a team leader at SMART's headquarters who noted that he was "kept abreast of [SMART's] strategy and vision," stated that when President Obama announced that the stimulus would include a significant cash infusion for education, SMART came up with strategies for "how to grab has much of that money as possible."

46.     However, as CW 1 stated, it was clear to SMART personnel prior to and at the time of the IPO that any stimulus-driven sales would not continue. Specifically, CW 1 stated that SMART "knew that the future of the [stimulus] program was uncertain [and] that that kind of sales growth wasn't going to continue," and that a year before the IPO SMART "saw the sign" that sales were declining, but based the IPO on sales figures driven by stimulus spending. As CW 1 added, "We had a really good year [in the fiscal year that ended March 31, 2010], and the IPO was shortly after that. *It was very strategic [that] the IPO was based on those numbers. The IPO was done very, very fast*."

### 2. SMART's Inability to Sell Its Products to Corporate Clients and Overseas without Significant Additional Investments

47.     Although the Offering Materials touted the "significant opportunities" for interactive whiteboards beyond the education market, the Offering Materials failed to inform investors that: (i) SMART was in no position to compete for those corporate opportunities, let alone profit from them, without making significant investments; (ii) sales to a number of SMART's purported "customers in the business sector" had fallen through; and (iii) SMART

would need to make significant investments in its global infrastructure before it could grow its business overseas.

48.     CW 5, manager of global operations in SMART's IT department, explained that the Company did not have a corporate sales team that could deliver on SMART's promises and meet customer expectations.   Indeed, before the IPO, CW 5, who was based in SMART's Calgary headquarters, stated that he heard repeatedly from Rob Henschel, SMART's Director of Corporate Development, that there was no support for corporate sales within SMART's executive organization, and that SMART lacked the capacity to foster and support global corporate sales.  CW 5 also cited the Company's failure to develop a working relationship with Microsoft to develop synergies between Microsoft's software used by potential corporate customers and the Company's whiteboard products.  In particular, CW 5 stated that SMART failed to implement the necessary connectors between SMART's products and Microsoft software to develop workable products for corporate customers, and that rather than develop Microsoft as a partner to boost sales to the corporate market, SMART viewed Microsoft primarily as a competitor.  As CW 5 put it, at the time of the IPO, SMART simply lacked the ability to sell its products in the corporate environment.

49.     CW 3, a senior manager in SMART's global information systems service operations, confirmed that SMART had an antagonistic approach to Microsoft that significantly undermined the Company's corporate development efforts.  For example, CW 3 stated that SMART products lacked drivers for Windows 7 at the time of the IPO, and that deficiency continued for at least several months after the IPO.  CW 3 also cited a similar example involving Hewlett Packard, in which SMART ignored entreaties from that company to jointly develop and market products to the oil and gas industry, as evidence of SMART's failure to commit to

17

developing corporate sales prior to the IPO. As CW 3 put it, as a result of the Company's failure to develop products compatible with Microsoft Windows 7 or to pursue opportunities with other leading players in the commercial sector such as Hewlett Packard, SMART "missed the boat."

50.     CW 6, a Senior Market Development Manager from late 2008 until after the IPO, also confirmed that SMART's Corporate Market Development Group was treated as "the red-headed stepchild," and that he and other colleagues in this group were forced out altogether soon after the IPO. Specifically, CW 6 and another member of the Group were terminated, while others were transferred. CW 6 also stated that the Company did not believe that the work of his Group would yield long-term results, but was instead looking for instant gratification in the corporate market area. As CW 6 explained, the lack of support for corporate sales reflected SMART's exclusive focus on education sales.

51.     CW 2, a SMART corporate trainer, confirmed that SMART's corporate sales were undermined by the Company's focus on education. As CW 2 stated, "The [corporate] clients weren't happy with the product because it's education focused and not easy to use." SMART team leader CW 1 stated that SMART's investment into corporate sales yielded "zero return," and corroborated the statements of CW 5 and CW 6 that SMART had not developed an effective corporate sales department as of the date of the IPO.

52.     As a result of the serious weaknesses in SMART's corporate sales group, numerous sales to corporate customers fell through, were canceled or significantly scaled back before the IPO. At the time CW 5 left the Company in July 2010 (just before the IPO), every major deal that he had been involved with – including potential transactions with Disney, Cisco, British Telecom, and Google – had fallen through, aside from a few modest whiteboards implementations. For example, CW 5, who was a manager of global operations in SMART's IT

department, said that British Telecom was poised to purchase 1,500 SMART whiteboards and license software for 100,000 users.  However, that sale collapsed after SMART provided the product to a single British Telecom office with 30 users because the product did not work as promised and SMART lacked the corporate development team to adequately deliver.

53.     SMART had similar weaknesses with respect to its ability to effectively access the global market.  As Defendants finally revealed in May 2011 – almost ten months after the IPO – doing so would require millions of dollars in operational expenses, thereby contributing to a 28% decline in profits for the first quarter of 2011 and materially underperforming analysts' estimates.

### 3.  The Stagnant Lack of Demand for NextWindow Products

54.     In April 2010, SMART acquired New Zealand-based Next Holdings Limited (a/k/a "NextWindow") for $82 million in cash.  NextWindow designs and manufactures interactive touch components to manufacturers of interactive displays and PCs (such as Dell and Hewlett Packard).  CW 5, a manager of enterprise operations  in SMART's IT department explained that, at the time of the acquisition, SMART and NextWindow were engaged in patent litigation, and that SMART's desire to resolve that litigation was a primary driver of the acquisition.

