UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
THOMAS MCKENNA, individually and on  :
behalf of itself and all others      :
similarly situated,                  :       11 Civ. 7673 (KBF)
                        Plaintiffs,  :
                                     :       <u>OPINION & ORDER</u>
             -v-                     :
                                     :
SMART TECHNOLOGIES INC., <u>et al.</u>,    :
                                     :
                        Defendants.  :
                                     :
------------------------------------ X

KATHERINE B. FORREST, District Judge:

Lead Plaintiff the City of Miami General Employees' and
Sanitation Employees' Retirement Trust ("plaintiff" or "City of
Miami") brings this putative class action against defendants
SMART Technologies, Inc. ("SMART"), various of SMART's officers
and directors, and SMART's co-founders (who, as minority
shareholders prior to the initial public offering ("IPO"),
appointed one member each to SMART's four-person pre-IPO board
of directors)--<u>i.e.</u>, Intel Corporation ("Intel") and Apax
Partners L.P. with Apax Partners Europe Managers Ltd.
(collectively, "Apax" or the "Apax Defendants").  Plaintiff
alleges that the registration statement (the "Registration
Statement") and prospectus (the "Prospectus" and collectively
with the Registration Statement, the "Offering Documents") filed
in connection with SMART's July 14, 2010 initial public offering

1

contained materially false and misleading statements in violation of sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").

Defendants have jointly moved to dismiss plaintiff's Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

For the reasons that follow, defendants' motion is GRANTED IN PART and DENIED IN PART.

BACKGROUND

For purposes of ruling on the motion to dismiss, the Court accepts as true all well-pleaded allegations in the Amended Complaint and draws all reasonable inferences in plaintiff's favor.  See Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001).  The Court also considers the Securities and Exchange Commission ("SEC") filings that plaintiff references in the Amended Complaint--namely, SMART's Prospectus relating to the IPO, filed with the SEC on July 15, 2010.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

I.   THE PARTIES

A.   Plaintiff

Lead Plaintiff City of Miami manages pension assets on behalf of Miami's municipal general and sanitation employees.

(Am. Compl. (Dkt. No. 81) ¶ 17.)   City of Miami purchased SMART common stock in the IPO and in the post-IPO secondary market or traceable to the Offering Documents, over the period of time from July 14, 2010 through December 14, 2010.   (Id.; see also id. Ex. A at 2.)

 B. Defendants

 Defendant SMART is a Canadian corporation that designs, develops, and sells interactive technology products and solutions.   (Am. Compl. ¶ 18.)   See also SMART Techs. Inc., Prospectus (Form 424B4) at 1 (July 15, 2010) (hereinafter "Prosp.") (Decl. of Andrew Stern (Dkt. No. 102) Ex. A).   SMART is best known for its interactive whiteboards--the "core" of SMART's interactive technology solutions.   (Am. Compl. ¶ 18.) See also Prosp. at 1.   By SMART's own account, interactive whiteboards, which SMART introduced in 1991, "combine the simplicity of a whiteboard and the power of a computer," and allow the user via touch to "control computer applications, access the Internet, write in digital ink and save and share work."   Prosp. at 1.

 The "Individual Defendants"--Nancy L. Knowlton, G.A. (Drew) Fitch, David A. Martin, Salim Nathoo, Arvind Sodhani, Michael J. Mueller, and Robert C. Hagerty--are SMART's current or former officers and directors.   During the relevant time period, Knowlton was SMART's Chief Executive Officer; Fitch was SMART's

Chief Financial Officer and principal financial and accounting officer; Martin was Chairman of SMART's Board of Directors; and Nathoo, Sodhani, Mueller, and Hagerty were directors on SMART's board. (Am. Compl. ¶¶ 19-25.) Each signed the Registration Statement, except for Mueller and Hagerty who were named therein with consent "as about to become [] director[s]" of SMART. (Id. ¶¶ 19-25.)

The Apax Defendants advised or managed funds that held more than 56 million shares of SMART stock prior to the IPO, which amounted to approximately 47 percent of SMART's total voting power at the time of the IPO. (Am. Compl. ¶ 27.) Apax sold almost 20 million of its shares in the IPO. (Id.) Defendant Nathoo was one of Apax's partners. (Id.)

Intel owned more than 27 million shares of SMART's pre-IPO stock, which amounted to 23.5 percent of SMART's total pre-IPO voting power. (Id. ¶ 28.) Intel sold 10 million of its shares in the IPO. (Id.)

The third primary shareholder of SMART's pre-IPO stock was the wholly-owned company of SMART's co-founders, IFF Holdings Inc. ("IFF"), which held shares totaling just under 30 percent of SMART's total voting power. Prosp. at 100. IFF is not a party to this action.

II.  THE IPO

On July 14, 2010, SMART announced that it would offer to the public 38.83 million shares of Class A Subordinate Voting Shares at $17.00 per share, with trading on the NASDAQ to begin the following day.  (Am. Compl. ¶ 32.)  SMART offered the shares pursuant to (a) the Registration Statement filed with the SEC on June 24, 2010, amended initially on June 28, 2010 and then again on July 12, 2010, and effective July 14, 2010; and (b) the July 14, 2010 Prospectus which was incorporated into the Registration Statement and filed with the SEC on July 15, 2010.  (Id. ¶ 33.) SMART did not itself sell the shares to the public, but rather sold them to a syndicate of underwriters--Morgan Stanley & Co., Inc., Deutsche Bank Securities Inc., and RBC Dominion Securities Inc--who offered them to the public.[1]  Prosp. at 129-30.

III. THE ALLEGED MISREPRESENTATIONS AND OMISSIONS

Plaintiff alleges that the Offering Documents contained material misstatements of fact or omitted material facts regarding four topics:  (a) demand for SMART's "core" interactive whiteboards; (b) the demand for and benefits of SMART's then recently-acquired NextWindow business; (c) SMART's ability to sell its whiteboards to corporate or foreign clients; and (d) the status of SMART's internal enterprise resources

---

[1] The underwriters were originally named as defendants when this action was first filed (Compl. (Dkt. No. 1)), but subsequently were dismissed voluntarily (Dkt. No. 71).

planning system ("ERP").  Plaintiff's essential claim is that defendants were aware of specific facts regarding the four topics, but failed to disclose them in the Offering Documents, rendering the Offering Documents false and misleading.

A.  Demand for Interactive Whiteboards

Plaintiff alleges that the Offering Documents contained positive statements regarding the growing demand for SMART whiteboards when, at the time of the IPO, defendants affirmatively knew that demand for whiteboards was already materially declining.  (Am. Compl. ¶¶ 63-64.)

Specifically, plaintiff alleges that SMART benefitted from the American Recovery and Reinvestment Act of 2009 ("ARRA"),[2] which sought to "preserve and create jobs and promote economic recovery," among other things, by infusing public funds into the economy--most relevant here, financial aid for local school districts, including for Enhanced Education Through Technology Program.  See Pub. L. 111-5, § 3(a)(1).  (Am. Compl. ¶ 45.)  According to plaintiff, although schools used government stimulus funds to purchase SMART's interactive whiteboards (usually only once) (Am. Compl. ¶¶ 45, 46, 65), the Prospectus allegedly failed to disclose the "known trend" (as of the IPO) of decreased educational spending as ARRA funding began to dry

---

[2] Congress passed ARRA on February 17, 2009, which President Obama signed into law four days later.  (Am. Compl. ¶ 45.)

up.  (Am. Compl. ¶¶ 37, 65.)  See also Prosp. at 44, 50 ("demand for our core products has been increasing as a result of a general expansion of the market for interactive whiteboards and other complementary products") (emphasis added).

Plaintiff alleges, through four confidential witnesses ("CWs"), that as much as a year prior to the IPO and by at least March 2010--four months prior to the IPO--SMART was encountering a "'big slowdown'" in sales, which was confirmed by a "decrease in forecasted revenues from SMART'S training group in July 2010"--i.e., the month SMART made its public offering.  (Am. Compl. ¶¶ 40, 46 (quoting CWs); see generally id. ¶¶ 40-46.)  According to CW4, each school used ARRA funding to purchase interactive whiteboards once, and thus, as ARRA funding wound down prior to the IPO, SMART's sales already had decreased.  (Id. ¶ 43.)  On those grounds, as alleged through CW1, SMART "knew that the future of the [stimulus] program was uncertain," and thus, that the sales growth SMART had enjoyed prior to the IPO "wasn't going to continue."  (Id. ¶ 46 (emphasis added).)

