UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 11, 2013
```

------------------------------------------------------------ X
                            :

IN RE SMART TECHNOLOGIES, INC.      :       11 Civ. 7673 (KBF)
SHAREHOLDER LITIGATION         :

                            :     OPINION & ORDER

------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

     Before the Court is Lead Plaintiff City of Miami General Employees' and

Sanitation Employees' Retirement Trust's ("plaintiff") motion for class certification

pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.[1]

Plaintiff seeks certification of the following class: "All persons or entities who

purchased or otherwise acquired SMART common stock pursuant or traceable to

the Offering Materials, and who were damaged thereby."[2]

     Recognizing that putative class actions brought under the Securities Act of

1933 (the "Securities Act"), like this one, are "especially amenable" to class

treatment, see In re IndyMac Mortgage-Backed Secs. Litig., --- F.R.D. ---, 2012 WL

3553083, at *2 (S.D.N.Y. Apr. 17, 2012), defendants[3] do not dispute that

certification of a class is proper here.[4]  Rather, they contest the scope of the class

---

[1] Plaintiff moved for class certification on October 16, 2012.  The motion was fully submitted as of
December 13, 2012, and the Court heard oral argument on the motion on December 14, 2012.

[2] Excluded from the Class are defendants and their respective officers, affiliates and directors at all
relevant times, members of their immediate families and their legal representatives, heirs,
successors or assigns, and any entity in which defendants have or had a control interest.

[3] "Defendants" collectively refers to SMART Technologies, Inc., Nancy L. Knowlton, G.A. (Drew)
Fitch, David A. Martin, Salim Nathoo Arvind Sodhani, Michael J. Mueller, Robert C. Hagerty, Apax
Partners L.P., Apax Partners Europe Managers Ltd., and Intel Corporation.

[4] See Oral Arg. Tr. ("Tr.") 45:11-12, Dec. 14, 2012 ("[T]he defendants actually have conceded there is
a class here.  We haven't argued otherwise.").

and argue that the Court should exclude: (1) investors who purchased after the purported November 9, 2010, "corrective disclosure"; (2) "in-and-out" traders; (3) investors who purchased their shares outside of the United States, based upon Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010); and (4) with respect to plaintiff's section 12(a)(2) claim, secondary market purchasers.  In addition, defendants argue that the class cannot include purchasers who bought shares of defendant SMART Technologies, Inc. ("SMART") in the secondary market because those investors are unable to "trace" their shares to the registration statement filed by SMART in connection with its July 14, 2010, initial public offering.

For the reasons set forth below, the Court certifies the following class:  "All persons or entities who purchased or otherwise acquired (and did not sell) SMART common stock in the United States prior to November 10, 2010, pursuant or traceable to the Offering Materials.  With respect to claims brought under section 12(a)(2), the class is limited to U.S. purchasers of SMART stock in the July 14, 2010, initial public offering."

I.      BACKGROUND

The Court set forth the facts underlying this action in its prior decisions on defendants' motions to dismiss the Amended and Second Amended Complaints, respectively.  See McKenna v. SMART Techs., Inc., No. 11 Civ. 7673, 2012 WL 113195, at *2-6 (S.D.N.Y. Apr. 3, 2012) ("McKenna I"); McKenna v. SMART Techs., Inc., No. 11 Civ. 7673, 2012 WL 3589655, at *1-2 (S.D.N.Y. Aug. 21, 2012)

("McKenna II").  Familiarity with both is presumed, and the Court recounts only those facts relevant to disposition of the instant motion.

After McKenna I and McKenna II, plaintiffs' remaining Securities Act claims relate to defendants' purported misrepresentations and omissions regarding (a) demand for SMART's "core" whiteboards; and (b) demand for products related to SMART's then-recently-acquired NextWindow business.

A.    The IPO

On July 14, 2010, SMART commenced an initial public offering (the "IPO") of 38.83 million shares of its Class A Subordinate Voting stocks in both the United States and Canada.

In the United States, SMART conducted the IPO pursuant to (i) a registration statement, filed with the Securities Exchange Commissions ("SEC") on June 24, 2010, as amended on June 28, 2010, and July 12, 2010, and made effective on July 14, 2010 (the "Registration Statement"); and (ii) a prospectus dated on or about July 14, 2010, and incorporated into the Registration Statement, and filed with the SEC on July 15, 2010 (the "Prospectus" and with the Registration Statement, the "Offering Documents").

In Canada, SMART conducted the IPO pursuant to a separate prospectus filed with the relevant Canadian securities commission as required by the Ontario Securities Act (the "Canadian prospectus").  In other words, the shares sold in Canada were not sold pursuant to the Offering Documents.[5]

---

[5] There is a parallel putative class action pending in Canada under the Canadian securities laws seeking the precise redress that plaintiff seeks in this putative class action.