55.     NextWindow's touch components are included in PCs that run on Windows 7.  As of the date of the IPO, virtually no touch applications had been developed for Windows 7, though Windows 7 had already been on the market for nine months and had sold more than 150 million copies.  As a result of the lack of touch applications for Windows 7, demand for NextWindow's touch-enabled products was extremely weak in the period leading up to the IPO. SMART did little to change this.  As CW 5 stated, the effort to integrate NextWindow with SMART's products following the acquisition were an "unmanaged gong show" and SMART

made no serious effort to integrate NextWindow.  CW 6, a SMART senior market development manager, stated that he discussed the lack of touch applications for Windows 7 with SMART's product development personnel, but was rebuffed.  The lack of such applications was known in the industry at the time of the IPO, and was known to SMART.  For example, a July 12, 2010 article on msnbc.com – published just days before the IPO – commented on the lack of touch applications for Windows 7: "Microsoft has had nearly a decade to encourage developers to create programs for touch and stylus interfaces, *with nothing – or next to nothing – to show for it.*" (Emphasis added.)  Indeed, an article in industry publication InfoWorld in September 2009 noted that "for touch gestures to work in applications, the software developer usually has to explicitly add touch support.  And *very few developers have*, despite the fact that Microsoft made the touch SDK available to all developers a year ago."

56.     A few months after the IPO, SMART admitted that demand for NextWindow's touch-enabled products would remain stagnant until Microsoft releases its next generation operating system, Windows 8.  Microsoft has still not announced a release date for Windows 8.

#### 4.  SMART's Defective Internal Controls

57.     SMART uses an Enterprise Resource Planning ("ERP") system to integrate the Company's finance and accounting department with its sales, manufacturing and service departments.  As with all ERP systems, the basic goal of SMART's ERP system was to provide a central repository of information that is shared among various departments in order to smooth the flow of information across the organization.

58.     The Company's ERP system was materially deficient from the time of its implementation in 2008, thereby exacerbating SMART's organizational problems and inability to effectively sell its products to corporate clients and overseas.  Multiple witnesses explained that – as of the time of the IPO, months after SMART claimed to have gotten tight rein over its

internal controls – SMART was using multiple sets of books to track operations and finances, and could not accurately assess its finances or shipments.

59.    CW 5, a manager of SMART's enterprise operations, stated that SMART retained Deloitte to try and improve those processes and procedures, with a goal of having appropriate processes in place by the time of the IPO.  CW 5 worked directly with the Deloitte consultants engaged in improving the information technology functions.  CW 5 explained that the problems that the Company was working with Deloitte to rectify in the months preceding the IPO were caused directly by the failures of the ERP system.  As a result of those failures, there was no control over the financials, and no process for removing accounts from the system, granting access to the system or controlling access to financial data.  CW 5 stated that SMART failed an audit conducted by KPMG, the Company's auditor, which included a GAAP analysis of the Company's process and procedure in finance and information technology, and that Deloitte's work to develop those essential processes in SMART's financial and other corporate functions continued at least into early 2011, long after the IPO.

60.    CW 7, an Oracle Solutions Architect who worked directly on the implementation of the ERP system from late 2009 through early 2011, confirmed that significant problems with the ERP systems existed at the time of the IPO, and continued through the end of CW 7's tenure in 2011.  For example, CW 7 stated that the ERP system undermined SMART's ability to track product shipments.

61.    CW 8, who worked as a Key Account Manager at SMART from mid-2009 through late 2010, also stated that the ERP system problems continued to undermine SMART's financial and accounting systems at the time of the IPO.  Indeed, CW 8 explained that at that time, he would still receive multiple reports from different SMART employees with conflicting

financial data, and could not accurately manage revenue recognition. CW 8 also said that he could not obtain accurate information about shipping or tracking, as well as compensation. CW 8 directly tied the internal control problems at SMART at the time of the IPO to the ERP system, and stated that SMART required at least an additional year to get those systems in working order. As CW 8 put it, at SMART, *"one and one wasn't equaling two."*

62. CW 3 confirmed that the ERP system remained "broken" at the time of the IPO and could not provide accurate sales numbers. For example, CW 3 explained that SMART could not track the employee time committed to software development, and instead simply recorded $1 per hour, regardless of how many employees were engaged on the development project. As a result, the recorded costs of development were understated. CW 3 directly tied the poor financial results the Company announced after the IPO to the underlying control problems that undermined SMART's ability to accurate assess its finances. "They're getting caught. Now they have to report real numbers" where, previously, sales projections were "pure speculation." Discussing SMART's sales, CW 3 explained *"We weren't doing the types of numbers they said we were. I don't want to say fabricated, but speculative at the best of times."*

## V.   MATERIAL MISSTATEMENTS AND OMISSIONS

### A.   Misrepresentations about the Demand for SMART Whiteboards

63. The Offering Materials contained misstatements of material fact and/or omitted material facts concerning the demand and the trend in the demand for SMART's interactive whiteboards that were necessary to make the statements therein not misleading. The Offering Materials represented that there was strong and growing demand for SMART's interactive whiteboards and related products as the result of an expansion of the market for interactive whiteboards:

Revenue for fiscal 2010 increased by $179.8 million, or 38%, from $468.2 million in fiscal 2009 to $648.0 million in fiscal 2010 *due primarily to higher product sales volumes in North America driven by the continued adoption of interactive whiteboard technology and related products in the U.S. education market.*

\*\*\*

*Demand for our core products has been increasing as a result of a general expansion of the market for interactive whiteboards and other complementary products.*

The Offering Materials further stated that SMART's "current market leadership and strong portfolio of solutions position us to increase sales as more schools introduce interactive whiteboards."

64.    These statements were materially misleading because they failed to disclose the material *decline* of SMART sales of its whiteboards at the time of the IPO, and the totality of the circumstances on which this decline was based, including the information discussed in ¶¶40-53. As a result, investors were materially misled as to the true demand for SMART's core products at the time of the IPO.

65.    Moreover, by having chosen to speak about the demand and trends in demand for SMART's core products, SMART and the Individual Defendants had a duty to speak fully and truthfully on those subjects. Thus, Defendants had a duty to disclose known trends, events or uncertainties related to its business that were reasonably likely to have material effects on SMART's financial results and cause reported financial information not to be necessarily indicative of future operating results. Here, at the time of the IPO, SMART was aware that stimulus spending was receding, resulting in a decline in educational spending, which in turn caused its sales of its interactive whiteboards to be negatively affected and its reported financial information not to be indicative of its future operating results. Defendants' failure to disclose these facts rendered the Offering Materials false and misleading. As a result, investors were

materially misled as to the demand for SMART's core products and ability to generate substantial revenues for the Company.