Immediately following the allegedly misleading "demand" language, the Prospectus discloses that "the education market, which represents an estimated 85% of our revenue base, has been aided by various government economic stimulus programs in fiscal 2010 as governments undertook spending initiatives . . . ."  Prosp. at 50.  SMART credits those initiatives with

"support[ing] the growth in technology spending in education and the adoption of [its] technology in several markets."  Id.; see also id. at 16.

SMART cautioned investors that a decrease in "technology spending in education" "may adversely impact [its] revenue." Prosp. at 16; see also id. at 4.  SMART acknowledged that ARRA funding was limited, warning, "If state and local governments are unable to secure an alternative source of funds upon the depletion of the funds provided under the ARRA, we could experience a slowdown of revenue growth as a result of that lack of funding."  Id. at 16.

B.    Demand for NextWindow

Three months prior to the IPO, in April 2010, SMART acquired Next Holdings Limited ("NextWindow"), a company that "designs and manufactures interactive touch components to manufacturers of interactive displays and PCs," for $82 million. (Am. Compl. ¶ 54.)  See also Prosp. at 4, 45.  Plaintiff alleges that the acquisition was motivated by SMART's desire to resolve a patent dispute with NextWindow--a fact never disclosed in the Offering Documents.  (Am. Compl. ¶¶ 54, 83.)

As of July 14, 2010, there were no touch applications for Windows 7--i.e., the program through which NextWindow's touch components are run.  (Id. ¶ 55.)  The Offering Documents, however, state that "the Microsoft Windows 7 operating system

8

released in October 2009 supports touch capabilities for
computer capabilities for computer displays."  Prosp. at 69
(quoted in Am. Compl. ¶ 79).

Although the lack of Windows 7 touch applications allegedly
weakened the "demand for NextWindow's touch-enabled products"
"in the period leading up to the IPO" (Am. Compl. ¶ 55), it is
alleged that SMART touted a "strong and growing demand for
NextWindow products" in the Offering Documents (id. ¶ 78).
Plaintiff purports that even though the lack of touch
applications for Windows 7 in the period leading up to the IPO
purportedly "was known in the industry," "was known to SMART,"
and was known to the public (i.e., citing a July 12, 2010
msnbc.com article) at the time of the IPO, defendants "had a
duty to disclose" the impact of that fact on SMART's business.
(Id. ¶¶ 55, 83; see also id. ¶¶ 84, 85.)

C.  Ability to Sell to Corporate and/or Foreign Clients

According to plaintiff, in reliance upon CWs, the Offering
Documents contained misrepresentations and omissions related to
SMART's ability to expand sales of its core products to
corporate clients and into foreign markets.  (See Am. Compl.
¶ 47.)  SMART allegedly provided an overly optimistic view of
its ability to expand into corporate and foreign markets when it
knew that it was facing an uphill battle to do so, had not
invested the necessary resources, or at least had faced setbacks

that should not have allowed it to paint the rosy picture it did in the Offering Documents.   (Id. ¶¶ 37, 50-53, 67, 71, 73, 75.) Plaintiff takes particular umbrage at the representation that SMART sold 100 interactive whiteboards to British Telecommunications plc ("BT") "for use by more than 3,000 developers," Prosp. at 77, but did not disclose that SMART originally had pitched a deal that would include BT's purchase of 1,500 SMART whiteboards for use by 100,000 users that eventually was negotiated down to the terms of the disclosed deal.   (Am. Compl. ¶ 52; see also id. ¶ 74.)

The Prospectus contains risk disclosures in this regard. SMART forewarned potential investors that the U.S. and British market for interactive learning products was becoming "more saturated," which would lead to a decrease in the "growth rate of [SMART's] revenue," and thus, SMART would necessarily have to expand into additional foreign markets.   Prosp. at 16.   SMART disclosed that expansion into those new overseas markets could require development of additional "customized solutions," which (implicitly) had yet to be undertaken.   See id.   SMART further disclosed that it faced "lengthy and unpredictable sales cycles in foreign markets," including, in some instances, "indefinite deferrals of purchases or cancellations of requests for proposals."   Id.   SMART even acknowledged the questions about its ability to expand into foreign markets in its general risk

disclosures about managing its overall growth, stating that "the difficulties and risks associated with our growth could be exacerbated by our expansion into foreign markets." Id. at 12.

With regard to developing its network in the corporate sector, SMART disclosed that such expansion would require "develop[ing] new distributor and dealer relationships," in which SMART "may not be successful." Id. at 21.

D.   ERP

SMART's ERP system purportedly "integrate[s] the Company's finance and accounting department with its sales, manufacturing and service departments" in an effort "to provide a central repository of information that is shared among the various departments in order to smooth the flow of information across the organization." (Am. Compl. ¶ 57.)  It is alleged that ERP "was materially deficient" from the time of its implementation in 2008 (id. ¶ 58), and any efforts to correct the issues were not rectified fully by the time of the IPO.  (Id. ¶¶ 60-62.)  As of July 2010, SMART allegedly "was using multiple sets of books to track operations and finances, and could not accurately assess its finances or shipments," such that SMART hired "Deloitte consultants" to "improve[e] information technology functions"--namely, ERP.  (Id. ¶¶ 57, 59.)

The Prospectus included an ERP-related risk disclosure that is worth quoting in full:

On April 1, 2008, we commenced implementing a new
enterprise resource planning, or ERP, system. We
experienced significant difficulties with this
implementation which resulted in severe disruptions to
our operations and to our financial and accounting
systems for a number of months. For example, we were
unable to issue invoices or ship any products for a
significant period of time during the first quarter of
fiscal 2009. This resulted in our inability to
complete reliable quarterly financial statements for
fiscal 2009. In order to temporarily resolve the
issues associated with the ERP system implementation,
we adopted several manual processes and workarounds to
perform functions that would typically be automated in
a company of our size. By the end of the second
quarter of fiscal 2009, we had shipped all the
products that we were unable to ship in the first
quarter of fiscal 2009, and as of December 31, 2009,
we had substantially resolved all material issues
associated with the portions of the ERP system that we
had implemented as of that date.

We have not yet completed the implementation of the
new ERP system and many manual processes for functions
that should be automated remain. The existence of such
manual processes allows the possibility for human
error that could potentially result in material
mistakes in our operations as well as our financial
reporting. Such mistakes, if made, could have a
material adverse effect on our business. In addition,
we currently do not have, and until we complete the
implementation of our ERP system, we will not have,
the necessary systems in place to provide us with
certain data that would normally be automatically
collected in an organization of our size. For example,
until the first quarter of fiscal 2010, our systems
were unable to generate operating expense reports for
our various business cost centers. Furthermore, we
have identified, and are in the process of correcting,
additional weaknesses in the ERP system that could
potentially have a material adverse effect on our
business. Specifically, the configuration of our ERP
system lacks sufficient authority controls and many
users are able to make changes to the system that may
affect all users. If a user makes unauthorized changes
to the system, our business could be harmed. These

issues did not prevent us from obtaining unqualified
audit reports on our annual financial statements.

In the first quarter of fiscal 2010, we continued to
experience problems of a less material nature in the
implementation of the ERP system. For example, on one
occasion, a particular module of the system was not
properly tested, and after implementing the module, we
discovered that the system prevented the shipment of
certain products and the issuance of invoices for
certain shipments. While in that particular instance
we were able to remediate the problem in time to
prevent any significant issues, we cannot assure you
that similar problems will not recur or that we will
be able to remediate these problems on a timely basis.
If additional problems arise in the implementation of
additional modules of the ERP system, we could
experience further disruptions to our business and
operations that could have a material adverse effect
on our business and could impair our ability to report
our operating results on a timely and accurate basis.

Prosp. at 20 (emphases added) (quoted in Am. Compl. ¶ 87
(different emphases supplied)).