SMART registered all 38.83 million offered shares with the SEC.  SMART filed with the SEC both the Prospectus and the Canadian prospectus, as part of the Registration Statement, confirming that all shares were indeed registered with the SEC--regardless of where SMART issued the shares (i.e., the U.S. or Canada).

All shares, regardless of where they were issued, share the same CUSIP.[6]

Subsequent to the IPO, SMART cross-listed the shares on the NASDAQ and the Toronto Stock Exchange ("TMX").  All shares were (and are) cross-tradeable: they can be sold either on the NASDAQ or the TMX.

B.     The Alleged "Corrective" Disclosure

On November 9, 2010, SMART announced its 2011 second-quarter results (the "November 9 corrective disclosure").  It disclosed that "SMART continued to generate solid revenue growth . . . driven by adoption of our core interactive and collaborative solutions," but had "seen slower than anticipated sales in our recently acquired NextWindow business" and "a more conservative growth assumption for the North American market in the second half of our fiscal year."  (Corrected Second Am. Class Action Compl. ("SAC") ¶ 10, ECF No. 111; see also id. ¶¶ 71-72; Decl. of Jackie A. Lu ("Lu Decl.") Ex. B at 1, ECF No. 142.)

Plaintiff alleges that the November 9 corrective disclosure caused the price of SMART common stock to "plummet[ ]."  (SAC ¶ 11; see also id. ¶ 74.)

---

[6] CUSIP is an alphanumeric code which identifies a North American financial security for purposes of facilitating clearing and settlement of trades.  Dictionary of Fin. and Inv. Terms 157 (6th ed. 2003).

4

The SAC does not plead that any other disclosure "corrected" the alleged misstatements and omissions in the Offering Documents regarding demand for SMART's core whiteboards and/or NextWindow.

## II.   LEGAL STANDARD

Before certifying a class, a district court must conduct a "rigorous analysis" to determine whether the plaintiff has satisfied the four prerequisites of Rule 23(a)--numerosity, commonality, typicality, and adequacy, Fed. R. Civ. P. 23(a) --and the requirements of at least one prong of Rule 23(b).  See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011); Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Initial Pub. Offerings Sec. Litig., 471 F.2d 24, 41 (2d Cir. 2006) ("In re IPO").  The plaintiff must prove the Rule 23 prerequisites by a preponderance of the evidence.  Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010).

Class certification is appropriate after the district court "resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met." Teamsters Local 445, 546 F.3d at 202 (quoting In re IPO, 471 F.2d at 41); see also Wal-Mart Stores, Inc., 131 S. Ct. at 2551-52 ("[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."; "The class determination generally involves considerations that are enmeshed in the factual and legal issues

comprising the plaintiff's cause of action." (quotation marks and citations omitted)).

However, class certification should not "become a pretext for a partial trial of the

merits." Teamsters Local 445, 546 F.3d at 204 (quotation marks omitted); see also

In re IPO, 471 F.3d at 41 ("[A] district judge should not assess any aspect of the

merits unrelated to a Rule 23 requirement.").

> Under Rule 23(a),
>
> [o]ne or more members of a class may sue or be sued as representative
> parties on behalf of all members only if: (1) the class is so numerous
> that joinder of all members is impracticable; (2) there are questions of
> law or fact common to the class; (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class;
> and (4) the representative parties will fairly and adequately protect
> the interests of the class.

Fed. R. Civ. P. 23(a).  The commonality, typicality, and adequacy requirements are

"closely related."  In re IndyMac, 2012 WL 3553083, at *3.  Indeed, the

"commonality and typicality requirements of Rule 23(a) tend to merge."  Wal-Mart

Stores, Inc., 131 S. Ct. at 2551 n.5.

In addition, in order to certify a Rule 23(b)(3) class--as plaintiff seeks to do

here--the court must determine that "questions of law or fact common to the class

predominate over any questions affecting only individual members," and that a

class action is the superior method of resolving the question of liability.  Fed. R. Civ.

P. 23(b)(3).  Although Rule 23(b)(3)'s "predominance" requirement is more exacting

that Rule 23(a)'s "commonality" prerequisite, the "court's [Rule 23(b)(3)] inquiry is

directed primarily toward whether the issue of liability is common to members of

the class."  In re IndyMac, 2012 WL 3553083, at *5 (quotation marks omitted).

III.    DISCUSSION

Defendants do not contest that plaintiff has established numerosity, commonality, or adequacy under Rule 23(a).  And although defendants concede that certification of <u>a</u> class is appropriate, they contest certification of the class proposed by plaintiff.  Defendants seek exclusion from the class of certain categories of investors on the basis that inclusion of those purchasers either will render plaintiff atypical, <u>see</u> Fed. R. Civ. P. 23(a)(3), or will cause individualized issues to predominate over common ones, <u>see</u> Fed. R. Civ. P. 23(b)(3).