66.     For the same reason, the purported risk warnings provided in the Offering Materials under the heading "Risks Associated with Our Business" and "Risk Factors"—such as "if there are decreases in spending or changes in the spending policies or budget priorities for government funding of schools, colleges, universities, other education providers or government agencies, we could lose revenue," and "we could experience a slowdown of revenue growth as a result" of declines in government stimulus spending were materially misleading because SMART had already experienced such declines prior to the IPO, and failed to disclose them.

67.     The Offering Materials also misrepresented the Company's opportunities and ability to expand its whiteboard business outside the education sector and, particularly with respect to increasing its sales of whiteboard products to the corporate market.  For example, under the heading **"Our Strategy for Growth"** the Offering Materials cited *"Accelerate Adoption in Business and Government Markets"* and stated:[3]

> We intend to accelerate the adoption of our products in these markets and have recently implemented senior management changes to increase our focus in these areas. Our growth strategy in these markets will focus on increasing the simplicity and ease of use of our products, while fully integrating them with critical business processes and products from other vendors of collaboration technologies.

68.     The Offering Materials also represented that "We believe that the business and government markets for interactive whiteboards, as well as the licensing of our touch-enabled technologies and sale of our touch-enabled solutions to other companies that seek to bring to market interactive touch products other than interactive whiteboards, represent additional attractive opportunities."

---

[3] Emphasis in original.

69.    In "MANAGEMENT'S DISCUSSION AND ANALYSIS"[4] the Offering

Materials further stated that:

> We believe that interactive whiteboards are in the early stages of adoption and *significant opportunities exist beyond the traditional education market.* Solutions to meet the needs of business and consumer markets may provide additional sources of revenue for the industry, including the company. Growth will be dependent on a number of factors including competition, our ability to keep pace with rapidly changing technologies, our ability to retain and attract customers, our ability to establish new, and to build on our existing relationships with, our dealers and distributors and general economic conditions.

70.    The Offering Materials similarly represented that "We further believe that

*additional attractive opportunities exist in the business and government markets for interactive*

*whiteboards...*"

71.    By having chosen to speak about the corporate demand for SMART's core

product, SMART and the Individual Defendants had a duty to speak fully and truthfully on that

subject.   Thus, Defendants had a duty to disclose that the Company had failed to focus on

corporate development, failed to adequately support the Company's corporate development

efforts, and failed to develop partnership opportunities with industry leaders such as Microsoft

and Hewlett Packard that were necessary to expand SMART's business beyond education and

into corporate applications.   Defendants' failure to disclose these facts rendered the Offering

Materials false and misleading.   As a result, investors were materially misled as to SMART's

ability to diversify its revenue base away from government spending by selling products outside

the education market.

72.    For the same reason, the Offering Materials' purported warnings that SMART

whiteboard products "may" not be accepted in the corporate market (such as the purported

warning, under the heading "We may not be successful in our strategy to grow in the business

---

[4] Emphasis in original.

and government markets") were all materially misleading because, as of the IPO, SMART had failed to develop or support a corporate sales operation and had lost major opportunities to develop and sell its whiteboards to corporate clients—facts which Defendants failed to disclose. Thus, the risk warned of had already been realized prior to the IPO.

73.     Moreover, the Offering Materials touted SMART's whiteboard customers in the business sector as including major corporations such as Cisco, Ernst & Young, and British Telecom, and provided an example of a sale to British Telecom as a "case study" to highlight the Company's success in selling whiteboards to major corporate clients.

74.     By having chosen to speak about purported corporate clients, SMART and the Individual Defendants had a duty to speak fully and truthfully on that subject. Thus, Defendants had a duty to disclose that numerous sales to corporate customers listed in the Offering Documents fell through, were canceled or significantly reduced before the IPO. *See* above at ¶52. Indeed, at the time of the IPO, SMART had lost or failed to close major contracts with several major corporations, including Cisco and British Telecom, and specifically failed to close a major sales opportunity to British Telecom. Defendants' failure to disclose these facts rendered the Offering Materials false and misleading. As a result, investors were materially misled as to SMART's pre-IPO achievements in diversifying its revenue base away from government spending by selling products outside the education market.

75.     The Offering Materials also misrepresented the Company's opportunities and ability to expand its whiteboard business beyond North America without significant investment in its global infrastructure. For example, the Offering Materials stated that SMART was the "Interactive Whiteboard Pioneer and Established Global Category Leader." According to the Offering Materials, SMART had sold products and solutions in over 100 countries and spent

almost 20 years building a global network of dealers and distributors, resulting in a "well-established distribution network" that gave SMART a "broad global presence and access to a large addressable market."

76.     These representations were material to investors.  For example, the analyst report initiating Morgan Stanley's coverage of SMART stock in August 2010 noted that although US demand drove 50% of industry growth during the prior two years, "growth drivers are shifting to Western Europe (ex UK) and the emerging markets."  In its August 2010 coverage initiation report, RBC Capital Markets agreed, noting "a large nascent global education and corporate opportunity."  Deutsche Bank analysts also agreed, noting in their August 2010 initiation report that they expected "growing penetration of the U.S. education system to support strong growth over the next 12-24 months" while, in the medium term, growth would be "increasingly driven by greater international class room penetration."  Morgan Stanley, RBC Capital Markets and Deutsche Bank each informed their clients that SMART presented a good investment opportunity – giving buy, outperform and overweight ratings – and issuing price targets between $17 and $20 per share.

77.     The statements set forth in ¶75 were materially false and misleading.  By having chosen to speak about SMART's "well-established distribution network" and "broad global presence and access to a large addressable market," SMART and the Individual Defendants had a duty to speak fully and truthfully on that subject.  Thus, Defendants had a duty to disclose that SMART required significant investments in its global distribution network to effectively access the global market.  Defendants' failure to disclose this fact rendered the Offering Materials false and misleading.  As a result, investors were materially misled as to SMART's ability to sell its products beyond North America.