E.    Post-IPO "Corrective" Disclosures

On November 9, 2010, four months after the IPO, SMART

issued a Form 6-K in which it reported its 2011 second quarter

financial results. See SMART Techs. Inc., Report of Foreign

Private Issuer (Form 6-K) (Nov. 9, 2010). SMART disclosed that

SMART experienced "slower than anticipated sales in our recently

acquired NextWindow business," reduced revenue guidance for the

second half of SMART's 2011 fiscal year by nine percent, and

reported that second quarter earnings fell 22 percent. Id. at

Ex. 99.1. (See also Am. Compl. ¶ 91.) On a conference call

that same day, defendant Knowlton confirmed that SMART "adjusted

our fiscal 2011 revenue outlook lower by approximately $80 million due to lower-than-expected performance of our recently-acquired NextWindow business and the more conservative near-term growth estimates for the North American market." (Am. Compl. ¶ 92 (quoting conference call).) In that same call, Knowlton stated that the NextWindow sales could be attributed to "the limited number of touch applications developed for Windows 7," and that SMART expected stagnant sales of NextWindow products until the release of Windows 8 (expected in late 2012). (Id. ¶ 93.) The next day, SMART's stock dropped by 30 percent-- from $13.07 at market close on November 9 to $8.91 on November 10. (Am. Compl. ¶ 95.)

On May 18, 2011, SMART issued its full-year and fourth quarter 2011 financial results in which allegedly revealed that it had missed its quarterly earnings target, with a decline of 28 percent, and earnings per share of $0.01, both of which were attributable to "significant increase in operating expenses"-- namely, research and development for corporate development. (Am. Compl. ¶ 99.) See also SMART Techs. Inc., Report of Foreign Private Issuer (Form 6-K) (May 18, 2011). Those disclosures allegedly caused a 23 percent drop in SMART's stock price. (Am. Compl. ¶ 101.)

IV.   PROCEDURAL HISTORY

On January 26, 2011, Thomas McKenna filed this action in the United States District Court for the Northern District of Illinois.  (See Dkt. No. 1.)  On June 16, 2011, Judge Edmond Chang of the Northern District of Illinois appointed plaintiff City of Miami lead plaintiff under the PSLRA's "greatest financial interest" presumption.  (Dkt. No. 63.)

On March 15, 2011, defendants moved pursuant to 28 U.S.C. § 1404 to transfer this action to the Southern District of New York, which plaintiff opposed.  (Dkt. Nos. 41, 68.)  On October 14, 2011, Judge Chang granted defendants' motion, and the instant action joined this Court's docket.  (Dkt. No. 78.)

Pursuant to the schedule set by the Court at the December 2, 2011 initial conference in this matter, defendants filed a joint motion to dismiss the Amended Complaint on January 6, 2012.  (Dkt. No. 100.)  Plaintiff opposed the motion on February 6, 2012, and the motion was fully briefed as of February 17, 2012.  (Dkt. Nos. 104, 105.)  The Court heard oral argument on the motion on March 9, 2012.  (See Dkt. No. 107.)

DISCUSSION

To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns, Inc., 493

F.3d at 98 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010)(quoting Twombly, 550 U.S. at 570).  See also Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (same).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949.  In applying that standard, the court accepts as true all well-pleaded factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."  Id.  If the court can infer no more than "the mere possibility of misconduct" from the factual averments, dismissal is appropriate.  Starr, 592 F.3d at 321 (quoting Iqbal, 129 S.Ct. at 1950).

I.   PLEADING STANDARD

        Defendants argue that the Amended Complaint "sounds in fraud," and thus, is subject to Rule 9(b)'s heightened pleading standards.  (Mem. of Law in Support of Defs.' Joint Mot. to Dismiss Pl.'s Am. Compl. ("Defs. Mem.") (Dkt. No. 101) at 11-12.)

        Rule 9(b) requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake."

Fed. R. Civ. P. 9(b).  A complaint predicated upon fraud must
"(1) specify the statements that the plaintiff contends were
fraudulent, (2) identify the speaker, (3) state where and when
the statements were made, and (4) explain why the statements
were fraudulent."  Rombach v. Chang, 355 F.3d 164, 170 (2d Cir
2004) (quotation marks omitted).  Failure to do so requires
dismissal of the complaint.  Id.

Although sections 11 and 12 do not require allegations of
fraud, when a claim under those statutes is "premised on
averments of fraud," the heightened pleading standard applies.
Rombach, 355 F.3d at 170, 171.  A determination that a complaint
"sounds in fraud" turns on the conduct alleged, not on the
claims asserted.  Id. at 171.

Close scrutiny of the Amended Complaint confirms that it
sounds in fraud.  See Ladman Partners, Inc. v. Globalstar, Inc.,
No. 07 Civ. 976, 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30,
2008).  The "gravamen" of the Amended Complaint is that
defendants, as allegedly evidenced by the CWs, were aware of
certain known trends and, pursuant to Item 303 of SEC Regulation
S-K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303"), were obligated
to disclose the impact of those trends on SMART's business.  By
allegedly failing to make disclosure of known facts, plaintiff
claims that the Offering Documents were materially "false and
misleading."  (See, e.g., Am. Compl. ¶¶ 65 ("Defendants had a

duty to speak fully and truthfully on that subject," but "fail[ed] to disclose these facts" which "rendered the Offering Materials false and misleading"), 71 (same), 74 (same), 77 (statements about global network and corporate clients were "materially false and misleading"), 83 ("Defendants had a duty to disclose that very few touch applications had been developed for Windows 7 in the period leading up to the IPO," and that "SMART acquired NextWindow in part to resolve a patent dispute" but failed to do so which "rendered the Offering Materials false and misleading), 86 (same), 89 (same re ERP); see also Am. Compl. ¶ 7 (the subject misrepresentations were "materially false").)  Plaintiff further alleges that defendants purposefully planned the date of the IPO such that the Offering Documents would not disclose facts already known to defendants, but not to the investing public.  (Am. Compl. ¶ 46.)

Allegations that defendants (i) sought to hide unpleasant, known facts from the public--or the material impact of those facts on aspects of SMART's business--and (ii) strategically timed the IPO to take advantage of certain known, but not-yet-disclosed facts, rendering the Offering Documents materially false and misleading, amount to claims of purposeful, fraudulent conduct.  See Rombach, 355 F.3d at 172 (allegations that, inter alia, "materially false and misleading statements were issued" contributed to the claim sounding in fraud); Ladmen Partners,

Inc., 2008 WL 4449280, at *11 (finding that the complaint
sounded in fraud where "Plaintiff basically assert[ed] that not
only did Globalstar have actual knowledge of the degradation of
its satellite constellation prior to the IPO, but it
deliberately withheld information from investors"); In re Axis
Capital Holdings Ltd. Secs. Litig., 456 F. Supp. 2d 576, 597
(S.D.N.Y. 2006) (where the plaintiffs "allege[d] that the
Registration Statement and Prospectus contained materially false
and misleading information," the Securities Act claims "sounded
in fraud").

Plaintiff rejoins that it merely alleges that defendants
"must have known," leading to the conclusion that the Amended
Complaint is cloaked in negligence, not fraud.  (Lead Pl.'s
Opp'n to Defs.' Mot. to Dismiss the Compl. ("Pl. Opp'n") (Dkt.
No. 104) at 16.)[3]  Such an argument ignores the statements of
plaintiff's own CWs, who allege that certain facts were known
internally at SMART but were not disclosed in the Offering
Documents.  (See, e.g., Am. Compl. ¶¶ 41-43, 46, 52, 55, 58-59,
62 ("CW 3 explained, 'We weren't doing the types of numbers they
said we were.  I don't want to say fabricated, but speculative
at the best of times.'").)  Plaintiff cannot, on the one hand,

---

[3] Even if plaintiff only alleged that defendants "must have known" of the
alleged problems but failed to disclose them, that in itself would be
sufficient to trigger Rule 9(b).  See Ladmen Partners, Inc., 2008 WL 4449280,
at *11 (allegations that the defendant "had to know" were part of the
"classic allegations of fraud").

use to their advantage the statements of their CWs to allege that defendants in fact actually <u>knew</u> certain facts and purposely omitted them from the Offering Documents and, on the other hand, disclaim the substance of those statements to evade Rule 9(b).  A finding that the Amended Complaint sounded in anything other than fraud would require turning a blind eye to the foundation upon which this action is premised.