After conducting the required "rigorous analysis," the Court finds that plaintiff has satisfied its burden as to numerosity, commonality, and adequacy (including adequacy of class counsel).  However, as discussed below, the Court finds that certain putative class members must be excluded in order for the class certified to meet all of Rule 23(a)'s and Rule 23(b)(3)'s requirements.

A.    <u>Putative Class Members Who Claims Cannot Succeed</u>

As a threshold matter, two categories of investors--non-U.S. purchasers and aftermarket purchasers with respect to the section 12(a)(2) claim--must be excluded from the class because they could not prevail on their claims.  <u>See</u> <u>In re Flag Telecom Holdings, Ltd. Sec. Litig.</u>, 574 F.3d 29, 39 (2d Cir. 2009) ("[W]hen a claim cannot succeed as a matter of law, the Court should not certify a class on that issue.").

1.    <u>Non-U.S. Purchasers</u>

Based upon the Supreme Court's ruling in <u>Morrison v. National Australia Bank Ltd.</u>, 130 S. Ct. 2869 (2010), defendants seek to exclude purchasers of SMART stock whose purchase(s) occurred extraterritorially--<u>i.e.</u>, investors who purchased SMART shares either in the Canadian offering or on the TMX.  The Court finds, as discussed below, that <u>Morrison</u>'s prohibition on extraterritoriality applies equally to Securities Act claims and thus, that non-U.S. purchasers of SMART stock may not be included in the class.

In <u>Morrison</u>, the Supreme Court repudiated the "conduct" and "effects" tests applied by the Second Circuit (and others) and held that section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") does not apply extraterritorially.  The Supreme Court made clear that the "purchase or sale of [a] security" that provides the basis for a section 10(b) claim must be a domestic one-- that is, "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  <u>Morrison</u>, 130 S. Ct. at 2884; <u>see also id.</u> at 2881.

In its analysis, the Supreme Court stated (in dicta) that

> [t]he same <u>focus on domestic transactions</u> is evident in the Securities Act of 1933, enacted by the same Congress as the Exchange Act, and forming part of the same comprehensive regulation of securities trading.  That legislation makes it unlawful to <u>sell a security</u>, through a prospectus or otherwise, making use of "any means or instruments of transportation or communication in interstate commerce or of the mails," unless a registration statement is in effect.  15 U.S.C. § 77e(a)(1).  The Commission has interpreted that requirement "not to include . . . <u>sales that occur outside the United States</u>."  17 C.F.R. § 230.901 (2009).

Morrison, 130 S. Ct. at 2885 (citations omitted) (emphases added).  Courts in this District uniformly concur that Morrison's prohibition on extraterritoriality applies to Securities Act claims.  See S.E.C. v. ICP Asset Mgmt., LLC, No. 10 Civ. 4791, 2012 WL 2359830, at *2 (S.D.N.Y. June 21, 2012); In re Vivendi Universal, S.A., Secs. Litig., 842 F. Supp. 2d 522, 529 (S.D.N.Y. 2012); S.E.C. v. Goldman Sachs & Co., 790 F. Supp. 2d 147, 164-65 (S.D.N.Y. 2011); In re Royal Bank of Scotland Grp. PLC Secs. Litig., 765 F. Supp. 2d 327, 338-39 (S.D.N.Y. 2011).  This Court agrees.

Plaintiff contends that section 11 "does not define conduct subject to regulation by reference to transactions," but rather regulates the making of untrue statements of material fact in registration statements alone and thus, because the filing of a defective registration statement with the SEC by itself "occurs entirely within the United States . . . neither Morrison's holding nor rationale applies to Section 11."  (Pl.'s Reply Mem. Law Further Supp. Mot. Class Cert. ("Pl. Reply") 5-6, ECF No. 149.)  A review of sections 11 and 12(a)(2)'s respective texts confirms the error of this premise:  Morrison's prohibition on extraterritoriality for section 10(b) claims applies equally to the Securities Act claims here.  Cf. FAA v. Cooper, 132 S. Ct. 1441, 1457 (2012) ("In a statutory construction case, the beginning point must be the language of the statute itself . . . ." (quotation marks omitted)).[7]

Section 11 provides a cause of action for "any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission)" where "[i]n case any part of the registration statement, when such part

_____

[7] Plaintiff itself urged this Court to examine the question of whether Morrison applies to Securities Act claims as one of "statutory interpretation" rather than to use Morrison as "a blanket policy decision about how all the securities laws should be interpreted."  (Tr. 15:11-13.)

became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a) (emphasis added).