**B.     Misrepresentations about the Demand for NextWindow Products**

78.     The Offering Materials contained misstatements of material fact and/or omitted

material facts concerning NextWindow that were necessary to make the statements therein not

misleading. The Offering Materials represented that there was strong demand for NextWindow's

interactive touch technologies.   For example, the Offering Materials described SMART's

acquisition of NextWindow, and NextWindow's growing revenues between 2008 and 2010 as

follows:

> On April 21, 2010, we acquired all the share capital of NextWindow, which
> designs and manufactures components of optical touch screens for integration into
> electronic displays, including PC displays.  For the fiscal years ended March 31,
> 2008 and 2009, NextWindow's revenue was $5.4 million and $31.8 million
> respectively, as reported on NextWindow's audited financial statements, which
> were prepared using International Financial Reporting Standards.  For the fiscal
> year ended March 31, 2010, NextWindow's unaudited revenue was
> approximately $46.4 million.

79.     The Offering Materials also represented that the strong and growing demand for

NextWindow products was due, at least in part, to the fact that Microsoft Windows 7 operating

system supported touch capabilities for computer displays and that, as a result, computer display

manufacturers were seeking to increase their sales of the interactive touch technologies sold by

NextWindow:

> *Interactive touch technologies have become more prominent in a variety of*
> *digital solutions beyond interactive whiteboards.   For instance, the Microsoft*
> *Windows 7 operating system released in October 2009 supports touch*
> *capabilities for computer displays.*  As a result, we believe that many computer
> display manufacturers are seeking to increase their sales in the future by including
> interactive touch technologies in their displays, including on desktops, laptops,
> notebooks, all-in-one computers and tablets.   In addition, interactive touch
> technologies are being incorporated into an increasing range of other products,
> such as mobile phones, digital retail signage, directories and kiosks.  According to
> DisplaySearch, a global market research firm for the display supply chain, the
> touch screen module market is predicted to grow from $3.7 billion in 2009 to $6.2
> billion in 2012, a compound annual growth rate of 19.3%.

80.     The Offering Materials specifically linked the demand, and the trend in demand, for touch technology purportedly supported by Windows 7 to the technology SMART acquired from NextWindow.   For example. the Offering Materials represented that the NextWindow acquisition would "accelerate" the Company's expansion into "interactive touch products other than interactive whiteboards" because NextWindow's interactive touch products were already being incorporated into the displays of several leading manufacturers of such devices:

> As a result of our acquisition of Next Holdings Limited, or NextWindow, discussed below, our technologies and solutions are currently used in touch-enabled PC displays of several leading manufacturers, as well as in non-PC interactive displays.   We expect to consider acquiring additional companies, technology and patents to ***further enhance*** our leadership position.
>
> ***
>
> We also expect that NextWindow's existing relationships with leading PC display manufacturers and other electronics equipment manufacturers will accelerate our ability to expand into the market for interactive touch products other than interactive whiteboards.

81.     The Offering Materials also specifically listed the additional products added to SMART's "portfolio of solutions" as "a result of our acquisition of NextWindow."   Then, touting the Company's "**Technology and Innovation Process**" the Offering Materials stated "As a result of our acquisition of NextWindow, we have obtained additional optical touch technology and know-how. These are utilized in the NextWindow 1900, 2100 and 2700 series products that are used by other manufacturers that seek to bring to market interactive touch products beyond interactive whiteboards."[5]

82.     These statements were material to investors.  Analysts viewed the NextWindow acquisition as a key to SMART's future profitability.   For example, on August 24, 2010 (following the expiration of the quiet period after the IPO), analysts at Cowen and Company

---

[5] Emphasis in original.

wrote that the NextWindow acquisition had added "a fast-growing unit" that "provides entry into the market for PC and CE touch-screens via major OEM [original equipment manufacturers] customers, Dell, HP, NEC and Sony," and would also "help to drive innovation in future generations of interactive whiteboards." Likewise, on September 15, 2010, analysts at CIBC wrote that "NextWindow's relationship[s] in the PC and electronic markets" would enhance "SMART's ability to expand its business" by allowing it entry "into consumer markets, where demand for touch-screen products is rapidly growing." As the *Financial Post* stated on November 11, 2010, NextWindow was a "key acquisition" for SMART—one which would drive the Company's earnings by allowing it to expand into the consumer markets and diversify SMART's revenue base.

83. By having chosen to speak about the demand and trends in demand for NextWindow products because the Microsoft Windows 7 operating system supported touch capabilities, SMART and the Individual Defendants had a duty to speak fully and truthfully on those subjects. Thus, Defendants had a duty to disclose that very few touch applications had been developed for Windows 7 in the period leading up to the IPO, though as of the time of the IPO Windows 7 had already been on the market for nine months and had sold more than 150 million copies. Defendants also had a duty to disclose that demand for NextWindow's interactive touch technology was extremely weak at the time of the IPO, and that far from "accelerat[ing]" the Company's expansion into the market for interactive touch products, demand for NextWindow's interactive touch technologies would remain stagnant at least until the release of Windows 8. And Defendants had a duty to disclose that SMART acquired NextWindow in part to resolve a patent dispute. Defendants' failure to disclose these facts

30

rendered the Offering Materials false and misleading. As a result, investors were materially

misled as to SMART's ability to diversify its revenue base into products other than whiteboards.

84.     The Offering Materials' risk disclosures about NextWindow were also false and

misleading, as they *gave no warning that there were no touch applications for the Windows 7*

*operating system* or that demand for NextWindow's products was very weak in the period

leading up to the IPO. The risk disclosures generically stated:

> [W]e may not realize the anticipated benefits of any or all of our acquisitions, or
> may not realize them in the time frame expected. For example, we recently
> acquired the entire share capital of NextWindow, and we intend to integrate its
> operations and technologies with our business. However, we cannot assure you
> that we will be able to integrate those operations and technologies without
> encountering difficulties, including, but not limited to, the loss of key employees,
> the disruption of our ongoing business, the inability to retain business
> relationships with NextWindow's customers or possible inconsistencies in
> standards, controls, procedures and policies.

The vague warnings that SMART "may not realize" the benefits of acquisitions such as

NextWindow in no way suggested there were virtually no touch applications for Windows 7 and

that, as a result, demand for NextWindow's products was extremely weak at the time of the IPO.