Having found that the Amended Complaint sounds in fraud, the Court concludes that, except as to the statements by plaintiff's CW regarding the fact that SMART knew that demand was decreasing (as discussed further below), it nevertheless meets Rule 9(b)'s "particularity" requirement.  As to the three other topics as to which it is alleged that the Offering Documents were false and misleading, the Amended Complaint sufficiently states--and gives defendants notice--of the allegedly false particular statements, identifies in which document those statements can be found, where in the document they are, the date that the document was filed with the SEC (<u>i.e.</u>, who the "speaker" is and "where and when the statements were made"), and explains why the statements made were purportedly false and misleading--<u>i.e.</u>, defendants knew certain facts, but purposely did not disclose them and/or their impact on SMART's business.  Thus, there is no basis for the Court to

dismiss the Amended Complaint <u>in full</u> on these grounds.[4]   <u>See</u>
<u>Rombach</u>, 355 F.3d at 170.

II.  SECTIONS 11 AND 12

Sections 11 and 12 are "Securities Act siblings with
roughly parallel elements."  <u>In re Morgan Stanley Info. Fund</u>
<u>Secs. Litig.</u>, 592 F.3d 347, 359 (2d Cir. 2011).  As with all
siblings, sections 11 and 12 have certain similarities, but also
certain differences.  Under both statutes, a plaintiff need only
establish one of three bases for liability:  "(1) a material
misrepresentations; (2) a material omission in contravention of
an affirmative legal disclosure obligation; or (3) a material
omission of information that is necessary to prevent existing
disclosures from being misleading . . . ."  <u>Litwin v.</u>
<u>Blackstone</u>, 634 F.3d 706, 715-716 (2d Cir. 2011).  (As discussed
above and below, plaintiff's case rests on the second basis for
liability.)  Neither provision requires allegations of scienter,
reliance, or loss causation in order to state a claim.  <u>Fait v.</u>
<u>Regions Fin. Corp.</u>, 655 F.3d 105, 109 (2d Cir. 2011).

Section 11 applies to material misstatements or omissions
made in a registration statement while section 12(a)(2) applies
to the same as contained in prospectuses, among other things.
<u>Id.</u>  Section 11 imposes "virtually absolute" liability while

---

[4] As mentioned above and discussed further in Part II.A.i., <u>infra</u>, the section
11 claim (and thus, the section 12 and 15 claims) related to demand for
SMART's core interactive whiteboards do not meet Rule 9(b)'s requirements.

section 12 holds defendants accountable for negligence.  In re Morgan Stanley Info. Fund, 592 F.3d at 359.

In considering whether alleged misrepresentations and/or omissions constitute violations of the securities laws, a court must read the offering documents as a whole.  Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996); see also In re Morgan Stanley Info. Fund, 592 F.3d at 366 ("When analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety."); I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991).  The "central issue" a court considers in assessing sibling Securities Act claims "is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities."  Olkey, 98 F.3d at 5 (quotation marks and brackets omitted).  Where "the risks of which plaintiffs complained were disclosed in the prospectus"--i.e., where a "reasonable investor" was informed "about the nature of the securities"--dismissal of the claims under Rule 12(b)(6) is appropriate.  Steinberg v. PRT Grp., Inc., 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) (citing Olkey, 98 F.3d at 9).

A.   Section 11

Plaintiff's theory of the case rests on the so-called "second basis for liability"--i.e., that defendants omitted certain material information from the Offering Document in contravention of an affirmative legal disclosure obligation (here, Item 303), which rendered the Offering Documents false and misleading and/or caused the Offering Documents to contain material misrepresentations.  See Litwin, 634 F.3d at 715-716; In re Morgan Stanley Info. Fund, 592 F.3d at 360.

The Court addresses seriatim the four topics on which the Offering Documents were allegedly misleading, and considers, as it must, the Offering Documents (namely the Prospectus) as a whole.

i. Demand for Interactive Whiteboards

Of the four topics, plaintiff principally focuses on the allegations that SMART knew about, but failed to disclose, a "precipitous decline in the demand" for SMART's "core" interactive whiteboards.  (See Am. Compl. ¶¶ 8, 37, 40-46, 63-65.)

Defendants counter those allegations, arguing first that the Prospectus' risk disclosures could not have lead a reasonable investor to believe that, inter alia, "SMART's sales figures had not benefitted from government-stimulus [i.e., ARRA] spending," and that "SMART's sales figures would not decline in the future

if stimulus spending were to decline." (Defs. Mem. at 16
(emphasis added).) Defendants are correct as to the former and
incorrect on the latter. They are correct on the former because
the Prospectus, read as a whole, clearly demonstrates that SMART
was a beneficiary of ARRA-spending in its interactive whiteboards
sales. See, e.g., Prosp. at 16 ("We believe we have been an
indirect but perhaps substantial beneficiary of . . . ARRA.");
id. ("We believe that some of our sales since the enactment of
the ARRA in February 2009 resulted from state and local
governments' obtaining funds under the ARRA for technology
purchases."). They are incorrect on the latter because the Court
reads the Prospectus as touting ARRA-funding--and thus, ARRA-
funded sales--as a present-based phenomenon. See, e.g., id. at
16. In other words, even if a reasonable investor would
understand that absent ARRA funding demand for SMART products
would decline in the future, a reasonable investor would not have
read the disclosures to state that demand was presently
declining, or had declined already.

The parties focus on the verb tense of SMART's demand
disclosures to assess whether those statements are ones dealing
with past, present, or future demand. (Defs. Mem. at 16, 17; Pl.
Opp'n at 22; Reply Mem. of Law in Further Support of Defs.' Joint
Mot. to Dismiss Pl.'s Am. Compl. ("Reply Mem.") (Dkt. No. 105) at
3.) The phrase that has taken hold on that front is "has been

increasing."  See, e.g., Prosp. at 44, 50.  Defendants argue that
the phrase references the time period from 2008 through 2010
(Defs. Reply at 3), while plaintiff sees it as a report on the
existing state of demand--i.e., that demand was continuing to
increase at the time of the IPO (Pl. Opp'n at 22).

The purpose of a Prospectus for an initial public offering,
like SMART's here, is to provide potential investors with a
picture of the company's financial health and prospects for
growth, which in turn provides a projection of the investors'
return on their investment.  Statements of demand trend for
SMART's core products leading up to the IPO, without any explicit
disclosure regarding differences or changes in that trend,
necessarily provided a present and future perspective on demand
for SMART's interactive whiteboards.  In other words, a
reasonable investor would have understood the "has been
increasing" language, even if referring to the 2008 to 2010 time
period as defendants argue, with a view that demand is
continuing--and will continue--to increase.

Thus, the Court must turn to whether plaintiff plausibly
alleges that at the time of the IPO SMART knew that demand for
interactive whiteboards either had already decreased or would do
so imminently such that the statements regarding demand are
misleading.  Plaintiff relies exclusively on statements by four

CWs--primarily on the statements of CW1--to demonstrate such knowledge.  (See Am. Compl. ¶¶ 40-46.)

To determine whether confidential witness statements give facial plausibility to a plaintiff's claims, a court need only determine whether the CW allegations are alleged with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000). The complaint must provide descriptions of the positions the CWs held such that the court can determine the probability "that a person in such position would have information regarding" the allegations at issue.  In re Gen. Elec. Co. Secs. Litig., No. 09 Civ. 1951, 2012 WL 90191, at *11 (S.D.N.Y. Jan. 11, 2012).

The allegations regarding CWs 3 and 4 fall short of meeting either the above standard or Rule 9(b)'s requirements.  CW3, a "Senior Manager in Global Information Systems Service Operations," provides only that "a slowdown in sales 'was apparent'" "months before the IPO."  (Am. Compl. ¶ 42.)  As to CW4, "an Education Account Representative for SMART," the Amended Complaint alleges only that CW4 "confirmed the decline in sales prior to the IPO," and that the government funding was a temporary bump given that "SMART's whiteboards were a one-time purchase and sales had decreased before the IPO."  (Id. ¶ 43.) The Amended Complaint provides the Court with no information as

to why individuals who held the positions that CW3 and CW4 held would have particular knowledge as to that information nor does it provide information as to by which defendants the particular knowledge of declining demand was held--or where or when particular defendants came to have that information. Accordingly, the Court will not consider the allegations supported by the statements of CW3 and CW4.