Section 12(a)(2) imposes liability upon

> [a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission),

where the plaintiff is "the person <u>purchasing such security</u> from him."  15 U.S.C. § 77l(a)(2) (emphasis added).[8]

The language of both statues makes clear that a cause of action lies under sections 11 and 12(a)(2) only where the plaintiff has "acquir[ed]" or "purchas[ed]" a security.  That language is legally equivalent to section 10(b)'s "purchase or sale of any security" requirement.  <u>See</u> 15 U.S.C. 78j(b).  And, as the Supreme Court found in <u>Morrison</u>, "we think that the focus of the Exchange Act is not upon the place <u>where</u> the deception originated, but upon <u>purchases and sales of securities</u> in the United States."  <u>Morrison</u>, 130 S. Ct. at 2884 (emphasis added).  That finding underscores the flaw in plaintiff's theory that the filing of a defective registration statement or prospectus on its own constitutes sufficient "domestic conduct."  Just as section 10(b) "does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security,'" <u>Morrison</u>, 130 S. Ct. at 2884,

---

[8] As with section 10(b), nothing on the face of either section 11 or 12(a)(2) suggests that they apply abroad--and the use of the term "interstate commerce" in section 12(a)(2) does nothing to change that.  <u>See</u> <u>Morrison</u>, 130 S. Ct. at 2881, 2882.

sections 11 and 12(a)(2) do not punish the making of misrepresentations or omissions in a registration statement or prospectus alone, but making such misrepresentations and omissions to an individual who "purchas[es]" or "acquir[es]" a security based upon them, see 15 U.SC. §§ 77k(a), 77l(a)(2).  Accordingly, to the extent that a plaintiff seeks to impose liability under sections 11 or 12(a)(2), that individual must have purchased a security listed on a domestic exchange or engaged in a "domestic transaction in other securities."  See Morrison, 130 S. Ct. at 2884; accord ICP Asset Mgmt., 2012 WL 2359830, at *2; In re Vivendi Universal, 842 F. Supp. 2d at 529.

Pasquitino v. United States, 544 U.S. 349 (2004)--and Morrison's discussion of it--does not persuade the Court otherwise.  (See Pl. Reply 5-6.)  In Pasquitino, the petitioners challenged whether a scheme to smuggle liquor into Canada--part of which included a telephone call from New York to Maryland to order the liquor--violated 18 U.S.C. § 1343 (a criminal wire fraud statute).  Pasquitino, 544 U.S. at 353-54.  The Supreme Court concluded that its interpretation of section 1343 (which the Court need not review at length here) did not "give [the statute] extraterritorial effect" because the defendants' "offense was complete the moment they executed the scheme inside the United States; the wire fraud statute punishes the scheme, not its success."  Id. at 371 (quotation marks omitted).

Analogizing the filing of a registration statement in the United States to the domestic telephone call in Pasquitino (as plaintiff does) does not work because a private plaintiff only has standing to bring a claim under section 11 or 12(a)(2) of

the Securities Act if that plaintiff "purchase[d]" or "acquir[ed]" the security pursuant to a registration statement or prospectus containing misstatements or omissions.  See 15 U.S.C. §§ 77k(a), 77l(a)(2).  As the Supreme Court recognized in Morrison, "[s]ection 1343 prohibits 'any scheme or artifice to defraud,'--fraud *simpliciter*, without any requirement that it be 'in connection with' any particular transaction or event."  Morrison, 130 S. Ct. at 2887 (emphasis added).[9]  In other words, contrary to plaintiff's contention (see Pl. Reply 6), sections 11 and 12(a)(2) are not focused on "deception alone," but rather deception upon individuals who purchase or acquire securities pursuant to a defective registration statement or prospectus.[10]

Thus, to the extent that putative class members purchased, incurred "irrevocable liability," or obtained "title" to securities, see Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 69 (2d Cir. 2012), in Canada[11]--or anywhere else outside the United States--they do not have a viable cause of action under the Securities Act, and may not be included in the class certified here.

---

[9] It is notable that 18 U.S.C. § 1343 "punishes frauds executed 'in interstate or foreign commerce.'" Pasquitino, 544 U.S. at 371-72 (quoting 18 U.S.C. § 1343).  For that reason, the Supreme Court concluded that section 1343 "is surely not a statute in which Congress had only domestic concerns in mind." Id. at 372 (quotation marks omitted).

[10] Taking that reasoning to its logical conclusion, if a foreign issuer registered shares in the United States pursuant to section 6 of the Securities Act, 15 U.S.C. § 77f(a), and the registration statement for those shares contained misstatements or omissions, a private section 11 claim would not lie unless brought by an individual who "acquire[d]" a security pursuant to the registration statement. See 15 U.S.C. § 77k(a).

[11] The fact that SMART cross-listed its shares on the NASDAQ and TMX does not change the conclusion because the "purchase[]" or "acqui[sition]" of shares on the TMX occurred extraterritorially.  See In re UBS Secs. Litig., No. 07 Civ. 11225, 2011 WL 4059356, at *5-6 (S.D.N.Y. Sept. 13, 2011).

2.    Section 12(a)(2): Secondary Market Purchasers

Defendants also seek exclusion of any investors who purchased SMART shares in the aftermarket from the section 12(a)(2) class.