85.     Likewise, the Offering Materials' risk disclosures about the integration of

SMART products with third-party operating system software failed to warn investors that there

were no touch applications for the Windows 7 operating system or that demand for

NextWindow's products was already very weak, and would continue to remain weak at least

until the release of Windows 8:

> The functionality of our products depends on our ability to integrate our products
> with the operating system software and related products of providers such as
> Microsoft Corporation, Apple, Inc., and the main distributors of Linux, among
> other providers. If integration with the products of those companies becomes
> more difficult, our products would likely be more difficult to use. Any increase in
> the difficulty of using our products would likely harm our reputation and the
> utility and desirability of our products, and, as a result, would likely have a
> material adverse effect on our business.

What was lacking for these products at the time of the IPO was demand, which was directly attributable to the dearth of touch applications for Windows 7, and not warned of in any way by this or other "risk factors" in the Offering Materials.

86.    Moreover, by having chosen to speak about the risk factors that could affect demand for NextWindow products, SMART and the Individual Defendants had a duty to speak fully and truthfully on that subject.  Thus, Defendants had a duty to disclose known trends, events or uncertainties related to its business that were reasonably likely to have material effects on SMART's financial results and cause reported financial information not to be necessarily indicative of future operating results.  Here, at the time of the IPO, SMART and the Individual Defendants were aware that developers had not provided touch applications for Windows 7 and were not developing such applications.  This trend, which indicated that developers were awaiting the release of Windows 8 to develop touch applications, directly impacted SMART's ability to utilize and make productive the technology and products obtained from NextWindow. Defendants' failure to disclose these facts rendered the Offering Materials false and misleading. As a result, investors were materially misled as to the demand for NextWindow products.

### C.    Misrepresentations about SMART's Internal Reporting System

87.    The Offering Materials contained discussion of the Company's ERP system that purported to warn investors about problems with the implementation of that system in 2008, while discussing processes implemented subsequently to resolve those problems.  Specifically, the Offering Materials stated:

> *We experienced significant difficulties implementing our enterprise resource planning system.*
>
> On April 1, 2008, we commenced implementing a new enterprise resource planning, or ERP, system. We experienced significant difficulties with this implementation which resulted in severe disruptions to our operations and to our financial and accounting systems *for a number of months*. For example, we were

unable to issue invoices or ship any products for a significant period of time during the first quarter of fiscal 2009. This resulted in our inability to complete reliable quarterly financial statements for fiscal 2009. In order to temporarily resolve the issues associated with the ERP system implementation, we adopted several manual processes and workarounds to perform functions that would typically be automated in a company of our size. By the end of the second quarter of fiscal 2009, we had shipped all the products that we were unable to ship in the first quarter of fiscal 2009, *and as of December 31, 2009, we had substantially resolved all material issues associated with the portions of the ERP system that we had implemented as of that date.*

We have not yet completed the implementation of the new ERP system and many manual processes for functions that should be automated remain. The existence of such manual processes allows *the possibility for human error that could potentially result in material mistakes* in our operations as well as our financial reporting. Such mistakes, if made, could have a material adverse effect on our business. In addition, we currently do not have, and until we complete the implementation of our ERP system, we will not have, the necessary systems in place to provide us with certain data that would normally be automatically collected in an organization of our size. For example, *until the first quarter of fiscal 2010*, our systems were unable to generate operating expense reports for our various business cost centers. Furthermore, we have identified, and are in the process of correcting, additional weaknesses in the ERP system that could potentially have a material adverse effect on our business. Specifically, the configuration of our ERP system lacks sufficient authority controls and many users are able to make changes to the system that may affect all users. If a user makes unauthorized changes to the system, our business could be harmed. *These issues did not prevent us from obtaining unqualified audit reports on our annual financial statements.*

In the first quarter of fiscal 2010, we continued to experience *problems of a less material nature* in the implementation of the ERP system. For example, on one occasion, a particular module of the system was not properly tested, and after implementing the module, we discovered that the system prevented the shipment of certain products and the issuance of invoices for certain shipments. While in that particular instance we were able to remediate the problem in time to prevent any significant issues, we cannot assure you that similar problems will not recur or that we will be able to remediate these problems on a timely basis. If additional problems arise in the implementation of additional modules of the ERP system, we could experience further disruptions to our business and operations that could have a material adverse effect on our business and could impair our ability to report our operating results on a timely and accurate basis.

88.     These representations and reassurances about SMART's internal controls were material to investors.   Absent an effective, working ERP system, SMART and its senior

management would encounter significant logistical problems in fulfilling orders, significant accounting problems in properly recording revenues, costs, and profits, and significant control problems in keeping track of materials, stocked finished products, and shipments.  In sum, SMART's management would have no way to credibly determine the financial state of the Company at any given moment without first undertaking a burdensome audit, including review and reconciliation of multiple sets of books used by different departments.

89.     By having chosen to speak about the problems with SMART's ERP system, SMART and the Individual Defendants had a duty to speak fully and truthfully on that subject. Thus, Defendants had a duty to disclose that the failures related to the ERP system implementation continued to cause material problems as of the time of the IPO, including the facts that SMART: (i) retained Deloitte to try and improve its ERP processes and procedures; (ii) continued to use multiple sets of books to track operations and finances; and (iii) could not accurately assess its finances, shipments or sales. *See* ¶¶57-62 above.

90.     Defendants' failure to disclose these facts rendered the Offering Materials false and misleading.  As a result, investors were materially misled as to SMART's reported sales figures before the IPO and SMART's ability to properly manage and control the business.

## VI.    THE TRUTH EMERGES

91.     The truth concerning the declining demand for SMART's and NextWindow's products began to be revealed on November 9, 2010.  After the close of trading, SMART (i) reported that its second quarter earnings fell 22% on weaker-than-expected revenue growth; (ii) cut its outlook for NextWindow by 60%; and (iii) reduced revenue guidance for the second half of the Company's fiscal year by 9% ($80 million).  SMART attributed this $80 million shortfall

equally to "a $40 million reduction to reduced demand for its interactive whiteboard products and our outlook for NextWindow's revenue contribution."