That leaves plaintiff with CWs 1 and 2 to support their "knowledge of declining demand" claim. Both CW1 and CW2 were in SMART's "training" division. CW1 "worked at the Company's headquarters in the Services Division," "including as a Team Leader in Technical Training," and CW2 was a "Corporate Trainer." (Am. Compl. ¶¶ 40-41.) The allegations do not provide sufficient plausible detail as to why individuals who held those positions would have any knowledge regarding the demand for SMART's interactive core products. Cf. In re Scottish Re Grp. Secs. Litig., 524 F. Supp. 2d 370, 392-93 (S.D.N.Y. 2007) ("The CWs, all of whom claim knowledge of a systematic failure in the Company's ability to manage its financial information, occupied positions that would have allowed for relevant hands on experience in various parts of the Company.").

Plaintiff attempts to buttress CW1's alleged understanding of the decline in demand for whiteboards through the statement, "'Training revenues mirrored sales revenues. If sales go up,

27

training revenues go up; if sales go down, training revenues go down.'" (Am. Compl. ¶ 40.) Such a statement is, however, conclusory. There are no allegations of reports or other internal documents that show the correlation between training and sales revenue and/or why someone with the title "Team Leader" (let alone "Corporate Trainer" like CW2) would have such knowledge (other than circumstantially) of any such correlation. See Pyramid Holdings, Inc. v. Invernness Med. Innovations, Inc., 638 F. Supp. 2d 120, 127-28 (D. Mass. 2009) (dismissing Securities Act claims where the plaintiff's confidential witnesses allegations were "too subjective," "lack[ed] contextualizing information," or provided information that was "insufficient to draw any meaningful conclusions").

CW1's allegation of an internal SMART report that forecasted revenues for SMART's training group in July 2010 "confirmed" "the big slowdown in sales" (Am Compl. ¶ 40)--without more--does not "nudge[] the demand claims across the line from conceivable to plausible." See Twombly, 550 U.S. at 570. In particular, the Amended Complaint does not allege which, if any, of defendants saw the report and, as above, why or how the "forecasted revenues from SMART's training group" were correlated to demand for SMART's interactive whiteboards. Thus, that allegation cannot support the section 11 demand claim. See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris

Cos., 75 F.3d 801, 812 (2d Cir. 1996) (an "unsupported general claim of the existence of confidential company sales reports that revealed [a] larger decline in sales is insufficient to survive a motion to dismiss"); see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008) ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information" (quotations marks and citation omitted)).

Taken collectively, CW1 and CW2's allegations simply are not enough (particularly when compared to the type of allegations that courts in this District have found sufficient) to show that defendants knew that demand for interactive whiteboards had declined prior to the IPO.  Cf. In re Ambac Fin. Grp., Inc. Secs. Litig., 693 F. Supp. 2d 241, 267-68 (S.D.N.Y. 2010) (allegations of scienter were supported by confidential sources where the sources, inter alia, "ma[d]e detailed allegations that Ambac lowered its underwriting standards in several ways, and that such changes were known to Ambac's officers," including identifying "[a] memo detailing th[e] change [in lowering overcollateralization requirements for HELOC deals from 3.5% to 0.5%] [that] was sent to the Credit Risk Committee," on which defendants sat).

Drawing all inferences in plaintiff's favor, the CW allegations would have passed muster under Iqbal and Twombly. But under Rule 9(b), the allegations supported by CWs 1 and 2 (and certainly CWs 3 and 4) simply do not have the hallmark specificity to support plaintiff's claim. See Rombach, 355 F.3d at 170. Without additional "corroborative facts," the section 11 claim as to declining demand cannot withstand defendants' motion. See Ladmen Partners, Inc., 2008 WL 4449280, at *16.

The Court does not find that such allegations are irreparably insufficient, however. It may be that plaintiff has sufficient factual information to bolster the demand allegations. Accordingly, the section 11 claim related to demand for SMART's interactive whiteboards is dismissed without prejudice; plaintiff is granted leave to replead this claim. See ATSI Commc'ns, Inc., 493 F.3d at 108 ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b).").

ii. Demand for NextWindows

Although the Prospectus does not include projections of future demand for NextWindow (see Defs. Mem. at 25), that does not render SMART's statements about NextWindow inactionable. SMART's touting its expectation that the NextWindow acquisition "will accelerate our ability to expand into the market for interactive touch products other than interactive whiteboards,"

Prosp. at 6, put the question of such expansion--and
NextWindow's contribution to that expansion--"in play" such that
SMART was required to make full disclosures to ensure the
accuracy of the Offering Documents. (See Pl. Opp'n at 26-27;
Defs. Reply at 5-6.)  See Freudenberg v. E*Trade Fin. Corp., 712
F. Supp. 2d 171, 179-80 (S.D.N.Y. 2010) ("Once corporate
officers undertake to make statements, they are obligated to
speak truthfully and to make such additional disclosures as are
necessary to avoid rendering the statements made misleading"
(quotations marks, citations, and alterations omitted)).

    That the world was "on notice" of the absence of Windows 7
touch applications is insufficient to absolve defendants of
liability as to those statements. (See Defs. Mem. at 26.)
Although it is true that "information already in the public
domain" or "reasonably available" to shareholders or potential
investors is part of the "total mix of information" investors
should consider, Garber v. Legg Mason Inc., 347 Fed. Appx. 665,
668 (2d Cir. 2009), an issuer has a duty to disclose information
or facts in the public domain where it and/or its impact is or
would be "material in the eyes of a reasonable investor,"
Litwin, 634 F.3d at 718, 719.

    Materiality of an omitted fact is actionable where "a
reasonable investor would have considered [it] significant in
making investment decisions."  Litwin, 634 F.3d at 716-17

(quoting <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 161-62 (2d Cir. 2000) (citing <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231, 107 S.Ct. 978, 99 L.Ed.2d 194 (1988))).  A court need not assess whether an "investor would have acted differently if an accurate disclosure was made," but only whether there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available."  <u>Id.</u>

Item 303--the SEC regulation upon which plaintiff relies for its theory that defendants should have disclosed (a) the lack of touch applications for NextWindows; and (b) the impact of that fact on SMART's business--requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  As the Second Circuit recognized in <u>Litwin</u>, "the SEC's interpretive release regarding Item 303" notes that disclosure is required "'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" 634 F.3d at 716 (citation omitted).

Defendants argue that the Prospectus does not contain misleading statements regarding NextWindow because there was no negative trend as of the relevant date.  (Defs. Reply at 6.)  But Item 303 also requires disclosures as to "known . . . uncertainties."  17 C.F.R. § 229.303(a)(3)(ii).  It is plausible that the total lack of any touch applications for Windows 7 would create a "known uncertainty" as to how, whether, and when SMART could "accelerate" its "expan[sion] into the market for interactive touch products"--and the material effect of such acceleration (or lack thereof) on SMART's financial condition.  The Offering Documents do not contain any disclosure to that effect, however.

Defendants point instead to the following disclosure as an adequate warning of the potential problems with NextWindow:  "If [SMART] is unable to integrate [its] products with certain third-party operating system software and other products, the functionality of our products would be adversely affected."  Prosp. at 22 (cited in Defs. Mem. at 26).  As an initial matter, that warning bears no clear connection to NextWindow when read in the context of the entire Prospectus.  A reasonable investor reading that disclosure would expect that there was a possibility of integration between SMART and third-party operating systems.  But without any available applications, no integration could be possible--which the Prospectus does not

state anywhere.  At bottom, the Prospectus' discussion of NextWindow is inadequate to provide a reasonable investor with a clear picture of SMART's ability to integrate NextWindow products and thus, "accelerate [SMART's] ability to expand into the market for interactive touch products . . . ."  Prosp. at 4.

Further, defendant Knowlton's statements on the November 9, 2011 conference call regarding the fact that the "limited number" of touch applications for Windows 7 contributed to disappointing NextWindow sales (Am. Compl. ¶ 93) likewise carries the claim over the line from conceivable to plausible. As alleged in the Amended Complaint, the number of Windows 7 touch applications could only have increased from July 14, 2010 to November 9, 2011, meaning that SMART certainly knew of the trend or uncertainty and could have--or should have--considered how such trend or uncertainty would or could affect the demand for NextWindow products.