It is well-settled that a plaintiff may maintain a section 12(a)(2) claim only where the plaintiff purchased securities directly in the initial public offering; so-called "aftermarket" or "secondary market" purchasers do not have standing to maintain a section 12(a)(2) claim.  In re IndyMac, 2012 WL 3553083, at *4; In re Fuwei Films Sec. Litig., 634 F. Supp. 2d 419, 445 (S.D.N.Y. 2009) (citing Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 578 (1995)).  Such a principle likely derives from section 12(a)(2)'s requirement that the sale be made "by means of a prospectus or oral communication."  See 15 U.S.C. § 77l(a)(2).

Accordingly, the Court finds it proper to exclude any aftermarket purchasers from the section 12(a)(2) class.[12]

B.    Typicality

The Court now turns to defendants' arguments regarding those investors who must be excluded from the class on grounds of typicality.

Rule 23(a) requires, among other things, that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality is satisfied where "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  In re Flag Telecom, 574 F.3d at 35; see also In re NASDAQ Market-Makers Antitrust Litig., 172 F.R.D. 119, 126

---

[12] Plaintiff does not address defendants' assertion in this regard.

(S.D.N.Y. 1997) ("Typicality under Rule 23 requires that a class representative have the incentive to prove all the elements of the cause of action which would be presented by individual members of the class were they initiating individualized actions.").

Defendants argue that the claims of (i) investors who purchased SMART stock <u>after</u> the November 9 corrective disclosure; and (ii) investors who purchased SMART shares <u>and sold</u> them prior to the November 9 corrective disclosure (so-called "in-and-out purchasers") are atypical and thus, both types of investors should be excluded from the proposed class.  The Court agrees.

       1.   <u>Post-November 9, 2010 Purchasers</u>

Section 11 provides a cause of action where the plaintiff can establish that it "acquired" a registered security, either directly from the issuer or in the aftermarket pursuant to a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Where "the plaintiff knew of the untruth or omissions at the time of his or her acquisition of the security," however, the plaintiff may not maintain a section 11 (or 12(a)(2)) claim.  <u>In re Initial Pub. Offering Sec. Litig.</u>, 483 F.3d 70, 73 n.1 (2d Cir. 2007).

Any investor who purchased after the November 9 corrective disclosure would have known of the alleged "untruth or omission at the time of his or her acquisition of the security," and thus, that his or her claims would be incongruous

with plaintiff's (who purchased prior to the November 9 corrective disclosure--i.e., without such knowledge).  Because "a section 11 and 12[a](2) claim, which is based upon a lack of information, could not be typical of such a claim made by persons who possessed additional information," plaintiff's section 11 and 12(a)(2) claims here "are not typical of the proposed class."  See Klein v. A.G. Becker Paribas Inc., 109 F.R.D. 646, 652 (S.D.N.Y. 1986); cf. New Jersey Carpenters Health Fund v. Residential Capital, LLC, 272 F.R.D. 160, 170 (S.D.N.Y. 2011), aff'd 477 F. App'x 809 (2d Cir. 2012).[13]

Plaintiff does not dispute that point.  Instead, plaintiff argues that there is "no need" to clarify that the class period ends on November 9, 2010, because the SAC "alleges November 9, 2010 as the only corrective disclosure"--meaning that, "the claims period effectively ends as of that date."  (Pl.'s Reply Mem. Law Further Supp. Mot. Class Cert. ("Pl. Reply") 15-16, ECF No. 149.)

Given (a) the parties' agreement that the class does not include post-November 9, 2010, purchasers of SMART stock, (b) potential class members' right to understand the scope of the class (and thus, whether they are covered by this action), and (c) defendants' right to have the class clearly defined, the Court

---

[13] Defendants further argue that inclusion of post-November 9, 2010, purchasers would create individualized issues on knowledge that would predominate over common ones.  (Defs. Mem. 11.)  As discussed below, predominance is a balance of individualized issues against common ones (namely, establishing liability).  Defendants have not submitted any evidence of the differing levels of knowledge as between pre- and post-November 9, 2010, purchasers and thus, the Court does not find that inclusion of such purchasers would necessarily defeat Rule 23(b)(3)'s predominance requirement.  See In re IndyMac, 2012 WL 3553083, at *8-9.

Defendants briefly mention that inclusion of post-November 9, 2010, purchasers would render plaintiff an inadequate representative.  (Defs. Mem. 1.)  They do not, however, address this point and the Court finds that such brief mention does not amount to contesting adequacy of plaintiff.

finds that the class definition should affirmatively exclude those individuals who purchased SMART stock after November 9, 2010.

        2.   <u>In-and-Out Traders</u>

Defendants argue that in-and-out purchasers should be excluded from the class because defendants' "negative loss causation" defense as to those purchasers would be atypical of their defense(s) against plaintiff.