92.   On a November 9, 2010 conference call with analysts, Defendant Knowlton confirmed that "[w]e have adjusted our fiscal 2011 revenue outlook lower by approximately $80 million due to lower-than-expected performance of our recently-acquired NextWindow business and the more conservative near-term growth estimates for the North American market." During the same call, Defendant Fitch noted that the "North American market grew 14% year-over-year," thereby implicitly admitting that the decline in demand for SMART products was independent of the size of the market.

93.   On November 9, 2010 Knowlton also confirmed that the "softness" in NextWindow sales was due to "the limited number of touch applications developed for Windows 7." This statement was a tacit admission that the Offering Materials' representations concerning NextWindow were false and misleading, because that material limitation existed at the time of the IPO yet was not disclosed in the Offering Materials. Knowlton further revealed that NextWindow's growth would be limited until Microsoft released its next generation operating system, Windows 8. As of July 2011, more than eight months after the November disclosure, there is still no announced release date for Windows 8, and current speculation is that Windows 8 will not be released until late 2012.

94.   During the November 9, 2010 conference call, Knowlton emphasized that SMART's full-year profit objective remained intact because of "best-in-class margin." Defendant Fitch similarly emphasized that SMART's "[g]ross margins for the second quarter were 52%, up from 48% last year and up from 51% during the first quarter of fiscal 2011." In addition, Fitch assured investors that SMART would protect its margins and be "cautious about

our OpEx spend," including operating expenses for research and development, marketing and sales infrastructure.

95.     The price of SMART stock plummeted more than 30% in heavy trading on the news of the lagging demand for SMART and NextWindow products, going from $13.07 per share at the close on November 9 to $8.91 per share at the close on November 10, 2010.  As Canada's Financial Post reported the following day, investors "fled" the Company after it released "worse-than-expected earnings and cut its revenue outlook … on a big miss from one of its key acquisitions."

96.     Analysts downgraded their price targets for SMART stock.   For example, Deutsche Bank noted a "surprise slowdown," and lowered SMART's price target from $17 to $14 per share.  Deutsche Bank questioned SMART's explanation that the lower than-expected revenues were caused in part by a purportedly recent slow-down in demand for SMART whiteboards. Deutsche Bank's November 9, 2010 analyst report stated:

> Top line weakness in the Q resulted from a substantial miss from NextWindow (optical touch sensors sold to PCs). In addition, SMT indicated it experienced weakness in U.S. IWB volumes in September which continued through October. SMT mgmt. indicated school administrators had budgets but were hesitant to deploy funds (conservatism / delays to capture Federal matching grants). *This slow-down surprised us and is inconsistent with our primary research.*

97.     Morgan Stanley also lowered SMART's price target from $17 to $14 per share, and warned that it would it "likely take time to restore investor confidence in the story."  RBC Capital Markets downgraded SMART to "sector perform" and lowered the price target from $17 to $12 per share, noting that "the unexpected cut to NextWindow outlook, only 3 months after providing guidance, lower[ed] investor confidence."

98.     However, analysts noted that SMART had reported strong margins, thereby preventing an even more radical downgrade of SMART's expected performance and price target.

36

Morgan Stanley informed investors that "Profitability is the bright spot," explaining that "[d]espite the revenue miss, operating income came in 20% above our estimate due to strong gross margins and operating expense control." Deutsche Bank noted that "[w]hile the top line was light, SMT did show very strong profitability with gross margins of 52%." And Cowen noted that SMART's second quarter for 2011 was "a mixed bag, with a 5% revenue miss more than offset by strong gross margin, lower expenses and interest, yielding 38% adjusted EPS upside."

99.     On May 18, 2011, after the markets closed, the Company revealed the complete truth about SMART – and the misstatements in the Offering Materials – when SMART issued a press release announcing financial results for the fourth quarter of 2011 and the full fiscal year. The Company's quarterly profit declined 28%, and SMART reported earnings-per-share of just $0.01, a significant miss from analysts' estimates of $0.08 per share. SMART revealed that the earnings miss was attributable to a significant increase in operating expenses, which increased 23%, from $52 million to $64 million, including additional costs for research and development, and investment in SMART's global infrastructure. Significantly, on a conference call with analysts on May 18, Defendant Fitch specified that the increased research and development spending was focused on corporate development, stating that "we are spending more money on our business-oriented products." This was a tacit admission that, as the witnesses cited above explained, SMART failed to invest in corporate development prior to the IPO and had no ability to sell to corporate clients at that time, thus necessitating increased spending to try to develop that capacity in the months after the IPO.

100.    Analysts commenting on the Company's poor performance noted that the Company's efforts to move into corporate sales remained in the "development phase" and could

not offset the shortfall in its core markets. For example, a May 19, 2011 Cowen analyst report stated that SMART's effort to address the corporate market "is likely to take at least a year to develop due to training and a long sales cycle in conjunction with other vendors." Cowen downgraded SMART from "outperform" to "neutral." The same day, *Reuters* reported that Piper Jaffray also downgraded SMART from overweight to neutral after concluding that "[p]otential catalysts for growth such as an expanding corporate sales channel and growth from emerging markets remain in the early stages of development phase and lack the scale to make up for the shortfall in developed markets."

101.   In response to this news, which revealed the full impact of the decline in education sales and SMART's inability to develop corporate sales that already existed at the time of the IPO less than a year earlier, SMART shares dropped more than 23% to close at $7.01.

102.   Thus, the disclosure of the truth about SMART drove the price of its stock down roughly 60% from the price at which it was sold to investors on the IPO, less than a year earlier. Indeed, as the following chart shows, during the same period in which the price of SMART stock (ticker "SMT") fell dramatically on November 9, 2010 and May 19, 2011, the NASDAQ (ticker "IXIC") and S&P 500 (ticker "GSPC") were relatively unchanged:[6]

---

[6] *See Yahoo! Finance*, available at
http://finance.yahoo.com/echarts?s=smt#chart23;symbol=smt;range=20101102,20110527;compare=^ixic+^gspc;ind
icator=volume;charttype=line;crosshair=on;ohlcvalues=0;logscale=on



## VII.   CLASS ACTION ALLEGATIONS

103.    Lead Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities who purchased or otherwise acquired SMART common stock pursuant or traceable to the Offering Materials, and who were damaged thereby (the "Class").   Since consummating the IPO pursuant to the Offering Materials, SMART common stock has traded on NASDAQ under the symbol "SMT" and on the Toronto Stock Exchange under the symbol "SMA."   The Class includes all persons and entities who purchased or otherwise acquired SMART common stock pursuant or traceable to the Offering Materials and who were damaged thereby.   Excluded from the Class are: (i) Defendants; (ii) the officers and directors of SMART and its subsidiaries and affiliates; (iii) members of the family of each Individual Defendant; (iv) any entity in which any Defendant has or has had a controlling interest; and (iv) the legal representatives, heirs, successors and assigns of any such excluded party.