On the allegations here, the Court finds that plaintiff plausibly alleges that defendants omitted information about NextWindow that was material to their business that they were legally required to disclose.  Plaintiff's claims as to NextWindow thus withstand defendants' motion to dismiss.

      iii.Expansion into Corporate and Foreign Markets

Plaintiff reduces its allegations regarding SMART's expansion into corporate and foreign markets to the fact that

SMART failed to disclose the need for significant additional investments to accomplish such expansion.  (Pl. Opp'n at 29-30 (foreign markets); id. at 30-31 (corporate sales).)  Reading the Prospectus as a whole, the Court does not find that the discussion of SMART's expansion into those markets amounts to actionable statements under the Securities Act.

The risk disclosures directly address that SMART faced an uphill battle in building its hold in both corporate and foreign markets.  Taking the latter first, SMART's risk disclosures state that "[i]n order for [its] products to gain broad acceptance in foreign markets, we may need to develop customized solutions specifically designed for each country in which we seek to grow our sales," including "significant customization and modification" of SMART's software "to adapt to the needs of foreign customers" such that it was available "in several languages and alphabets."  Prosp. at 16 (emphasis added).  Any reasonable investor digesting that disclosure would understand "develop[ment] [of] customized solution[s]" to require investment on SMART's part.

With regard to plaintiff's allegation that SMART should have disclosed that it originally pitched a larger contract to BT than the one disclosed in the Prospectus (see Am. Compl. ¶¶ 52, 74), that cannot amount to an actionable misstatement or omission.  Taken to its logical extension, requiring companies

to disclose the substance of all contract negotiations would impose new and substantial burdens on businesses.  Compelling such a disclosure obligation could impose a severe impediment to even beginning contract discussions between companies if outcome was known to be uncertain (as often, of course, it is).  The Court declines to read such a burdensome requirement into the securities laws.  Accordingly, plaintiff's allegations as to foreign sales do not form the basis for a claim.

Plaintiff's allegations as to corporate sales fare no better.  SMART clearly acknowledged that "there has not been widespread adoption of interactive whiteboard solutions" in the business sector, and disclosed that corporate and government sales collectively only amounted to 15 percent of SMART's revenue.  Prosp. at 20, 77.  Those statements in and of themselves address the allegations that SMART subrogated corporate sales in favor of education sales (including those allegations supported by statements from two of plaintiff's CWs).  (See Am. Compl. ¶¶ 48-51; see also Pl. Opp'n at 30-31.)

The allegation that plaintiff did not have "workable corporate products" (Pl. Opp'n at 31 (citing Am. Compl. ¶¶ 99-100)) likewise cannot withstand SMART's risk disclosures.  SMART conceded that its interactive whiteboards in their current form were not appropriate for corporate or government users who are "occasional users for whom the training required to use our

interactive whiteboards may be too significant of a time investment." Prosp. at 20. According to the Prospectus, expansion into the corporate sector thus would "depend on [SMART's] ability to introduce products that are easier to use intuitively with relatively minimal or no training." Id. at 20-21. The Court finds the only reasonable interpretation of that disclosure to mean that SMART needed to develop new products to expand its business into the corporate sector.

The Prospectus clearly addressed the risks relating to the expansion into corporate and foreign markets; they, therefore, do not support a section 11 claim. See Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 360 (2d Cir. 2002) ("The cautionary language addresses the relevant risk directly, and therefore neither offering memorandum was misleading."); I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991) (the "central inquiry" is "whether defendants' representations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment").

iv. ERP

As plaintiff would have it, the numerous references throughout the Prospectus regarding SMART's ERP system, including an extensive and detailed risk disclosure, is actionable because the risk disclosure discusses past problems

37

and does not include enough language about the continuing problems with ERP.  (Pl. Opp'n at 32-34.)  The Court disagrees.

The ERP risk disclosure is quite explicit and comprehensive regarding present and future risks.  Reading the full ERP risk disclosure, no reasonable investor could possibly have thought that SMART had adequate internal controls.  Indeed, the Court finds that disclosure nothing if not disquieting.  So much so that the Court finds it necessary to reiterate part of the disclosure here to demonstrate just how it was "specific enough to warrant a reasonable investor's attention."  <u>Olkey</u>, 98 F.3d at 9.

> The Prospectus stated that SMART
>
> <u>had not yet completed</u> the implementation of the new ERP system and <u>many manual processes for functions that should be automated remain</u>.  The existence of such manual processes allows the possibility for human error that could potentially result in material mistakes in our operations as well as our financial reporting.  Such mistakes, if made, could have a <u>material adverse affect</u> on our business.

Prosp. at 20 (emphases added).  In addition, the Prospectus disclosed that "the configuration of our ERP system <u>lacks</u> sufficient authority controls and many users are able to make changes to the system that may affect all users."  <u>Id.</u> (emphasis added).  Those statements are couched in the <u>present</u> tense--<u>i.e.</u>, they reveal current problems at SMART.  A reasonable investor, reading the full ERP disclosure, would

understand that SMART was continuing to do certain of its books "by hand," which allowed for significant room for error.   The full ERP disclosure is more than sufficient to find that defendants did not make misstatements or omissions about ERP in the Offering Documents.   See Halperin, 295 F.3d at 360.

B.   Section 12

i.Section 12 Claims Against SMART

For the reasons that certain alleged misrepresentations or omissions succeed or fail with regard to plaintiff's section 11 claims against SMART, so too do they succeed or fail with respect to section 12.   See Fait, 655 F.3d at 109, 110, 112; In re Morgan Stanley Info. Fund, 592 F.3d at 359-60, 361.   Given the cautionary statements with respect to SMART's expansion into corporate/foreign markets and ERP, defendants cannot be liable under section 12(a)(2).   See P. Stoltz Family P'ship L.P. v. Daum, 355 F.3d 92, 96 (2d Cir. 2004) ("A defendant may not be liable under § 12(a)(2) for misrepresentations in a prospectus if the alleged misrepresentations were sufficiently balanced by cautionary language within the same prospectus such that no reasonable investor would be misled about the nature and risk of the offered security.").

Plaintiff may proceed against SMART under section 12(a)(2) for alleged misrepresentations or omissions relating to the statements about demand for NextWindows.

The section 12(a)(2) claim with respect to demand for SMART's interactive whiteboards is dismissed without prejudice for the same reasons as the section 11 claim on that topic.

### ii. The Individual Defendants as Statutory Sellers

As discussed above, sections 11 and 12(a)(2) have "roughly parallel elements." In re Morgan Stanley Info. Fund Secs. Litig., 592 F.3d at 359. A prima facie section 12(a)(2) claim requires that (a) defendant be a "statutory seller"; (b) who effectuated the alleged violative sale "by means of a prospectus or oral communication"; and (c) said prospectus or oral communication must "include[] an untrue statement of a material fact or omit[] to state a material fact necessary in order to make the statutes, in the light of the circumstances under which they made, not misleading." 15 U.S.C. § 77l(a)(2); In re Morgan Stanley Info. Fund, 592 F.3d at 359. Thus, establishing that an individual or entity is a statutory seller is a necessary prerequisite to stating a claim under 12(a)(2). See In re Morgan Stanley Info. Fund, 592 F.3d at 359.

An individual meets the definition of a "statutory seller" subject to 12(a)(2) liability in one of two circumstances: (i) he "passed title, or other interest in the security, to the buyer for value," or (ii) he "successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."

Pinter v. Dahl, 486 U.S. 622, 642, 647, 108 S.Ct. 2063, 100
L.Ed.2d 658 (1988); see also In re Morgan Stanley Info. Fund,
592 F.3d at 359.

Plaintiff asserts claims under section 12(a)(2) against
SMART--a conceded statutory seller--and the Individual
Defendants.  Defendants argue that the claim cannot lie against
the Individual Defendants because they are not "statutory
sellers."  (Defs. Mem. at 30-31.)  Plaintiff asserts that the
Individual Defendants can be held liable under section 12(a)(2)
as mere signatories of the registration statement.  (Pl. Opp'n
at 25.)  The Court finds defendants are on the correct side of
this argument.