Under sections 11 and 12(a)(2), "if the defendant proves that any portion or all of such damages represents [something] other than the depreciation in value of such security resulting from" the alleged misstatements or omissions, the defendant will not be liable for "such portion of or all such damages."  15 U.S.C. §§ 77k(e), 77l(b).  The plain language of the statutes requires a causal connection between the alleged misstatement or omission and a diminution in the security's value--<u>i.e.</u>, that the revelation of the prior misstatement or omission caused the value of the security to drop.  <u>See</u> <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 173 (2d Cir. 2005) (loss causation is proved by demonstrating that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security").  Thus, where something <u>other than</u> the alleged misstatement or omission caused a decline in the value of the security, the defendant has a "negative loss causation" defense.  <u>In re Flag Telecom</u>, 574 F.3d at 35-36.

Here, defendants argue that in-and-out purchasers will be subject to a unique defense in that any loss they may have suffered in selling their SMART shares

cannot be attributable to the November 9 corrective disclosure.[14]  Plaintiff alleges that the loss it sustained on its SMART shares was attributable only to the November 9 disclosure (see SAC ¶¶ 10-11, 71-74, 77), and concedes as much on this motion (Pl. Reply 15 (the SAC "alleges November 9, 2010 as the only corrective disclosure")).  Thus, to the extent that purchasers who sold their SMART shares prior to November 10, 2010 (the alleged date SMART's stock dropped due to the corrective disclosure) suffered losses, those losses are not attributable to any misstatement or omission in the Offering Documents because (under plaintiff's own allegations) no such "truth" was known prior to November 9, 2010.  In other words, something other than the November 9 corrective disclosure caused any loss sustained by purchasers who sold their SMART shares prior to November 10, 2010.  That fact provides defendants with a "negative causation" defense as to the in-and-out purchasers that would be atypical of any defense they could assert against plaintiff.

That determination is not, as plaintiff contends (see Pl. Reply 18-19), an examination of the merits of defendants' "negative loss causation" defense.[15]

---

[14] Defendants also note that including in-and-out purchasers in the class could require potentially broad discovery.  (See Tr. 40:21-41:10.)  Although that does not drive the Court's endpoint, it is relevant to whether a determination is best made now versus later.

[15] Plaintiff argues that making a finding in this regard on class certification contravenes the Supreme Court's recent decision in Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179 (2011).  (Pl. Reply 17.)  In Halliburton, the Supreme Court held that a plaintiff need not prove loss causation for certification of a class pursuing claims under section 10(b) of the Securities Exchange Act of 1934.  Halliburton, 131 S. Ct. at 2187.  Overturning the Ninth Circuit Court of Appeals, the Court held that at the certification stage, a putative class representative need not demonstrate whether the alleged "misrepresentation that affected the integrity of the market price also caused a subsequent economic loss."  Id. at 2186.  As discussed below, a finding on typicality (or lack thereof) as between in-and-out purchasers and plaintiff does not go to the merits of defendants' "negative loss causation" defense, but rather construes the SAC's allegations against the language of the statute.

Rather, this Court's finding on typicality--or the lack thereof between plaintiff and in-and-out purchasers--measures the SAC's allegations against the plain language of sections 11 and 12(a)(2). As discussed, the SAC specifically alleges that the purported "truth" became known for the first time on November 9, 2010, and that the price of SMART shares fell immediately thereafter. Thus, any losses on sales prior to November 9, 2010, <u>necessarily</u> would be attributable to something <u>other than</u> the alleged misstatements or omissions in the Offering Documents. <u>See</u> <u>In re Flag Telecom Holdings</u>, 574 F.3d at 35-36.

Citing certain documents exchanged in discovery, plaintiff attempts to show that in-and-out purchasers sustained losses "for reasons directly related to the misstatements and omissions alleged in the complaint"--that is, that SMART "leaked" the truth prior to November 9, 2010. (Pl. Reply 19; <u>see also</u> Oral Arg. Tr. ("Tr.") 12:6-12:14, Dec. 14, 2012.) That argument belies plaintiff's theory of this case as articulated in the SAC (and as alleged from the inception of this action). (<u>See</u> SAC ¶¶ 10-11, 71-74, 77.) Further, the two documents plaintiff submitted to show the purported "leakage" (<u>see</u> Decl. of Hannah G. Ross Exs. 3, 4, ECF No. 150) do not, by a preponderance of the evidence, undermine plaintiff's long-standing premise that the November 9 disclosures caused putative class members' damage.[16] Indeed, those two documents convince the Court that including in-and-out purchasers would require significant individualized inquiries (not common ones, as

---

[16] It is notable that plaintiff has not made any application to this Court to amend the complaint further to include the "leakage" theory (which they asserted for the first time in their class certification reply, filed December 13, 2012).

plaintiff asserts (see Pl. Reply 17-18))[17] into what caused those purchasers' losses--e.g., supposed "leakage," other market factors, etc.