104.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through discovery, Lead Plaintiff believes that there are thousands of different investors who purchased the 38,830,000 shares of stock sold pursuant to the Offering Materials. The names and addresses of the record owners of SMART shares that were purchased or acquired by members of the Class, are available from the Company and/or its transfer agents. Notice may be provided to such record owners via first class mail using techniques and forms of notice that are customarily used in similar class actions.

105.    Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and other members of the Class purchased or acquired their SMART common stock pursuant and/or traceable to the Offering Materials and sustained damages as a result of defendants' wrongful conduct complained of herein.  Lead Plaintiff is committed to prosecuting this action and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has the same interests as other class members.  Accordingly, Lead Plaintiff is an adequate Class representative and will fairly and adequately protect the Class' interests.

106.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, but are not limited to:

(a) whether the Defendants violated the Securities Act as alleged herein;

(b) whether the Offering Materials contained material misstatements or omitted to state material information; and

(c) the proper measure of damages.

107.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to obtain individual redress.  There will be no difficulty in the management of this action as a class action.

108.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication, or substantially impair their ability to protect their interests.

109.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## VIII.   CAUSES OF ACTION

### COUNT I

### Violation of Section 11 of the Securities Act
### (Against SMART and the Individual Defendants)

110.     Lead Plaintiff repeats and realleges each and every allegation contained above, as if more fully set forth herein.

111.     This Count is asserted against SMART and the Individual Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiff and other Class members who purchased or otherwise acquired SMART common stock pursuant or traceable to the materially untrue and misleading Offering Materials, and were damaged thereby.

112.     This claim is not based on and does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Lead Plaintiff does not allege that any Defendant acted with

scienter or fraudulent intent, which are not elements of a Section 11 claim. The Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements therein not misleading, and omitted to state material facts required to be stated therein.

113.   SMART was the issuer of the securities in the IPO.   SMART also signed the Registration Statement.   SMART is strictly liable under Section 11 for the materially untrue statements and omissions in the Registration Statement and incorporated Prospectus for the IPO.

114.   Each Individual Defendant named in this Court is liable for the untrue statements and omissions in the Offering Materials because each Individual Defendant was: (a) a director of the issuer or named, with his consent, in the Registration Statement as about to become a director of the issuer, and/or (b) a signatory of the Offering Materials.

115.   Each of these Individual Defendants is unable to establish an affirmative defense based on a reasonable or diligent investigation of the statements contained in the Registration Statement and incorporated Prospectus.   These Individual Defendants did not make a reasonable investigation or possess reasonable grounds to believe that those statements were true and that there were no omissions of material fact.   Accordingly, they acted negligently and are liable to Lead Plaintiff and the other members of the Class.

116.   Lead Plaintiff and the Class purchased or otherwise acquired SMART securities in the IPO pursuant or traceable to the Registration Statement.

117.   At the time they purchased or acquired their SMART securities, Lead Plaintiff and the other members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Registration Statement and incorporated Prospectus.

118.    The value of the SMART securities declined substantially subsequent to the consummation of the IPO, and Lead Plaintiff and the other members of the Class have sustained damages.

119.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.  Less than three years has elapsed between the time that the securities at issue in this Complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.

120.    By virtue of the foregoing, Lead Plaintiff and the Class are entitled to damages from the Defendants and each of them, jointly and severally, under the provisions of Section 11(e).

## COUNT II

### Violation of Section 12(a)(2) of The Securities Act
**(Against SMART and the Individual Defendants other than Defendants Mueller and Hagerty)**

121.    Lead Plaintiff repeats and realleges each and every allegation contained above as if more fully set forth herein.

122.    This Count is asserted against SMART and the Individual Defendants other than Defendants Mueller and Hagerty for having promoted and sold the SMART securities issued in the IPO pursuant to a prospectus which contained untrue statements of material facts and material omissions as alleged herein.

43

123.    This claim is not based on and does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Lead Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

124.    SMART and the Individual Defendants directly solicited the purchase of SMART securities by Lead Plaintiff and other members of the Class by means of the Registration Statement and related Prospectus, and financially benefited thereby.  Their acts included but are not limited to: (i) preparing and approving the Registration Statement for the IPO and the Prospectus incorporated by reference therein; and (ii) making the decision to proceed with the IPO upon the terms set forth in the Offering Materials.  Part of the proceeds of the IPO were paid to SMART.

125.    SMART and the Individual Defendants used the means and instrumentalities of interstate commerce and the US mail.

126.    SMART and the Individual Defendants are unable to establish an affirmative defense based on a reasonable or diligent investigation of the statements contained in the Registration Statement and incorporated Prospectus.  Defendants did not make a reasonable investigation or possess reasonable grounds to believe that those statements were true and that there were no omissions of material fact.  Accordingly, they acted negligently and are liable to Lead Plaintiff and the other members of the Class pursuant to Section 12(a)(2) of the Securities Act.

127.    Lead Plaintiff and the Class purchased or otherwise acquired SMART securities in the IPO pursuant or traceable to the Registration Statement and incorporated Prospectus and did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts contained therein.

128.    The value of the SMART securities declined substantially subsequent to the consummation of the IPO, and Lead Plaintiff and the other members of the Class have sustained damages.

129.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.  Less than three years has elapsed between the time that the securities at issue in this Complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.