In Citiline Holdings, Inc v. iStar Financial Inc., 701 F.
Supp. 2d 506 (S.D.N.Y. 2010), Judge Sullivan squarely addressed
whether individuals face liability under section 12 merely for
signing a registration statement.  Without guidance from the
Second Circuit, Citiline considered "[e]very Court of Appeals to
have considered the issue," id. at 512 (citing Rosenzweig v.
Azurix Corp., 332 F.3d 845, 871 (5th Cir. 2003), Shaw v. Digital
Equip. Corp., 82 F.3d 1194, 1216 (1st Cir. 1996), Craftmatic
Sec. Litig. v. Kraftsow, 890 F.2d 628, 636 (3d Cir. 1989)), and
"Pinter's statement that Congress did not intend to impose
liability under Section 12 'for mere participation in unlawful
sales transactions,'" 701 F. Supp. 2d at 512 (quoting Pinter,

486 U.S. at 650), and concluded that "an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)."  701 F. Supp. 2d at 512.

Plaintiff seeks to have this Court disregard Citiline, relying instead upon a swath of cases (except one) that predate Citiline by almost a decade.  (See Pl. Opp'n at 35 n.13.)  Those cases stand for the proposition that "on a motion to dismiss, officers or directors who signed the registration statement are deemed to have solicited the purchase of the offered stock." Briarwood Invs. Inc. v. Care Inv. Trust Inc., No. 07 civ. 8159, 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009).  Briarwood Investments, decided one year before Citiline and the only recent case on which plaintiff relies, cited only to the same, decade-old district court decisions on which plaintiff relies; it did not consider rulings of Courts of Appeals outside the Second Circuit or the rationale underlying Pinter.  See Briarwood Invs. Inv., 2009 WL 536517, at *4.

The Court finds Judge Sullivan's reasoning in Citiline well-reasoned and well-supported, and sees no reason to deviate from it here.  Plaintiff alleges nothing more than that the Individual Defendants signed the registration statement. Accordingly, the section 12(a)(2) claims against the Individual Defendants are dismissed.

III. SECTION 15

    A.   <u>Legal Standard</u>

    Section 15 of the Securities Act imposes what is known as "control person" liability upon individuals

> who, by or through stock ownership, agency, or
> otherwise, or who, pursuant to or in connection with
> an agreement or understanding with one or more other
> persons by or through stock ownership, agency, or
> otherwise, controls any person liable under section 11
> or 12 . . . .

15 U.S.C. § 77o(a).

    To adequately allege a section 15 violation, a plaintiff must plead a primary violation and "actual control" of the primary violator by the defendant.  <u>In re Lehman Bros. Mortgage-Backed Secs. Litig.</u>, 650 F.3d 167, 185-86 (2d Cir. 2011); <u>In re Global Crossing, Ltd. Secs. Litig.</u>, No. 02 Civ. 910, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005) (Lynch, J.).  "Control" means "the power to direct or cause the direction of the management and policies of [the primary violators] . . .," as well as the transaction in question.  <u>In re Lehman Bros.</u>, 650 F.3d at 185; <u>accord</u> <u>In re Global Crossing, Ltd.</u>, 2005 WL 1875445, at *3; <u>Anwar v. Fairfield Greenwich Ltd.</u>, 728 F. Supp. 2d 372, 425 (S.D.N.Y. 2010).

    B.   <u>Primary Violation</u>

    As discussed above, plaintiff has not pleaded adequately a primary violation related to demand for interactive whiteboards,

43

the expansion of SMART'S corporate and foreign networks, or ERP. Accordingly, the section 15 claim based upon those grounds is dismissed, without prejudice as to the demand claim.

Primary violations related to demand for NextWindow remain, requiring the Court to examine whether plaintiff has pleaded adequately Apax's and Intel's "control" over SMART and the Individual Defendants, as well as over the IPO.

C.   "Collective" Control

Apax and Intel argue that their individual stock ownership--i.e., 23.5 percent for Intel and 47 percent for Apax--and their ability to appoint directors to the board do not suffice for purposes of section 15.  (Defs. Mem. at 34-35.)  The Court agrees that if that were all that were before the Court, the claim would fail.  See In re Alstom SA Secs. Litig., 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005); In re Flag Telecom Holdings, Ltd. Secs. Litig., 352 F. Supp. 2d 429, 458-49 (S.D.N.Y. 2005), abrogated on other grounds, 574 F.3d 29 (2d Cir. 2009); In re Deutsche Telekom AG Sec. Litig., No. 00 CIV 9475, 2002 WL 244597, at *7 (S.D.N.Y. 2002).  But it is not.

As plaintiff argued in its opposition--and at oral argument--the Court should look at Apax and Intel's stock ownership and board presence collectively.  (Pl. Opp'n at 38.) Plaintiff asserts that in taking Apax and Intel's "control" together, it is clear "the transaction here could never have

44

happened without their mutual agreement and joint action." (Id.
at 38-39.)  Plaintiff did not, however, include such allegations
in the Amended Complaint, nor cite any cases to support its
"collective control" theory.  Plaintiff relies upon section 15's
express language--"an agreement or understanding with one or
more other persons by or through stock ownership, agency, or
otherwise," 15 U.S.C. § 77o(a) (emphasis supplied by
plaintiff)--to suggest that the Court should analyze Apax and
Intel's "practical control" "collectively."  (Pl. Opp'n at 39.)
If plaintiff's pleadings and the text of section 15 were the
only things before the Court, the section 15 claim would
necessarily fail.  There would only be speculation about whether
Apax and Intel were actually acting in concert.

Despite plaintiff's failure to plead any plausible facts
alleging Apax and Intel's collective control, the Court has
considered the Prospectus on this motion.  See ATSI Commc'ns,
Inc., 493 F.3d at 98 (on a motion to dismiss, a court may
consider of "legally required public disclosure documents filed
with the SEC" as well as documents "incorporated into the
complaint by reference" or relied upon by the plaintiff "in
bringing suit").  The Prospectus itself does away with any
speculation about Apax and Intel's "collectivity" of action.
There, SMART disclosed that one of the risks to which its
"business is subject," is "the concentration of voting power and

control with our co-founders, Intel and Apax Partners." Prosp.
at 4 (emphasis added); see also id. at 28. The "concentrated
control," according to SMART, "will limit [shareholders']
ability to influence corporate matters, including takeovers."
Id. at 4. That risk disclosure "nudge[s]" plaintiff's section
15 claim "across the line from conceivable to plausible." See
Twombly, 550 U.S. at 570.

SMART's decision to warn prospective investors about the
concentration of Apax and Intel's control--and how it may curb
their power over all of SMART's "corporate matters" (and not
just "takeovers" as Intel's counsel suggested at oral
argument)[5]--sufficiently alleges that Apax and Intel either had
an "agreement or understanding" by virtue of their collective
stock ownership to act together in a way that would effectively
"control" SMART. With respect to the IPO itself, that
disclosure plausibly supports the inference that Apax and Intel
used its pre-IPO collective 70.5 percent voting power to approve
of the IPO--i.e., to "control" by virtue of its collective vote

---

[5] At oral argument, defendants focused on page 28 of the Prospectus, urging
the Court to read the "concentrated control" risk disclosure as related to
takeovers only. Reading the disclosure as a whole--in particular the heading
itself--leads to a contrary conclusion--i.e., that Apax and Intel's
"concentrated control" will limit prospective shareholders' ability to
influence all "corporate matters." See Prosp. at 28.

whether SMART would undertake the IPO.  That is enough to meet
the "actual control" prong of a section 15 claim.[6]

    D.   <u>Culpable Participation</u>

    Defendants argue that plaintiff's failure to allege
"culpable participation" independently dooms the section 15
claim.  (Defs. Mem. at 38-39.)