In undertaking its "obligation" to resolve factual disputes relevant to the Rule 23 requirements, the Court finds that adjudicating a "negative loss causation defense" would create an unnecessary "sideshow."  Because the Court finds that defendants' "negative loss causation" defense against in-and-out purchasers would be atypical of their defenses against plaintiff, the Court excludes in-and-out purchasers from the class.  See Fed. R. Civ. P. 23(a)(3) (requiring that the claims or defenses of the class representative be typical of the claims or defenses of the putative class members).[18]

C.    Rule 23(b)(3): Predominance

Defendants argue for exclusion of any putative class member who purchased SMART securities in the secondary market on the basis that those investors necessarily cannot "trace" their shares to the Registration Statement.  (See generally Opp'n Def. Intel Corp. Pl.'s Mot. Class Cert. ("Intel Opp'n"), ECF No. 140; see also Mem. Law Opp'n Lead Pl.'s Mot. Class Cert. ("Defs. Mem.") 1 n.1, ECF No.

---

[17] Plaintiff's reference to In re Constar International Inc. Securities Litigation, 585 F.3d 774 (3d Cir. 2009) (cited in Pl. Reply 17-18) does not convince the Court otherwise.  There, the question was not whether in-and-out purchasers and a plaintiff who sold after the purported correct disclosures were typical.  Rather, the Third Circuit--examining the question of commonality (not typicality as defendants argue here)--found that to the extent that "[i]f something other than the alleged misrepresentations produced a drop in stock price, be it the weather, market conditions, or any other factor, class members would be affected uniformly.  If for example, Investors X, Y, and Z all purchase Security A, and Security A's price happens to fall dramatically in the ensuing months, the cause of that decline would not differ as to each investor."  Id. at 785 (emphases added).  Here, however, plaintiff argues that the cause of losses for in-and-out purchasers may vary--e.g., purported "leakage" of the truth, etc.  Thus, Constar is not persuasive.

[18] Defendants briefly mention to catch-phrases "predominance" and "adequacy" in this regard as well, but do not address it in full.  The Court's finding on those prongs as set forth in n.13 supra applies with equal force here.

141.)  According to defendants, questions of "traceability" raise individualized issues that defeat Rule 23(b)(3)'s predominance requirement.  (Intel Opp'n 14-15.)

As stated above, a plaintiff has established "predominance" under Rule 23(b)(3) where "questions of law or fact common to the class predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  "Class wide issues predominate if resolution of some of the legal or factual questions that qualify each member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject to only individualized proof."  New Jersey Carpenters Health Fund, 477 F. App'x at 812 (quoting UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 131 (2d Cir. 2010)).

With respect to the "tracing" requirement, the Second Circuit has held that "[section] 11's plain language . . . state[s] unambiguously that a cause of action exists for any person who purchased a security that was originally registered under the allegedly defective registration statement--so long as the security was indeed issued under that registration statement and not another."  DeMaria v. Andersen, 318 F.3d 170, 176 (2d Cir. 2003)  Put simply, any individual who can show that his or her shares were issued under/registered to the allegedly defective registration statement--regardless of whether the shares were acquired directly from the issuer or in the aftermarket--has standing to pursue a section 11 claim.  "Tracing may be established either through proof of a direct chain of title from the original offering to the [plaintiff] . . .  or through proof that the [plaintiff] bought her shares in a market

containing only shares issued pursuant to the allegedly defective registration statement." In re IPO, 471 F.3d at 31 n.1 (alteration and ellipses in original) (quotation marks omitted).

Here, defendants argue that although SMART registered all shares with the SEC pursuant to the Registration Statement, any SMART shares purchased after the IPO cannot be "traced" back to a sale pursuant to the Registration Statement because: (1) all shares share the same CUSIP; and (2) some shares were sold in Canada pursuant to the Canadian prospectus. According to defendants, those two facts necessarily mean that failing to exclude post-IPO purchasers would inappropriately capture within the class U.S. purchasers whose shares were initially sold in Canada (not pursuant to the Registration Statement). As plaintiff puts it, defendants argue "that there must have been a continuous 'chain of custody' by U.S. purchasers of SMART shares in order to establish traceability [to the Registration Statement]." (Pl. Reply 13 (quoting Intel Opp'n 12).) Under this theory, the class should exclude all U.S. aftermarket purchasers.

As far as this Court is aware, defendants' argument is one of first impression. And, as discussed below, certain aspects of the argument are compelling. It is based upon an inarguably correct premise that traceability to a misleading registration statement is required prior to a showing that a putative class member was in fact damaged. However, this is the class certification stage, and the Court is unwilling to go as far as defendants suggest at this time.