130.    By virtue of the foregoing, SMART and the Individual Defendants are liable under Section 12(a)(2) of the Securities Act to Lead Plaintiff and other members of the Class who purchased SMART securities in the IPO.  In addition, Lead Plaintiff and other members of the Class who have sold and suffered damages on this SMART securities that they originally purchased in the IPO are entitled to rescissory damages.

## COUNT III

### <u>Violation of Section 15 of The Securities Act</u>
**(Against the Individual Defendants other than Defendants Mueller and Hagerty)**

131.    Lead Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

132.    This Count is asserted against the Individual Defendants other than Defendants Mueller and Hagerty for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and the other members of the Class who assert claims pursuant to Sections 11 or 12(a)(2) of the Securities Act as set forth above.

45

133.    This claim is not based on and does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Lead Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

134.    Defendants Martin, Knowlton, and Fitch, through their positions as SMART's Executive Chairman, Chief Executive Officer, Chief Financial Officer, and General Counsel, respectively, were each controlling persons of SMART within the meaning of Section 15 of the Securities Act at the time of the IPO.  As signatories to the Registration Statement, and because of their positions of control and authority of senior officers of SMART and their control of SMART's SEC disclosures, Martin, Knowlton, and Fitch were able to, and did, control the contents of the Registration Statement and the incorporated Prospectus, which contained materially untrue or misleading information and omitted material facts.

135.    As acknowledged in the Offering Materials, Defendants Martin and Knowlton were each also controlling persons of SMART within the meaning of Section 15 of the Securities Act at the time of the IPO by virtue of their voting power and their positions as two of SMART's four-member board of directors, which further enabled them to control the contents of the Offering Materials.

136.    Defendants Sodhani and Nathoo, by virtue of their appointment by Intel and Apax Partners to SMART's four-member board of directors, were also each controlling persons of SMART within the meaning of Section 15 of the Securities Act at the time of the IPO.  As signatories to the Registration Statement, and because of their positions of control and authority of members of SMART's board of directors, Sodhani and Nathoo were able to, and did, control the contents of the Registration Statement and the incorporated Prospectus, which contained materially untrue or misleading information and omitted material facts.

137.    By reason of the foregoing, Defendants Martin, Knowlton, Fitch, Sodhani and Nathoo are liable under Section 15 of the Securities Act to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired SMART securities pursuant or traceable to the Offering Materials, and who were damaged thereby.

**COUNT IV**

**<u>Violation of Section 15 of The Securities Act</u>**
**(Against Defendants Apax Partners and Intel)**

138.    Lead Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

139.    This count is asserted against Defendants Apax Partners and Intel for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and the other members of the Class who have asserted claims pursuant to Section 11 or 12(a)(2) of the Securities Act set forth above.

140.    This claim is not based on and does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Lead Plaintiff does not allege that any Individual Defendant acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

141.    Immediately prior to the IPO, Apax Partners owned 51.4% of SMART's Class A Subordinate Voting Shares and 46.7% of SMART's Class B shares, giving it 46.8% of SMART's total voting power.  Immediately prior to the IPO, Intel owned 25.8% of SMART's Class A Subordinate Voting Shares and 23.4% of SMART's Class B shares, giving it 23.5% of SMART's total voting power.

142.    As acknowledged in the Offering Materials, Defendants Apax Partners and Intel, through their voting power and the appointment of Defendants Nathoo and Sodhani as their designated directors to SMART's four-member board of directors, were each controlling persons

47

of SMART within the meaning of Section 15 of the Securities Act at the time of the IPO.  For example, the Offering Materials stated that "Intel and Apax Partners will have significant influence over our management and affairs and over all matters requiring shareholder approval, including the election of directors and significant corporate transactions."

143.    According to CW 5, the IPO was driven by Apax Partners, which sought to liquidate its investment in SMART.  CW 1 similarly reported, based on discussions with colleagues, that Intel also sought to "cash out" and "move on" by selling a large portion of its SMART shares in the IPO.

144.    The Offering Materials also made clear that the holders of SMART's Class B shares had entered into a securityholders agreement requiring them to exercise their voting power so as to ensure that the Board of Directors would at all times contain one director nominated by Apax Partners and one director nominated by Intel.

145.    At the time of the IPO, Defendants Nathoo and Sodhani served as representatives of Apax Partners and Intel, respectively, on the SMART Board of Directors and were, effectively, the agents of those entities:

- Apax Partners and Intel were the direct employers of Nathoo and Sodhani, respectively;

- Apax Partners and Intel had access to all reports, agendas, information and other information available to Nathoo and Sodhani as Company directors;

- Apax Partners and Intel participated in the preparation and dissemination of the Offering Materials through Nathoo and Sodhani,.

146.    Apax Partners and Intel also controlled, or had the power to control, the manner in which Defendants Nathoo and Sodhani would vote on matters as SMART Directors.  The Offering Materials noted that although the directors nominated by Apax Partners and Intel owed

48

fiduciary duties to the Company, "the duties owed to us could conflict with the duties such directors owe to other companies or investors."

147.    By reason of the foregoing, Defendants Apax Partners and Intel were able to, and did, control the contents of the Registration Statement and the incorporated Prospectus, which contained materially untrue or misleading information and omitted material facts.

148.    By reason of the foregoing, Defendants Apax Partners and Intel are liable under Section 15 of the Securities Act to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired SMART securities pursuant or traceable to the Offering Materials, and who were damaged thereby.

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

1.    Determining that this action is a proper class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2.    Awarding all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiff and all members of the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

3.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

4.    Such other and further relief as the Court may deem just and proper.

## X.    JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: November 4, 2011

Respectfully Submitted,

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
Avi Josefson (AJ-3532)
Jeroen van Kwawegen (JV-1010)
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Telephone: 212-554-1400
Facsimile:  212-554-1444

*Lead Counsel for the Class and Counsel for Lead
Plaintiff the City of Miami General Employees' and
Sanitation Employees' Retirement Trust*

KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON
Robert D. Klausner, Esq.
10059 N.W. 1st Court
Plantation, FL 33324
Tel: (954) 916-1202

*Counsel for Lead Plaintiff the City of Miami
General Employees' and Sanitation Employees'
Retirement Trust*