    Requiring "culpable participation" in the context of the
Securities Act's "control person" statute, as opposed to the
Exchange Act's--<u>i.e.</u>, section 20(a)--remains an open question in
this Circuit.  <u>In re Lehman Bros.</u>, 650 F.3d at 186.  District
courts that have considered the question are divided.  <u>Compare</u>
<u>In re Sec. Capital Assur. Secs. Litig.</u>, No. 07 Civ. 11086, 2011
WL 4444206, at *7 (S.D.N.Y. Sept. 23, 2011) (requiring culpable
participation); <u>Pub. Emps.' Ret. Sys. Of Mississippi v. Merrill</u>
<u>Lynch & Co. Inc.</u>, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010)

---

[6] Per this Court's Order on questions to be answered at oral argument (Dkt.
No. 106), counsel for Intel provided the Court with two cases that do not
assess control "collectively."  <u>See</u> <u>LLDVF v. DiNicola</u>, No. 09 Civ. 1280, 2010
WL 3210613, at *12 (D.N.J. Aug. 12, 2010) ("[E]ach defendant's control must
be evaluated separately unless there is some basis on which to consider their
collective action. . . . [A] contrary holding would mean that any
shareholder, no matter how small, could be grouped with others to form a
majority control group, even absent any allegations or facts supporting that
shareholder's actual control"); <u>Fouad v. Isilon Sys., Inc.</u>, No. C07-1794,
2008 WL 5412397, at *13 (W.D. Wash. Dec. 29, 2008) ("Without additional
allegations that the venture capital firms acted together to control Isilon,
these allegations of control by virtue of collective ownership are conclusory
and unconvincing").

The Court does not find those cases persuasive here for two reasons.  First,
there is no indication that the record before the respective courts in those
cases contained the type of risk disclosure that the Prospectus includes
here.  Second, both cases include language (cited in the above
parentheticals) that suggest that if the courts there had been presented with
facts evidencing "collective action," as the Court is here, the results may
have been different.

(same); Ladmen Partners, Inc., 2008 WL 4449280, at *10 (same);

P. Stoltz Family P'Ship, L.P. v. Daum, 166 F. Supp. 2d 871, 873

(S.D.N.Y. 2001) (same), rev'd in part on other grounds by 355

F.3d 92 (2d Cir. 2004) with In re Deutsche Bank AG Secs. Litig.,

No. 09 Civ. 1714, 2011 WL 3664407, at *11 (S.D.N.Y. Aug. 19,

2011) (culpable participation is not an element of section 15);

New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc., No.

08 Civ. 5310, 2011 WL 1338195, at *11 (S.D.N.Y. Mar. 31, 2011)

(same); Police & Fire Ret. Sys. Of City of Detroit v. SafeNet,

Inc., 645 F. Supp. 2d 210, 242 (S.D.N.Y. 2009); In re Fuwei

Films Secs. Litig., 634 F. Supp. 2d 419, 435 (S.D.N.Y. 2009); In

re Scottish Re Group Secs. Litig., 524 F. Supp. 2d 370, 387

(S.D.N.Y. 2007); In re Adelphia Commc'ns Corp. Secs. & Deriv.

Litig., No. 03 MD 1529, 2007 WL 2615928, at *10 (S.D.N.Y. Sept.

10, 2007); In re Refco, Inc. Secs. Litig., 503 F. Supp. 2d 611,

661 (S.D.N.Y. 2007) (Lynch, J.); Am. High-Income Trust v.

AlliedSignal, 329 F. Supp. 2d 534, 549 n.10 (S.D.N.Y. 2004)

("this Court joins the apparent majority of judges in the

Southern District that have determined that culpable

participation is not an element of § 15" (quotation marks

omitted)); In re Global Crossing, Ltd., 2005 WL 1907005, at *11;

Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust

v. J.P. Morgan Acceptance Corp. I, No. 08 CV 1713, 2012 WL

601448, at *21 (E.D.N.Y. Feb. 23, 2012); In re CINAR Corp. Secs.

Litig., 186 F. Supp. 2d 279, 309-10 (E.D.N.Y. 2002).  See also
In re WorldCom, Inc., 377 B.R. 77, 102-03 (Bankr. S.D.N.Y. 2007)
(discussing the split among district courts and collecting
cases).  The Court agrees with the weight of the authority in
this Circuit and declines to impose the additional "culpable
participation" requirement.

　　　"Culpable participation" is akin to scienter.  In re
WorldCom, Inc., 377 B.R. at 102.  Courts declining to read the
Exchange Act's "culpable participation" requirement into the
Securities Act have relied upon the fact that

> because claims under the Securities Act do not contain
> an intent element--indeed, defendants need not even
> know about the misrepresentations--it would make
> little sense to compel plaintiffs to allege a culpable
> state of mind in order to state a claim under Section
> 15.

In re CINAR Corp., 186 F. Supp. 2d at 310; accord In re Deutsche
Telekom AG Secs. Litig., 2002 WL 244597, at *6.  The Court
agrees.

　　　Defendants argue that where, as here, a plaintiff's claims
sound in fraud, a court must require allegations of "culpable
participation."  (Defs. Mem. at 38-39.)  That the Amended
Complaint sounds in fraud simply connotes the pleading standard
that plaintiff must meet under procedural rules.  It is
axiomatic that procedural rules cannot eviscerate substantive
law, imposed by statute or otherwise.  See 28 U.S.C. § 2072(b)

(procedural rules "shall not abridge, enlarge, or modify any substantive right"). The Securities Act is a strict liability statute, imposing liability for, at a minimum, negligence and does not, as just discussed, require allegations of scienter. The "sounds in fraud" argument fails on that ground. Cf. Emps.' Ret. Sys. Of the Gov't of the Virgin Is. V. J.P. Morgan Chase & Co., 804 F. Supp. 141, 158 n.6 (S.D.N.Y. 2011) ("[T]he 'culpable participation' cases [in this District] should not impose the scienter requirement from Section 20 or otherwise impose any conduct or state of mind standard that is more stringent than the standards of Section 11 itself.").

There are two additional, independent reasons that that argument does not work. First, lack of knowledge (i.e., lack of "culpable participation") is an affirmative defense under section 15: the text of the statute eliminates Securities Act "control person" liability where the alleged control person "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o(a). Thus, requiring a plaintiff to allege "culpable participation" would turn the relative burdens imposed by the statute on their head. Second, Congress added the "culpable participation" requirement to section 20(a) liability at the same time it amended section 15, see Lanza v. Drexel & Co., 479 F.2d 1277, 1299 (2d Cir.

1973), demonstrating that Congress knew how to impose the "culpable participation" element when it believed it should be required.  Importing the scienter requirement into a section 15 claim every time a complaint sounds in fraud would do away with the statute as Congress intended it.

Accordingly, defendants' motion to dismiss the Section 15 claims related to demand for NextWindow is denied as to Apax and Intel.  To the extent that plaintiff successfully repleads a section 11 and 12 claim related to demand for SMART's interactive whiteboards, that would support a claim against Apax and Intel under section 15.

CONCLUSIONS

For the aforementioned reasons, defendants' joint motion to dismiss the Amended Complaint is GRANTED IN PART and DENIED IN PART.

Plaintiff's section 11 and section 12(a)(2) claims related to misrepresentations or omissions on demand for NextWindow survive.

Plaintiff section 11 and 12(a)(2) claims related to misrepresentations and omissions on demand for SMART's core interactive whiteboard are dismissed without prejudice.

Claims under section 11 and section 12(a)(2) for misrepresentations or omissions related to (i) ERP; and

(ii) SMART's corporate and foreign network are dismissed with prejudice.

Plaintiff's section 12(a)(2) claims against the Individual Defendants are dismissed.

The section 15 claims against Apax and Intel as to ERP and SMART's corporate and foreign networks are dismissed with prejudice.  The section 15 claim as to demand for NextWindow survives, and the claim as to demand for interactive whiteboards is dismissed without prejudice.

No later than April 23, 2012, plaintiff is directed to file a second amended complaint to reflect the Court's rulings herein as well as to amend its allegations on its Section 15 claim to include the language from the Prospectus regarding "concentrated" control, on which it relied at oral argument, but does not appear in the Amended Complaint.

If defendants plan to move against any new allegations in a second amended complaint related to demand for SMART's interactive whiteboards, they should do so no later than May 11, 2012, with plaintiff's opposition thereto due no later than May 18, 2012.  No reply will be allowed.  Any memorandum of law in support of or in opposition to a motion to dismiss shall be limited to no more than 15 pages.

The Clerk of Court is directed to terminate defendants'
joint motion to dismiss the amended complaint (Dkt. No. 100).

SO ORDERED:

Dated: New York, New York
       April 3 , 2012

_____

KATHERINE B. FORREST
United States District Judge