21

Although determining traceability may require individualized inquiries, the potential for such inquiries alone does not defeat predominance.  The predominance inquiry requires this Court to analyze whether common questions regarding liability exceed those which are individualized.  See New Jersey Carpenters Health Fund, 477 F. App'x at 812; In re IndyMac, 2012 WL 3553083, at *5 (noting that the predominance inquiry "is directed primarily toward whether the issue of liability is common to members of the class").  Here, they do.  Liability will turn first and primarily on whether the Offering Documents contained misstatements and omissions as plaintiff alleges--an issue clearly subject to "generalized proof."  In re IndyMac, 2012 WL 3553083, at *8.  It is also true that for those class members who purchased in the secondary market, there will also be a question of whether their purchases can traced back to the Registration Statement.  However, the liability issue clearly predominates over individualized tracing inquiries.  See United Food & Commercial Workers Union v. Chesapeake Energy Corp., 281 F.R.D. 641, 656 (W.D. Okla. 2012) ("UFCWU") ("With respect to the impact of tracing on the predominance requirement of Rule 23(b)(3), the common question of whether the registration statement was materially  misleading predominates over any secondary tracing issues that might be encountered." (quotation marks omitted)).

Second, accepting this argument at this stage would require the Court to "assess an[ ] aspect of the merits unrelated to a Rule 23 requirement."  See In re IPO, 471 F.3d at 41; see also UFCWU, 281 F.R.D. at 656 ("[T]he issue of tracing is a merits issue, not appropriate for consideration at the class certification stage."

(quotation marks omitted)), id. at 657 (collecting cases).  Defendants' argument also would require the Court to assume that no aftermarket purchaser of SMART shares has "proof" of a "direct chain of title" from the IPO.  See In re IPO, 471 F.3d at 31 n.1.  But it is arguably possible that some putative class member who purchased in the secondary market indeed has "proof" of traceability.  For example, a stockbroker could have purchased a large block of SMART shares in the IPO and then sold those shares to two or three of his clients.  Thus, those investors may have access to evidence allowing them to trace their shares back to the IPO.  It is likewise possible that the same broker bought that same large block of SMART shares, sold them to a client, repurchased them from that client, and then brokered a subsequent sale to another client.[19]  The second client may also be able to produce evidence tracing his/her SMART shares back to the IPO through the stockbroker.  Thus, making an assumption now that an aftermarket purchaser cannot show traceability would be inappropriate.[20]  Such a conclusion would preemptively preclude class members, without providing an opportunity to develop the factual issues on which resolution

---

[19] The same hypothetical works even if the initial client was located in Canada and the second, in the U.S.

[20] That plaintiff's investment advisor's 30(b)(6) representative was unable, at his deposition, to state whether plaintiff's shares were first offered in the U.S. or Canada (Dep. Jonathan Ruch ("Ruch Tr.") 83:16-22, 8:23-84:4 (Decl. of Jonathan C. Dickey Supp. Def. Intel Corp.'s Opp'n Pl. Mot. Class Cert. Ex. 8, ECF 140-1)), and did not know whether there was a way to determine where plaintiff's shares were first  offered (Ruch Tr. 84:12-14) falls far short of the preponderance of the evidence needed to demonstrate that no secondary-market purchaser could prove traceability.  Indeed, one reading of the testimony is that plaintiff's investment advisor had not conducted an investigation or analysis on that point at the time of his deposition.  The Court will not preclude all secondary-marker purchasers on that scant evidence alone.

of the tracing question may turn.[21]  See In re Dynegy, Inc. Secs. Litig., 226 F.R.D.

263, 282 (S.D. Tex. 2005) ("Defendants' argument that aftermarket purchasers will

be unable to trace their purchases to the December 20, 2001, stock offering is an

argument best addressed after a factual record has been developed.").

Accordingly, the Court will not exclude all aftermarket purchasers from the

Section 11 class at this time.

IV.    CONCLUSION

For the aforementioned reasons, plaintiff's motion for class certification is

GRANTED to the extent that the Court finds class certification appropriate.

The Court certifies the following class:

"All persons or entities who purchased or otherwise acquired (and did not

sell) SMART common stock in the United States prior to November 10, 2010,

pursuant or traceable to the Offering Materials.  With respect to claims brought

under Section 12(a)(2), the class is limited to U.S. purchasers of SMART stock in the

---

[21] Allowing the development of those legal and factual issues during discovery will not render the Court's overseeing of this action unmanageable.  See Fed. R. Civ. P. 23(b)(3)(D); In re LILCO Secs. Litig., 111 F.R.D. 663, 671 (E.D.N.Y. 1983) ("With respect to the manageability issue [in Rule 23(b)(3)'s superiority prong], however, it is apparent that tracing will not pose insurmountable obstacles warranting denial of class status.").

July 14, 2010, initial public offering."

The Clerk of the Court is directed to terminate the motion at ECF No. 131.

SO ORDERED:

Dated: New York, New York
        January _11_, 2013

_____
KATHERINE B. FORREST
United States District Judge